IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

```
-----------------------------------
                                    :
                                    :
UNITED STATES OF AMERICA            :
                                    :
             Plaintiff              :
                                    :
          v.                        :  3:11-cr-00229-FAB
                                    :
ALEXIS D. NEGRON CRUZ(1)            :
                                    :
             Defendant              :
-----------------------------------
```

PRELIMINARY REVOCATION HEARING

Was held Before HONORABLE MARCOS E. LOPEZ, U.S. MAGISTRATE

JUDGE sitting in San Juan, Puerto Rico, on February 12, 2024

at 9:26 a.m.

1   APPEARANCES:

2

3   FOR THE GOVERNMENT:

4   JENIFER HERNANDEZ, AUSA

5

6   FOR DEFENDANT:

7   KEVIN LERMAN, AFPD

8   JOSEPH NISKAR, AFPD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE MAGISTRATE: Good morning.

2          MS. HERNANDEZ: Good morning, Your Honor.

3          MR. NISKAR: Good morning, Your Honor.

4          THE CLERK: You may be seated.

5          MR. NISKAR: We have a motion before we begin.

6          THE CLERK: Okay, but you don't have any

7     Ids?

8          MR. NISKAR: No, no.

9          THE MAGISTRATE: Counsel, I'm having some issues

10    with my computer that I can't connect with the system.  I'm

11    trying to get that fixed as quickly as possible.

12         MR. NISKAR: Yes, Your Honor.

13         THE MAGISTRATE: Let's go ahead and call the case.

14         THE CLERK: Criminal Case number 11-229, United

15    States of America versus Alexis D. Negron Cruz for

16    Preliminary Revocation Hearing.  On behalf of the government

17    is AUSA Jenifer Hernandez.  On behalf of the defendant is

18    AFPD Joseph Niskar and AFPD Kevin Lerman.  The defendant is

19    present in the courtroom, under custody and is being

20    assisted by a certified court interpreter.

21         THE MAGISTRATE: Good morning, Counsel.  I'm sorry

22    that we had some delay.  For some reason my computer was not

23    able to connect to the system but now it has been fixed.

24    So, let's proceed then.  How many witnesses -- I believe the

25    last time you said you had one or maybe two.

1          MS. HERNANDEZ: Yes, Your Honor, that's correct.

2          THE MAGISTRATE: Okay, all right.

3          MR. NISKAR: Your Honor, we have a motion to make

4    before the Court begins with the preliminary hearing.

5          THE MAGISTRATE: Yes, go ahead.

6          MR. NISKAR: Your Honor, at this time we are asking

7    the Court to not interfere with Judge Besosa's order

8    requiring the government to respond to our motion for a stay

9    of these proceedings.  As the Court is aware, a preliminary

10   revocation hearing was scheduled to begin last week.  I

11   believe it was February 7.

12       We had motioned the District Court Judge to which this

13   case is assigned, Judge Besosa, following that preliminary

14   revocation hearing for a motion for a stay of proceedings

15   and Judge Besosa has ordered the government to respond to

16   that by February, I think it's the 21st is the date he set

17   for response from the government.

18       I think it's important to note that our motion did not

19   just simply ask for a stay of the final revocation hearing.

20   We asked for a stay of the entire revocation proceeding.  He

21   stayed pending a decision or a resolution by the Circuit

22   Court of Appeals in this case regarding our motion to

23   prevent ex parte communications between the Probation

24   Officer and the Court.

25       Therefore, it's our belief that the District Court

1    Judge to which this case is assigned, Judge Besosa, has this

2    matter under consideration currently in that he has ordered

3    the government to respond and, therefore, we're asking that

4    the Court not force us to proceed with the preliminary

5    revocation hearing nor to interfere with the process that's

6    on appeal and we would ask that this matter be continued to

7    a date after the date for which the government has been

8    ordered to respond.

9        That motion was filed forthwith following after we left

10   the court on February 7th, we filed then two notice of

11   appeals with the Circuit Court regarding the Pre-Trial

12   detention of Mr. Negron Cruz as well as appealing the motion

13   for reconsideration as well.

14       We continue to object to defendant's Pre-Trial

15   detention as well.  We don't believe that this Court would

16   have authority at this time even if we held a preliminary

17   hearing.  As the Court noted, the Court was willing to

18   listen to other arguments following the completion of the

19   preliminary revocation hearing regarding conditions of

20   release for Mr. Negron Cruz but since this matter is now on

21   appeal, I think that that matter would also be out of your

22   hands as well.

23           THE MAGISTRATE: Well, you wish to address any of

24   these arguments?

25           MS. HERNANDEZ: Yes, Your Honor.  I understand that

6

1    the order of the District Court indicated the last order

2    issue that the preliminary hearing would be held today.  As

3    to the motion to stay and their request for ex parte

4    communications which is the issue that form our point of

5    view is not even right, nonetheless they've continued to

6    file motions in that regard and they did file a notice of

7    appeal that relates more to the final revocation hearing and

8    not to the preliminary hearing because at this stage there

9    has been no ex parte communications between the Probation

10   Office and the Magistrate Court.

11       Also going into the bail request, they continue to

12   indicate that there has been no proper procedure followed

13   and there's a probable cause determination that is pending

14   and that is why we are here today for the preliminary

15   hearing, so that the first stage, which is probable cause

16   relating to the motion, can be determined by the Court and

17   at that time we have that portion of the revocation hearing.

18       So, we are ready to proceed.  Our witnesses are here.

19   We were ready to proceed in the last Court scheduling of

20   this hearing and at this time we would request to proceed

21   with the preliminary hearing as was indicated by the

22   District Court.

23           THE MAGISTRATE: Yeah, yeah.  I agree in part and

24   disagree in part with the arguments raised by the defense.

25   As to the matter of conditions of release, I do concur with

1    what the defense has stated.  I did express my openness that

2    once the preliminary revocation hearing was held, if the

3    defense wanted to either request a reconsideration or bring

4    additional arguments to my attention, that I would be

5    willing to address, to at least listen and evaluate those.

6        However, since then, the defense has filed a notice of

7    appeal regarding the detention.  So, I believe that as to

8    that matter, because there is an appeal pending, there is --

9    the matter is not within my jurisdiction anymore.

10       So, of course, the defense has the right to proceed in

11   either way.  I mean, if the defense does not wish, they

12   could have opted not to file a notice of appeal detention

13   order and request a reconsideration after this hearing was

14   over.  The defense chose not to and that's their right.

15       If they want to appeal, they can appeal.  So, as to the

16   matter of detention, I believe that that matter is right now

17   pending before Honorable Judge Besosa.  In fact, I believe

18   that there is an order from the Court of Appeals that was

19   entered, it looks like today on the docket.

20       Basically directing the District Court to promptly

21   adjudicate defendant's appeal from the Magistrate Judge for

22   returning to interim for order of detention.

23       So, as to the points raised by the defense regarding

24   the matter of detention, I agree that at this moment

25   procedurally it is because the defendant voluntarily chose

8

1  to file a notice of appeal, the matter of detention.  That

2  matter right now is before the attention of Judge Besosa and

3  not before me.  So, as to that part, I agree.

4      As to the matter of the preliminary revocation hearing,

5  I will not postpone the preliminary revocation hearing.  We

6  will proceed with the preliminary revocation hearing today.

7  I do not believe that we're interfering with Judge Besosa's

8  order.

9      He is aware that this preliminary revocation hearing is

10  scheduled for today.  Had he wanted to stay this preliminary

11  revocation hearing, he could have explicitly said so in his

12  sound discretion.  He chose not to, not to make any

13  expression as to that particular matter.

14      So, for those reasons, we will proceed today with the

15  preliminary revocation hearing.  So, for those reasons I

16  agree in part and disagree in part with the arguments made

17  by the defense.  So –

18          MR. NISKAR: Your Honor, we would ask for a short

19  continuance so we can appeal this decision of the Court as

20  well, the refusal of the stay.

21          THE MAGISTRATE: Denied.

22          MR. NISKAR: Okay.

23          THE MAGISTRATE: You may call your first witness.

24          MR. NISKAR: Before we begin, may I also ask the

25  Court to make a record of something into support what Ms.

1    Hernandez stated.  She seems to have information that the

2    Court has had no ex parte communications with the Probation

3    Officer.

4        I don't know how Ms. Hernandez knows that but may we

5    ask the Court whether the Court, Your Honor in particular,

6    has had any ex parte communications with Mr. Lozada since

7    the filing of the informative motion in this case regarding

8    the allegations that are contained in the motion.

9            THE MAGISTRATE: I can tell you categorically and

10   without hesitation, absolutely not.  Not only I have not had

11   any conversations with Officer Lozada ex parte about this

12   case.  I have also not had any conversations with AUSA

13   Hernandez ex parte about this case.

14           MR. NISKAR: Okay, so I don't know how Ms.

15   Hernandez knew that but she seemed to have that information

16   then.  So, we wanted --

17           MS. HERNANDEZ: We don't like the implications.  We

18   are aware of how the system works relating to the

19   preliminary hearings when there is a probable cause

20   determination.  Generally Magistrates have no communications

21   relating to that probable cause determination and that is

22   the point where we're at.

23           THE MAGISTRATE: Well in any event, regardless,

24   regardless --

25           MR. NISKAR: Thank you, Your Honor.

1        THE MAGISTRATE: Regardless.  Just to be and again

2    I want to be categorical about this.  I think I have been

3    crystal clear.  I have not, since we had the hearing, when

4    was it last week, I believe.  Let me try to check here in

5    the calendar when is it that we met last time.  I think that

6    we met last time I believe on the 7th of February.

7        I have not had any conversation whatsoever about this

8    case with AUSA Hernandez or with Officer Lozada.

9        MR. NISKAR: Since the filing of the informative

10    motion by the Probation, not just since February 7.

11        THE MAGISTRATE: Since the filing of that motion

12    and also including also the -- but, yes, since the filing of

13    the motion.

14        MR. NISKAR: Okay, thank you.

15        THE MAGISTRATE: Let me put it to you this way.

16    Since I came into this case for the very first time for this

17    revocation proceeding is what I mean.  When I was brought

18    into this case for the very first time for these revocation

19    proceedings, since then I have not had any conversation with

20    AUSA Hernandez or with Officer Lozada about this case.

21        MR. LERMAN: Judge Lopez, if I may respectfully,

22    just because I represent Mr. Negron Cruz on the Appellate

23    cases as well, and we need to make our record crystal clear

24    regarding the issue with the Court's decision to proceed

25    notwithstanding the pending emergency request to stay these

1    proceedings and I'd like to just make three points for the

2    record.

3        The first is, there's no right of action for the

4    government that would justify the government insisting to

5    proceed over objection with this preliminary hearing.  The

6    right to a prompt hearing under Morrissey, under Canon,

7    under Rule 32.1, those are rights held exclusively by the

8    accused, exclusively.

9        The government has not stated any basis for forcing the

10   hearing to go forward, for insisting.  The government stated

11   basis appears to be because the government is ready.  Second

12   and relatedly, the government hasn't stated any basis on the

13   merits to oppose the stay.

14       So, the government has been ordered to respond.  The

15   government hasn't provided a response to our initial motion

16   to preclude ex parte communication.  The government hasn't

17   opposed these on the merits.  One of the things that we

18   wrote to the Circuit in the emergency request release this

19   weekend is that the U.S. Attorney also has concerns about

20   local Rule 132.1 which prohibits officers like Mr. Lozada

21   from disclosing any of his ex parte communication.

22       So that puts Officer Lozada in a position where he

23   would be in contempt of court if he even disclosed the

24   nature of any ex parte communication.  So, that deals with

25   the issue here.

1      Our issue is not -- we're not alleging in any of our

2   pleadings, we're not alleging misconduct by any individual

3   person.  There's a problem with the process.  Again, as we

4   indicated to the First Circuit, there's a problem with the

5   process where there's a practice that allows a fact witness

6   and I'd like to repeat our objection, who's been allowed to

7   listen to all of these proceedings and has continued to file

8   -- I'm sorry, has filed an unsworn response to one of our

9   motions with factual allegations.

10      The combination of these factors makes it so there's no

11   possibility that a fair process can proceed and so the

12   moment this Court initiates the preliminary hearing, it has

13   one, interfered at the government's request, we understand.

14   Interfered with the same application that's under

15   consideration, the emergency stay application which we filed

16   and we greatly appreciate the Court's quick turnaround on

17   this continuance and the Court's response to our motion that

18   we do object, that we lodged on February 7th; that we object

19   to a continuance without a date, an indefinite continuance,

20   but we don't understand why a stay motion that is filed

21   emergency that has to be adjudicated promptly has not only

22   not been adjudicated but hasn't been responded to by the

23   government.

24      So, in a sense, there's an unopposed motion to stay

25   these proceedings pending and the overriding of those

1  proceedings by allowing the government to proceed with

2  actions that it has no right.

3      All of the actions are as a matter of right, are rights

4  that are held by Mr. Negron.  So, if this Court continues

5  this proceeding, we have a due date for the response to the

6  stay which is this month.  It should be earlier and as Mr.

7  Niskar objected, we objected to continued incarceration but

8  the Court is wishing to hold the preliminary hearing that

9  will have no bearing on its detention consideration.

10      So, that makes it doubly wrong to proceed as if the

11  government is an ordinary party and this is somehow some

12  sort of, you know, two parties on equal footing like it's a

13  civil case, and they have a right to go forward and they

14  have a right to go forward with a preliminary hearing which

15  the Supreme Court put in place to prevent prolonged

16  detention.

17      So, that's to vindicate a right.  So, there's a process

18  to vindicate a right.  It doesn't vindicate anything to

19  proceed and no one, no one will be harmed.  The government

20  has not alleged any harm or responded to our position that

21  Mr. Negron would be irreparably harmed if the proceedings

22  continue with the current process in place and so, we do

23  lodge those and in fact if I would "atreverme", if I would

24  ask the Court to reconsider the decision to proceed based on

25  these objections.

1          THE MAGISTRATE: Your objections are duly noted for

2    the record.  We will proceed with the preliminary revocation

3    hearing.  You may call your first witness.

4          MS. HERNANDEZ: Yes, Your Honor.

5          THE MAGISTRATE: The objection is overruled.

6    Again, if either the -- I cannot speak.  I cannot speak for

7    the Circuit.  I cannot speak for Honorable Judge Besosa but

8    the record is clear in terms of when the preliminary

9    revocation hearing is scheduled to be held.

10        I have not seen an order staying the proceedings as of

11    today from either the Circuit or from Honorable Judge

12    Besosa.  So, respectfully the objections are overruled and

13    we'll proceed.  Who is your first witness?

14          MS. HERNANDEZ: Yes, Your Honor.  The United States

15    will call to the stand Probation Officer Jose Lozada.

16          THE MAGISTRATE: Very well.

17          MS. HERNANDEZ: Your Honor, since we are calling

18    this witness to the stand, we also want to make the record

19    clear that after the last hearing we did inform defense

20    counsel that we understood that there were some cronos that

21    the Probation Officer had prepared for the Court or as part

22    of the documentation relating to their own records and that

23    they would have to file a motion as the procedure to obtain

24    those cronos to obtain a court order relating to those.

25     They were so informed.  So before the witness takes the

1   stand, that would be the only, I understand, written product

2   other than the motion that was filed that was prepared by

3   the witness.  So, we want to make that clear on the record.

4           THE MAGISTRATE: Do you have an objection that the

5   defense see the cronos?

6           MS. HERNANDEZ: If the defense makes the request

7   and the Court orders, we have not -- we don't have an

8   objection.  We just wanted to indicate what the procedure is

9   in relation to obtaining cronos.

10          MR. NISKAR: Your Honor, there's a separate

11  procedure for obtaining cronos that has to do Jencks and

12  we've made a previous request for Jencks.

13      We were notified by the government that they would be

14  providing us Jencks of their witnesses.  To date we have not

15  received any Jencks.  We haven't seen those statements.

16          THE MAGISTRATE: So, can I understand that the

17  cronos will be the only Jencks?

18          MS. HERNANDEZ: Yes, Your Honor.

19          THE MAGISTRATE: Okay.

20          MS. HERNANDEZ: The motions that are already on the

21  record that the witness prepared.

22          MR. NISKAR: Then we would ask for a continuance

23  after the direct examination of Mr. Lozada to review the

24  cronos and prepare cross examination.

25          THE MAGISTRATE: How lengthy are these?

1          MR. LOZADA: I'm sorry?

2          THE MAGISTRATE: How lengthy are these?

3          MR. LOZADA: There are three cronos.

4          THE MAGISTRATE: Yes, but it has three pages?

5          MR. LOZADA: Yes.

6          THE MAGISTRATE: Three pages, okay.  Well, then

7    here is what we're going to do.  Since there's no objection

8    from the government before he starts right now, I'll wait

9    right here.  Look at it -- you know, I don't appreciate when

10   I'm talking that you folks are talking to each other.  Okay,

11   I would appreciate it if you pay attention.

12          MR. NISKAR: We are, Your Honor.  We are listening.

13   We are paying attention.

14          THE MAGISTRATE: Yes, well, if you're talking to

15   each other, you're not listening to me.  So, please provide

16   the three pages right now.  I'll wait right here.  Please

17   examine them right now so that they can have access to that

18   right now and that way we don't have to delay the

19   proceedings any further.  Take a moment.  I'll wait right

20   here.

21          MR. NISKAR: Your Honor, we're going to need about

22   fifteen minutes to review these cronos.

23          THE MAGISTRATE: I'll wait right here.

24          MR. NISKAR: Thank you.  Okay, thank you, Your

25   Honor, we're ready.

1          THE MAGISTRATE: Okay, all right, let the record

2    reflect that Officer Lozada provided copies of the cronos to

3    defense counsel and they have been given an opportunity to

4    examine those documents.  So, AUSA Hernandez, I believe you

5    had called Officer Lozada to the stand.

6          MS. HERNANDEZ: Yes, Your Honor.

7          THE MAGISTRATE: Let's place the witness under

8    oath.

9               (The witness was duly sworn)

10         THE MAGISTRATE: Let's have a seat.  Sir, if you

11   could please have the microphone closer towards you so that

12   that way we can hear you better.  Your witness for direct

13   examination.

14   Whereupon,

15                    JOSE LOZADA

16   was called as a witness and after having been first duly

17   sworn, was examined and testified as follows:

18                 DIRECT EXAMINATION

19   BY MS. HERNANDEZ:

20   Q    May you please state your full name for the record.

21   A    Jose Lozada.

22   Q    How are you currently employed?

23   A    I'm currently employed by the United States Probation

24   Office.

25   Q    In what position?

1    A    As a U.S. Probation Officer.

2    Q    Since when have you been working with the United States

3    Probation Office?

4    A    Ten years approximately.

5    Q    In what Probation Office do you work?

6    A    The District of Puerto Rico.

7    Q    What are your duties and obligations in that position?

8    A    As a Probation Officer my main duties are to supervise

9    persons under supervision and seek them guidance, assistance

10   to re-entry into the community after incarceration, notify

11   any violations of supervision conditions to the Court.

12   Q    Currently in what group within Probation Office do you

13   work?

14   A    I work in the Supervision Division.

15   Q    The Supervision Division relating to defendants who are

16   at what stage?

17   A    The specific unit that I work in supervision are

18   persons that are convicted and were released from

19   imprisonment after a sentence and are on supervised release

20   term.

21   Q    As part of your current duties and obligations, do you

22   supervise an individual by the name of Alexis Negron Cruz?

23   A    That is correct.

24   Q    Do you see that person in this courtroom here today?

25   A    Yes.

1  Q    Can you please signal the person and indicate an item

2  of clothing.

3  A    Yes, he's sitting in the defense attorney to my right

4  wearing a khaki jumpsuit.

5  Q    Can you point to that person?

6  A    Yes.

7         MS. HERNANDEZ: Let the record reflect that the

8  defendant has been identified by the Probation Officer.

9         THE MAGISTRATE: The record shall so reflect.

10 BY MS. HERNANDEZ:

11 Q    Now, since when do you supervise Alexis Negron Cruz?

12 A    November 9, 2023.

13 Q    Prior to November 9, 2023, had you supervised Alexis

14 Negron before?

15 A    No.

16 Q    What is the offense of conviction for Alexis Negron

17 Cruz?

18 A    Possession of child pornography.

19 Q    What was the last judgement or sentence imposed

20 relating to Jose Lozada?

21 A    I'm sorry?

22 Q    What was the last judgement or sentence imposed upon

23 Jose Lozada for which you enter into his supervision?

24 A    My supervision was based on a prior revocation.

25         MS. HERNANDEZ: Your Honor, we would file.  We

1    request that the Court take notice of the last judgement

2    issued on November 9, 2023 which is docket 429 of this

3    criminal case docket.

4            THE MAGISTRATE: Just give me a moment.  I'm going

5    to docket 429 at this moment.  Just give me a second.

6            MS. HERNANDEZ: To clarify, we're saying the

7    supervision of Alexis Negron Cruz, the judgement relating to

8    him.

9            THE MAGISTRATE: I do take notice of the judgement

10   on revocation that appears in docket 429.

11   BY MS. HERNANDEZ:

12   Q    Now, when you entered into supervision which you

13   indicated was November 9, 2023, where was Alexis Negron Cruz

14   residing?

15   A    After he was revoked, his last revocation, the

16   defendant was homeless and he was placed in Guarabi in

17   Caguas.  It's a temporary transitional home that the United

18   States Probation Office pays for persons that are homeless

19   for a short term of period.

20   Q    Okay, and calling your attention to November 15, 2023,

21   what happened that day?

22   A    That day I went with my field partner to go visit Mr.

23   Alexis Negron and at that time when we were about to enter

24   his room, he was alone there.  He was in his room and we

25   approached to do what we call a home inspection.  It's just

1    a brief home inspection of where he resides.

2        So, after doing the home inspection, I noticed a little

3    black box similar to an internet hot spot in which he was

4    confronted about that.  He admitted that he was having

5    internet access through that hot spot and that hot spot

6    would supply internet to his T.V. and his Xbox cable

7    console.  So after that --

8            THE MAGISTRATE: I'm sorry, Officer.  Could you

9    repeat what you just said.  He had access to the T.V. and to

10   what, did you say?

11           THE WITNESS: To a gaming console, an Xbox.

12           THE MAGISTRATE: You may proceed.

13           THE WITNESS: After that we start the case with

14   Supervisor Orlando Rullan, based on plain view hunter bag,

15   that is the hot spot, to activate the search condition that

16   Mr. Negron Cruz has under his revocation judgement.

17       As we -- well it was reasonable suspicious that a

18   violation was committed by Mr. Negron Cruz.

19   BY MS. HERNANDEZ:

20   Q    Which violation would this be?

21   A    Possession of internet access or a device that was

22   capable to connect to the internet.

23   Q    Is that special condition 32?

24   A    That's correct.

25           MS. HERNANDEZ: And for purposes of the record,

22

1    since the Court has taken notice of the judgement, the

2    special condition number 32 is, "he shall not possess or use

3    a computer, cellular telephone or any other device with

4    internet accessing capability at any time and place other

5    than those with systems that will enable the Probation

6    Officer or his or her designee to monitor and filter any

7    internet accessing."

8              THE MAGISTRATE: Where are you reading from?

9              MS. HERNANDEZ: That is special condition number 32

10   relating to the judgement of conviction, Your Honor.

11             THE MAGISTRATE: Okay.  See but I think precision

12   matters.  Are you referring to the original underlying

13   conviction or are you referring to the judgement of

14   revocation?  Where are you reading from?  Which of the two

15   judgements are you reading from?

16             MS. HERNANDEZ: Yes, Your Honor.  It is special

17   condition number 2 that would be applicable to the original

18   judgement and to the last judgement that was imposed because

19   the special conditions throughout the judgements have

20   remained the same.

21        In particular, that condition is also indicated in

22   document 439, which is the motion that was filed by the

23   Probation Office and is part of the docket.

24             THE MAGISTRATE: Hold on, hold on.  I want to see

25   special condition – did you say 2 or 32?

1              MS. HERNANDEZ: Special condition number 32.

2              THE MAGISTRATE: 32, okay.  So, you may proceed.

3      BY MS. HERNANDEZ:

4      Q    Now, you indicated that day that you were accompanied

5      by a another field officer, is that correct?

6      A    It is correct.

7      Q    Who is that?

8      A    Officer Coralis Guzman.

9      Q    Did she arrive with you to this home visit?

10     A    Yes.

11     Q    Okay and you may continue indicating what you observed

12     and how you proceeded to search.

13     A    So, after we start with our supervisor, Orlando Rullan,

14     he started with senior management and it was determined that

15     reasonable suspicious was -- it was reasonable suspicious

16     enough to activate the search condition.

17            So, I asked Mr. Negron Cruz to step out of his room for

18     safety purposes and in order to activate the conditions and

19     at the beginning he refused to do so but after explaining to

20     him the condition, he stated that "you cannot search the

21     room, only plain view", and I explained to him that the

22     search condition was going to be activated that is on his

23     judgement and the same we can search more than just simple

24     plain view.

25     Q    At that point in time what was the attitude of Alexis

1    Negron?

2    A    He was very defiant.  He stated on multiple occasions

3    that he does not agree with the conditions of supervision.

4    I tried to do what we call a role clarification; that we

5    clarify roles as to this particular supervision but he was

6    not able to -- he didn't want to --

7           MR. LERMAN: Objection, Your Honor.  Objection.

8    It's speculation about what he was able to do or wanted to

9    do and we also object the officer appears to be transmitting

10   uncertified translations.  It haven't been vetted and we

11   have information and belief that at least some of these

12   alleged statements in what has been turned over aren't

13   accurate and the misleading translations.

14          THE MAGISTRATE: Well, sustained in part and

15   overruled in part.  As to the latter, regarding the

16   statements, I think that's fair grounds for cross

17   examination.

18       As to the former, I'm going to sustain your

19   objection because statements like, "well, he did not want

20   to", well, AUSA Hernandez, you would need to lay the

21   foundation for that.  I mean, where is this based from?  Was

22   it a statement made or was this something else?  In other

23   words, he's not here to give interpretations but rather to

24   testify about facts.

25       So, you can cover this area in your direct examination

1    but you have to lay the foundation.  You know, you cannot

2    just simply jump to a conclusion that the defendant did not

3    want to do X, Y, Z.

4         MS. HERNANDEZ: I understood that he was explaining

5    his interaction directly with the defendant and the --

6         THE MAGISTRATE: Well, but I think that the defense

7    has raised a fair, a fair objection in that regard.  I think

8    just lay the foundation in terms of what did this officer

9    said and what was said to him and then the parties are free

10   to argue to the Court any reasonable inferences that can be

11   drawn.

12        So, again you're not precluded from covering this area

13   in your examination but you do need to lay the foundation

14   for the statements that he's making.  Go ahead.

15   BY MS. HERNANDEZ:

16   Q    Officer Lozada, if you can explain the interaction that

17   you particularly had with Alexis Negron, at the moment and

18   time when you were going to commence the search.

19   A    He initially didn't want me to search the room and he

20   stated that only plain view search was the only way to do

21   it.  I explained to him the conditions of the search and

22   asked him to step away from the room or outside the room.

23   Q    What happened at that moment?

24   A    Initially he didn't want to step outside the room --

25        MR. LERMAN: Same objection, Your Honor.

1           THE MAGISTRATE: Rephrase.

2           THE WITNESS: He initially refused to step outside

3   the room and after explaining the search condition, he

4   complied and stepped outside the room.

5   BY MS. HERNANDEZ:

6   Q    When you say that he refused, what led you to

7   understand he was refusing?

8   A    I'm sorry?

9   Q    When you say he refused to step out of the room, why

10  do you say this?

11  A    Because he said, "I'm not going to step outside the

12  room."

13  Q    So, was there actually a verbal communication in

14  relating to his refusal to step out of the room?

15  A    Yes.

16  Q    What happened next?

17  A    After he stepped outside the room with Officer Guzman,

18  before commencing the search, I asked him if he had a cell

19  phone device or another electronic device before commencing

20  the search in which he admitted that he had a smartphone

21  device hidden in a blue laundry basket.

22          MR. LERMAN: Objection, Your Honor.  Objection.

23  It's the expression of a legal opinion to describe something

24  that somebody admitting something and this is not the

25  communication of something that was seen or heard.  It's

1    beyond fact witness testimony.

2            THE MAGISTRATE: Overruled.  You may proceed.

3    BY MS. HERNANDEZ:

4    Q    What did you proceed to do?

5    A    So, I proceeded to search the room, especially after he

6    stated that there was a smartphone in said area.  I said,

7    "search that blue laundry basket" and there was a smartphone

8    device there.

9    Q    When you say a smartphone, what are you referring to?

10   A    So a smartphone device with access to the internet.

11           MR. LERMAN: Objection, Your Honor, foundation.

12   BY MS. HERNANDEZ:

13   Q    Why do you call it –

14           THE MAGISTRATE: Well, he was defining what does he

15   mean by the term smartphone.  So, if you wish to cross

16   examine him on that particular definition, you may do so.

17   You may proceed.

18   BY MS. HERNANDEZ:

19   Q    When you mentioned the word smartphone, did there

20   come a time where you actually seized the phone?

21   A    Yes.

22   Q    What type of phone was it?

23   A    It was an Android smartphone and I checked the same

24   and it had access to the internet.

25   Q    Now –

1          MR. LERMAN: Same objection, Your Honor, lack of

2    foundation.

3          THE MAGISTRATE: Overruled.

4    BY MS. HERNANDEZ:

5    Q    I am showing you what has been marked as Government's

6    Identification 1 through 9.  If we may approach, Your Honor.

7          THE MAGISTRATE: You may.  Now, do you want to hand

8    only Id-1 or are you handing Id-1 through 9?

9          MS. HERNANDEZ: We're handing Identifications 1

10   through 9.

11          THE MAGISTRATE: You may approach the witness.

12          MR. LERMAN: Objection, Your Honor, foundation.

13          THE MAGISTRATE: Well but they're not admitted yet

14   into evidence.  They're Ids.  So, I will allow the witness

15   to examine Ids 1 through 9.  Of course, if the defense and

16   the government wish to use the document projector at some

17   point, you're free to use it.  But if you prefer to do it

18   the traditional way, that's fine, too, whichever way you

19   prefer.

20          Let the record reflect that the witness has been handed

21   Id number 1 through Id number 9.

22   BY MS. HERNANDEZ:

23   Q    Have you had an opportunity to examine them?  Do you

24   recognize them?

25   A    Yes.

1    Q    What do you recognize them to be?

2    A    I took those pictures.  I recognize that those pictures

3    were taken in Mr. Negron Cruz' room at Carib Guarabi.

4    Q    On what day?

5    A    On November 15, 2023.

6    Q    Are they an accurate depiction of what you observed

7    and took pictures of that day?

8    A    Yes, I observed what I see in the pictures.  It's the

9    little black box capable --

10   Q    Without entering into the contents of the same.

11   A    Oh, yes.

12        MS. HERNANDEZ: Your Honor, at this time we would

13   request that Identifications 1 through 9 be marked as

14   Government's Exhibits.

15        THE MAGISTRATE: Is there any objection to their

16   admissibility?

17        MR. LERMAN: Your Honor, we don't have any

18   indication to confirm whether those were actually -- that

19   those are depicted as they were taken.  We would note that

20   each one of those pictures has a white sort of rim around it

21   where it appears that whatever actual original photos were

22   taken were copy and pasted into some other document format.

23        So, we don't have a date when those were taken and

24   there's an allegation that this search was pursuant to a

25   reasonable suspicion.  So we don't have -- the Court is not

1    going to have any way to confirm the order in which those

2    were taken or to confirm whether the pictures were actually

3    modified since they were actually taken on whatever device.

4         We don't know what device they were taken on and we

5    don't know what processing they went through after.

6    Ordinarily that wouldn't be an issue.  You're just taking a

7    picture of some stuff in a hamper.  We understand it

8    shouldn't be a big issue but given the timing and a lot of

9    the very subjective nature of the allegations here, we do

10   object until we can be -- unless the government has some

11   more information about these, the actual photos that were

12   taken, not whatever has been printed onto some other file

13   type.

14             THE MAGISTRATE: The objection is overruled except

15   for one point.  You are raising an objection that as to

16   whether they have been modified or altered in any way.  So,

17   all the other arguments, the objection is overruled but as

18   to that particular specific objection, AUSA Hernandez,

19   please advise the witness as to that particular objection.

20   BY MS. HERNANDEZ:

21   Q    Officer Lozada, how did you take these pictures?

22   A    With my cell phone.

23   Q    Okay and did you have an electronic copy of those

24   images?

25   A    I have them on my cell phone and I sent them through

1    e-mail, to my e-mail.

2    Q    Those that you have before you, are they an exact copy

3    of the images that you printed?

4    A    Yes, they are.

5    Q    Have they been modified or altered in any way, shape

6    or form?

7    A    No.

8         MR. LERMAN: Objection, Your Honor.  He doesn't

9    have the foundation -- there's no foundation laid for him to

10   make that determination of whether they're the same thing.

11   He may have used programs that modified them and that

12   foundation hasn't been laid.

13        THE MAGISTRATE: The objection is overruled.

14   They're admitted into evidence as Exhibits 1 through 9.

15                        (Government's Exhibits 1 through 9

16                         admitted into evidence)

17        MS. HERNANDEZ: May we publish, Your Honor?

18        THE MAGISTRATE: Yes, you may.  Now, if you don't

19   mind -- if they don't have -- if they haven't been labeled

20   yet as with the Exhibit stickers, they might have Id

21   stickers but exhibit stickers, if they don't have them,

22   please approach for a moment to the lower bench so that the

23   Courtroom Deputy Clerk can place the exhibit labels on them.

24   BY MS. HERNANDEZ:

25   Q    I'm showing you what has been marked as Government's

1  Exhibit 1.  Can you explain and describe what we see here.

2  A    It's a little black box.  It's the hot spot that

3  provides internet to other devices.

4  Q    Where was this located?

5  A    Inside the defendant's room in Guarabi.

6  Q    Looking at Government's Exhibit 2.

7  A    It's a the same hot spot with a different picture

8  taken.

9  Q    What is underneath the same?

10 A    There's a battery charger for the Xbox gaming console.

11 Q    Was this connected?

12 A    Yes.

13 Q    Government Exhibit number 3.

14 A    Yes, the same.  It has a battery charger and a charging

15 docking station for the Xbox gaming console controls.

16 Q    Government's Exhibit number 4.

17 A    A cell phone charger cable.

18 Q    Can you circle what you're identifying.

19 A    A black cell phone charging cable.

20 Q    Was that charging cable compatible with any of the

21 other items that were seized?

22 A    Yes.

23 Q    With which one?

24 A    With the cell phone smartphones that it was seized

25 that day.

1   Q    Okay.

2        THE MAGISTRATE: I'm sorry.  What was that cable?

3        THE WITNESS: Cell phone charger cable.

4        THE MAGISTRATE: You may proceed.

5   BY MR. HERNANDEZ:

6   Q    Government Exhibit number 5.

7   A    That's the blue laundry basket that the cell phone was

8   inside.

9   Q    Where is that located within the room?

10  A    Can I circle?

11  Q    Yes.  In what location is that within the room?  What

12  part of the room is this?

13  A    It's a small room, so it's right to the left when you

14  enter the room in this corner.

15  Q    Can you describe what's above it.

16  A    It's a small closet.

17  Q    Looking at Government's Exhibit number 6.

18  A    That's the blue laundry basket and inside is the seized

19  smartphone.

20  Q    Can you circle.  Government's Exhibit number 7.

21  A    Those is a tablet.  After reviewing that tablet, the

22  same is not capable to connect to the internet as it's owned

23  by the Bureau of Prisons.

24  Q    Government's Exhibit number 8.

25  A    The same tablet, just a picture of the back of the

1  tablet.

2  Q    So, we have also here Government's Exhibit number 9.

3  What is this?

4  A    It's a small basket and inside it has the cell phone,

5  the smartphone cell phone box.

6  Q    Can you circle.

7       MR. LERMAN: Objection, Your Honor, relevance for

8  that photo.

9       THE MAGISTRATE: Well, overruled.

10  BY MS. HERNANDEZ:

11  Q    Where was the location of this box?

12  A    It was on the bottom of the blue laundry basket.

13  Q    What were those items that you just circled?

14  A    Smartphone, cell phone's boxes.

15  Q    Now, going back to Government's Exhibit 5.  Can you

16  indicate the correlation between the box that we saw in 9

17  and the location here in Government Exhibit 5.  Now, the

18  smartphone that you identified found and depicted in

19  Government's Exhibit 6, does that correlate to any of the

20  two boxes that were found that you mentioned in Government

21  Exhibit 9?

22  A    I do not recall that.

23  Q    What type of phone was the one in Government's Exhibit

24  6 that was seized?

25  A    It was an Android smartphone.

1  Q    Did you provide a specific description within the

2  motion notifying violations?

3  A    I do not recall right now.  I would have to review my

4  motion.

5  Q    Would reviewing the motion that you filed refresh your

6  recollection?

7  A    Yes.

8        MS. HERNANDEZ: Your Honor, may we approach?

9        THE MAGISTRATE: Yes, for refreshing recollection

10 purposes, yes.

11        MS. HERNANDEZ: For purposes of the record, it's

12 docket 439.  It's part of the court record.

13        THE MAGISTRATE: You may approach the witness.

14        THE WITNESS: It's a black Android VLU.  That's the

15 model.

16 BY MS. HERNANDEZ:

17 Q    Was it with the corresponding charger?

18 A    Yes, it was.

19 Q    What other items did you seize that day?

20 A    The hot spot and the tablets.

21 Q    Now, for purposes of this hearing, do you adopt the

22 statements that you made in that motion at docket 439?

23 A    Yes.

24        MR. LERMAN: Objection, Your Honor.  We object to

25 -- we don't know where the government is headed with this

1    but what's listed in docket entry 439, the Probation Officer

2    has already filed something with the Court stating that

3    these allegations are based on what other individuals have

4    said.

5         If there is an attempt to use this document, the

6    document is unsworn.  If there's any attempt to use this

7    related to as proof of any of the allegations 1 through 6,

8    we would object and there's multiple layers of hearsay that

9    would violate Mr. Negron's right under Rule 32.1 to confront

10   and cross examine adverse witnesses against him.

11        THE MAGISTRATE: I will sustain the objection but

12   AUSA Hernandez, you are free to continue your direct

13   examination to cover additional topics.

14        MS. HERNANDEZ: Yes, we are, Your Honor.

15        THE MAGISTRATE: Related to that motion.

16        MS. HERNANDEZ: And if we may briefly respond?  We

17   want to clarify that this is the preliminary hearing of the

18   revocation proceedings, so that it is not subject to the

19   same as, for example, when we proceed with a criminal

20   prosecution in trial.

21        The witness can adopt statements that were made in the

22   past.  This motion in particular, the Court can take notice

23   of because it's in docket 439 and part of the record of the

24   same and the defense will have an opportunity to cross

25   examine this witness in this proceeding, both for the

1    statement made here and in relation to the motion that was

2    filed notifying the supervision.

3            THE MAGISTRATE: Well, there's several things

4    there.  First, there's an element of discretion.

5            MS. HERNANDEZ: Yes, Your Honor.

6            THE MAGISTRATE: And the Court can decide whether

7    to allow the witness to adopt it or not and I can choose to

8    exercise my discretion the way that I believe that fits best

9    the particular circumstances of the case.

10           MS. HERNANDEZ: Yes, Your Honor.

11           THE MAGISTRATE: The second one is as to can I take

12   judicial notice of what has been filed?  Well, of course I

13   can take judicial notice of what are the allegations made

14   but I'm here to make an assessment as to whether there is

15   probable cause and I believe that it's fair to allow in this

16   particular case for the witness to testify as to any

17   particular matters that pertain to those allegations

18   notified.

19           So, can I take notice of what has been alleged?  Sure,

20   in exactly the same way that I can take notice of what are

21   the charges in an indictment but that is not the same thing

22   as meaning that I'm going to allow necessarily the witness

23   for purpose of his testimony today to adopt the contents of

24   the motion.

25           So, having said that, having said that, since I have

1   sustained the objection, you're free to continue with your

2   direct examination as to any other matters that you wish to

3   ask this witness.

4          MS. HERNANDEZ: Yes, Your Honor.

5   BY MS. HERNANDEZ:

6   Q    Now, once the search was completed, what was the

7   interaction, if any, with the defendant, Alexis Negron?

8   A    I explained the procedure in terms of after seizing the

9   smartphone, we talked about that the same was a violation of

10  his supervision condition.  He did not agree that the same

11  was a violation.

12         MR. LERMAN: Objection, Your Honor, the same as

13  previously.  It's speculation about what happened in the

14  mind state of someone else.

15         THE MAGISTRATE: Well, I will allow for the

16  prosecutor to do follow up questions to lay the foundation.

17  So, for example, Officer, when you say that he did not

18  agree, where are you getting that from?

19         THE WITNESS: He stated that he did not agree with

20  the conditions imposed by the Court.

21         THE MAGISTRATE: So, again, I think that you're --

22  I mean I understand the nature of your objection but AUSA

23  Hernandez, whenever you have situations like this with the

24  witness, please ask the pertinent follow up questions so

25  that we know what is the basis of knowledge of the witness.

1   You may proceed.

2           MS. HERNANDEZ: We will, Your Honor, but to

3   clarify, our question was, "what interaction did you have

4   with the defendant, Alexis Negron", and he was responding as

5   to a particular interaction and that's when the objection

6   came in.

7   BY MS. HERNANDEZ:

8   Q    Officer, what you're inquiring is specifically can you

9   describe that interaction with the defendant.

10  A    After explaining that the same was in violation of his

11  conditions --

12          MR. LERMAN: Objection, Your Honor.  That's an

13  expression of a legal opinion and again, we have a fact

14  witness that's presented by the United States in an

15  adversarial proceeding and we respectfully object and ask

16  the Court to instruct the witness to testify based on what

17  he actually saw or heard, anything that's percipient.

18          THE MAGISTRATE: Overruled.  He has said that he

19  explained to the defendant that this was a violation of his

20  conditions.  If you want to cross examine that, you may.

21  Overruled.  You may proceed.

22          THE WITNESS: I said that the case -- that the

23  violations would be staffed with my supervisor in order to

24  seek guidance of the same.

25  BY MS. HERNANDEZ:

1    Q    What happened after that?

2    A    After that, we concluded the intervention and left.

3    Q    Now, going to November 28, 2023, what transpired, if

4    anything, that day?

5    A    Can I refer to my motions so I can refresh --

6            MR. LERMAN: May I ask clarification what the date

7    was that the government requested?

8            MS. HERNANDEZ: November 28, 2023.

9            MR. LERMAN: Okay and we object to a request by a

10   witness to ask for help clarifying his -- what his answer

11   would be.  If the answer is, "I don't know" or "I don't

12   remember", then that should be the answer.

13           THE MAGISTRATE: Well, you may ask it again, this

14   particular matter, to the witness.

15   BY MS. HERNANDEZ:

16   Q    Did you include the dates of your interactions, at some

17   of your interactions with the defendant on docket 439?

18   A    Yes.

19   Q    Would reviewing that assist in refreshing your

20   recollection?

21   A    Yes.

22           MR. LERMAN: Objection, Your Honor.  He hasn't

23   answered the question and so there is no reason to refresh

24   if he hasn't stated that he doesn't know.

25           THE MAGISTRATE: All right.  AFPD Lerman, you're

1     technically right but you see, we can get to the shore with

2     a two hour swim or with a fifteen minute sprint.  So, let's

3     cut to the chase.  Officer, do you remember what if anything

4     happened on the 28th of November of 2023?

5               THE WITNESS: I --

6               THE MAGISTRATE: Yes or no?

7               THE WITNESS: I do not recall right now, Your

8     Honor.

9               THE MAGISTRATE: Do you have any follow up

10    questions that now in light of this answer you want to give

11    to the witness?

12              MS. HERNANDEZ: Yes.

13    BY MS. HERNANDEZ:

14    Q    Is there any document that would refresh your

15    recollection as to the particular date?

16    A    Yes.

17    Q    What would that be?

18    A    The motion that I filed.

19              MS. HERNANDEZ: Your Honor, at this time we would

20    request to approach the witness with docket 439.

21              THE MAGISTRATE: You may for refreshment of

22    recollection purposes.  Let the record reflect that AUSA

23    Hernandez has retrieved docket 439, the document that has

24    been docketed with docket number 439 from the witness.  You

25    may proceed with your emanation.

1  BY MS. HERNANDEZ:

2  Q    So, I inquire, what, if anything, happened on November

3  28, 2023?

4  A    I scheduled an appointment with the IPPC.  That's the

5  electronic monitoring system that our office has a contract

6  with to install or make an appointment for Mr. Negron Cruz,

7  so we can install the monitoring system in a smartphone for

8  him.

9  Q    What is the monitoring system?

10  A    The monitoring system is a contract company that the

11  United States Probation Officer has under contract that

12  monitors the cell phones of the person that has the

13  monitoring program inside.

14      It monitors web pages, texts, all that it has to do

15  with a smartphone.

16  Q    What was that going to be used for?

17  A    To monitor Mr. Negron Cruz' cell phone as his condition

18  of supervision if he wants to have access to the internet.

19  Q    On November 15, 2023 when you found the smartphone

20  that you have indicated that that smartphone, did it have

21  the monitoring device?

22  A    No.

23  Q    Had the defendant informed of the possession of that

24  smartphone?

25  A    No.

1  Q    Now, after November 28, 2023, what happened?

2  A    After he got the appointment for I believe it was

3  December 7, 2023, the same was not able to be installed on

4  his cell phone as it was --

5         MR. LERMAN: Objection, Your Honor, foundation and

6  even though it doesn't refer to a statement, it appears to

7  be a hearsay statement that hasn't been communicated with

8  any foundation.

9         THE MAGISTRATE: Well, I'll allow the witness to

10  answer.  I'm going to hold in abeyance my ruling on your

11  objection.  I'll allow the witness to answer.  Go ahead, you

12  may finish your answer.

13         THE WITNESS: But they were not -- I mean, the

14  electronic monitoring program system was not able to be

15  installed in Mr. Negron Cruz' cell phone as the same was not

16  comparable.

17         MR. LERMAN: Objection, Your Honor, and we'd add

18  lack of personal knowledge.

19         THE MAGISTRATE: Just a moment, please.  I couldn't

20  hear the last part of your sentence.  As the same was what?

21         THE WITNESS: Not comparable with them.  Like they

22  were not -- his cell phone was not in the list of the cell

23  phone that the program allows them to have.

24         THE MAGISTRATE: Okay.  How do you know this?

25         THE WITNESS: Because the monitoring program told

1    me --

2         MR. LERMAN: Objection, Your Honor, it's hearsay

3    and that alleged declarant is not present in court to be

4    confronted and cross examined.

5         THE MAGISTRATE: It is hearsay but then taking them

6    into account -- I don't disagree with you as to the hearsay

7    nature of it.  It is but taking into account that the Rules

8    of Evidence do not apply strictly and that these are

9    statements that were made directly to him, I will allow and

10   then give it whatever weight I believe is due.

11        MR. LERMAN: Just to clarify for the record, then

12   we object under Rule 32.1.  There's been no balancing and we

13   also object, the government suggested to the Court earlier

14   that it didn't have to address confrontation issues and

15   there's a Fifth Amendment confrontation right in these

16   proceedings and that would be violated at this time.

17      So, the generic proposition that the Rules of Evidence

18   don't formally apply, doesn't cover the present objection.

19        THE MAGISTRATE: Your objection is duly noted for

20   the record and your objection is overruled.  You may finish

21   your answer.

22        THE WITNESS: And also I had a telephone call with

23   the case manager from Guarabi and with Mr. Negron Cruz and

24   they both stated that the same was not able to be installed

25   in his cell phone.

1          MR. LERMAN: Same objection, Your Honor.  Same

2     objection as to the former USPO.

3          THE MAGISTRATE: Noted and overruled.  Could you

4     please repeat because I couldn't hear the last portion due

5     to the objection.

6          THE WITNESS: That we had a three-way telephone

7     call with Mr. Negron Cruz and his case manager from Guarabi

8     and they both indicated to myself that the monitoring

9     program was not able to be installed because it was not a

10    compatible device.

11         THE MAGISTRATE: You may proceed.

12    BY MR. HERNANDEZ:

13    Q    I'm going to call your attention to December 5, 2023.

14    What, if anything, happened that day?

15    A    I made contact with Mr. Negron Cruz at his room in

16    Guarabi Caribe.

17    Q    When you indicate made contact, what do you mean?

18    A    A face to face contract, a home visit to his residence

19    at that time.

20    Q    Where was that?

21    A    In Guarabi, Carib, in Caguas, Puerto Rico.

22    Q    Can you describe to the Court what transpired during

23    that interaction on December 5, 2023 during the home visit?

24    A    So that day I went with United States Probation Officer

25    Rosangela Lugo.  On that day we visit Mr. Negron Cruz at his

1    residence and at that time Mr. Negron Cruz was in his room

2    and we were attempting to make a visit to him as a routine

3    visit but we were attempting to communicate with Mr. Negron

4    Cruz but he was --he didn't want to communicate with the

5    Probation Officer.

6             MR. LERMAN: The same objection as previously, Your

7    Honor.  It's subjective speculation.

8             THE MAGISTRATE: I'll hold in abeyance my ruling on

9    follow up questions.

10   BY MS. HERNANDEZ:

11   Q    Can you describe your interaction and what, if

12   anything, was said or happened during this event.

13   A    He stated -- Mr. Negron Cruz stated that he didn't

14   want to talk to me and that all the communication was going

15   to be through the Court.

16   Q    From your point of view, what was the attitude of the

17   defendant at that time?

18   A    It was a negative attitude.

19             MR. LERMAN: The same objection, Your Honor.

20   Speculation, subjective opinion testimony that doesn't have

21   foundation.

22             THE MAGISTRATE: As to the previous objection that

23   I held in abeyance, overruled.  As to this one, ask your

24   follow up questions. I'm holding in abeyance again my

25   ruling.

1    BY MS. HERNANDEZ:

2    Q    Why do you say this?

3    A    His demeanor and the way that he was talking to myself

4    was not appropriate as he was stating that he didn't want to

5    be in supervision; that this supervision was a restrictive

6    supervision instead of a supervised release and he was asked

7    about employment.  In that case the Probation Officer --

8          MR. LERMAN: Objection, objection, Your Honor, not

9    responsive to the question.

10          THE MAGISTRATE: Well, to address your previous

11    objection as to whether the -- what characterization to give

12    to the attitude, I'll sustain your objection.  I will draw

13    my own conclusions based on the statements.

14      However, his answers to the questions as to what the

15    defendant said, those answers remain in the record and as to

16    that, those remain admissible for purposes of the evidence

17    to be taken into account.  So, what's your new objection

18    now, AFPD Lerman?

19          MR. LERMAN: Yes, Your Honor, the narrative, the

20    on-going narrative is not being responsive to that question

21    about the attitude.

22          MS. HERNANDEZ: I specifically asked him --

23          THE MAGISTRATE: Overruled.  You may proceed.

24          THE WITNESS: As to employment, the Probation

25    Officer gave multiple proposed employment plan as to getting

1    employment in which Mr. Negron Cruz denied all the options

2    provided to him in terms of seeking employment and stated

3    that without internet, he was not able to seek an employment

4    and after providing all those options, he just stated that

5    the same are not going to work and just laughed.

6    BY MS. HERNANDEZ:

7    Q    You indicated that after you provided options,

8    defendant indicated that it was not going to work and

9    laughed.  What were the options that were provided?

10   A    So, one of the options were that he was to use

11   supervised internet in Carib Guarabi with his case manager

12   to seek employment.  The other was to go out and simply seek

13   employment but he stated that that would not work for him.

14   Q    Now at that point in time, did defendant work full time

15   at least 30 hours per week at a lawful type of employment?

16   A    No.

17             MR. LERMAN: Objection, Your Honor, leading.

18             THE MAGISTRATE: Although the question is not

19   necessarily suggesting whether he should answer in the

20   affirmative or in the negative, perhaps the matter can be

21   addressed in a more open ended manner, you know, as to

22   whether there were any other matters that transpired or any

23   other alleged violations that transpired and then let's see

24   what the witness answers.

25             So, I'm going to sustain your objection, not because I

1  believe that the question in and of itself is suggesting an

2  affirmative or a negative answer but simply because it could

3  be suggesting to the witness what could other potential

4  violations be.  You may proceed with your examination of the

5  witness.

6  BY MS. HERNANDEZ:

7  Q    Did the defendant at that point in time, since your

8  supervision and your visit from November 9 until the date

9  that we are now conversing about, December 5, did he have a

10  full time employment?

11  A    No.

12  Q    Is there any condition or requirement as part of his

13  supervised release conditions relating to employment?

14  A    Yes.

15  Q    What is that?

16  A    That the defendant shall be gainfully employed while

17  in supervision.

18        MS. HERNANDEZ: Your Honor, at this time we would

19  request that the Court take notice of standard condition

20  number 3, that is part of the judgements in relation to the

21  docket.

22        THE MAGISTRATE: Just give me a second, please, so

23  I can access the docket.

24        MR. NISKAR: May I ask what docket we're reading

25  from?

1        THE MAGISTRATE: I don't believe she mentioned a

2  specific docket number. I think she just alluded generically

3  as to the judgements in plural.

4        MS. HERNANDEZ: The last judgement, Your Honor,

5  that we had mentioned to the Court is at document 429 but as

6  we indicated, those are standard conditions and special

7  conditions that are included in the judgements in this case.

8        THE MAGISTRATE: I understand but I want to, you

9  see when you say, when you're asking me to take judicial

10  notice of what standard condition number 3 is, well, I want

11  to look at it.  I want to see where it is and I'm looking

12  for it right now.

13      Just give me a second because right now I can't find

14  it.  I'm looking in docket 429 and just bear with me for a

15  moment.  It might be there.  It might be there.  It's just

16  that I haven't been able to find it.

17        MR. NISKAR: I can assist the Court.

18        THE MAGISTRATE: I welcome your assistance in that

19  regard.

20        MR. NISKAR: So docket 429 is related to a

21  judgement following a revocation which adopted on pages 4 of

22  6, and 5 of 6, and 6 of 6.  The same conditions that were

23  previously imposed on him at the time of his original

24  sentencing.

25      Those standard and special conditions the Court can

1   find at document 143.  It was entered on December 4, 2013 at

2   pages 3 through 6.

3            THE MAGISTRATE: Okay.

4            MS. HERNANDEZ: We have the three judgements

5   printed, Your Honor, and the Court could have the same.

6            THE MAGISTRATE: I mean, I just want to make sure

7   that I am and thank you, AFPD Niskar, for your assistance on

8   that regard.  I just want to make sure that we're all on the

9   same page because you see, we have -- there's a terminology

10  here.

11      Some are called mandatory conditions, others are called

12  standard conditions, others are called special conditions.

13  So, I just want to make sure that the one that you're

14  referring to is the one that I'm reading and that we're not

15  looking at different conditions.

16      That's all that I'm trying to get at, so just to be

17  clear, you're not referring to a mandatory condition.

18  You're not referring to a special condition.  You're

19  referring to a standard condition.

20            MS. HERNANDEZ: Correct, Your Honor.

21            THE MAGISTRATE: Number 3.

22            MS. HERNANDEZ: Yes.

23            MR. LERMAN: And again, number 3 from which

24  judgement because number 3 from the original judgement.

25            THE MAGISTRATE: Oh, they're different?

1          MR. NISKAR: Yes, they're all different.

2          THE MAGISTRATE: Okay, well, AUSA Hernandez, that

3    is a problem and it's really on you then to really put the

4    Court in that position to know exactly which one you're

5    referring to.

6        See, it's not the same thing to say, all the conditions

7    are repeated, that all the conditions have the same numbers.

8          MS. HERNANDEZ: We understand, Your Honor.

9          THE MAGISTRATE: So, then if you're going to ask me

10   to take judicial notice of a particular condition, to avoid

11   this confusion, how about if we do it this way.  You ask the

12   Court to take judicial notice of the judgement entered in

13   docket so and so, on page so and so, number so and so, and

14   that way there is no ambiguity as to which one you're

15   referring to and I think that that will help all of us,

16   meaning the defense, the witness, the Court, so that we are

17   all clear which one you're referring to.

18          MS. HERNANDEZ: Yes, Your Honor, and if we may, we

19   are understanding that in this preliminary hearing for

20   revocation proceedings, there is a motion that was filed by

21   Probation which is part of the docket and which particularly

22   standard conditions are being included there, particularly

23   special conditions, and that is what's served as notice to

24   the Court as to what are the conditions that are being

25   noted.

1          THE MAGISTRATE: That's fine but ultimately AUSA

2     Hernandez, what matters to me -- you see it's one thing what

3     the Probation Officer says is the condition allegedly

4     violated.  It's another thing for you to ask me to take

5     judicial notice that, in fact, that was a condition in

6     effect and for that, in order for me to take that as a

7     judicial notice, you need to allude to the specific

8     judgement.

9        Okay, so that that way I can look at the judgement with

10    my own eyes and I can just go ahead and say, "okay, here it

11    is."

12         MR. NISKAR: So, for example, the government had

13    asked the Court to take judicial notice of special

14    conditions 31 and 32 and there are no such special

15    conditions in these judgements.  There are no numbers 31 and

16    32 in any of the judgements.

17         MS. HERNANDEZ: Your Honor, if I may ask the

18    witness relating to this also.

19         THE MAGISTRATE: AUSA Hernandez, you don't need to

20    ask the witness this.  All you need is to, if you have a

21    computer right now, go into the docket, look at the

22    judgement, the most recent one, open it and tell me exactly

23    which docket number, which page, which standard condition.

24    It's that simple.

25         MS. HERNANDEZ: Yes, Your Honor, and to clarify

1    because we want the record to be clear.  There are three

2    judgements in this case and they all relate to one another

3    because even though there are two revocations, there are

4    certain standard conditions and special conditions that upon

5    imposing the judgement in the revocation proceedings, remain

6    and are adopted as to the subsequent one.

7        The last judgement is document 429, which is the one we

8    mentioned to the Court, was issued on November 9, 2023.

9            THE MAGISTRATE: Okay and all right.  So,

10   specifically on docket 429, which condition do you want me

11   to take judicial notice of?

12           MS. HERNANDEZ: Yes, Your Honor.  In that

13   particular one, in page 5 of the judgement, there's standard

14   condition of supervision 7.

15           THE MAGISTRATE: Okay, the one that starts with

16   "You must work full time"?

17           MS. HERNANDEZ: Yes, Your Honor.

18           THE MAGISTRATE: Okay, keep going.

19           MS. HERNANDEZ.  That is the one that we were

20   particularly inquiring about.

21           THE MAGISTRATE: Okay, well that doesn't sound,

22   doesn't ring to my ear like standard condition number 3,

23   which is what I heard sometime ago.  At least in the

24   judgement that I'm looking on my screen, I see a number 7,

25   right underneath standard conditions.

1    You see why it's important for all to be clear?

2    Precision.  Docket number, page number, number of the

3    condition and that way we're all on the same page.

4    I do take judicial notice of standard condition number

5    7, which appears on page 5 of the judgement entered in

6    docket 429.

7            MR. NISKAR: Your Honor, we respectfully renew our

8    request to have this hearing continued in light of the

9    testimony that the Court has heard so far and in light of

10   the government's difficulty to move through highly, highly

11   subjective allegations.

12   The reasons that we put -- that we pleaded in our

13   motion for a stay and the reasons that we mentioned last

14   week on February 7, regarding the risk of irreparable harm

15   to Mr. Negron, are playing out before Your Honor and we

16   think not only would the government not be prejudiced by a

17   continuance while the briefing on the structure of these

18   proceedings proceeds.

19   We think it actually may promote the appearance of

20   fairness of this process because what's playing out before

21   Your Honor is the government essentially deferring to what

22   the Probation Officer pleaded and alleged and stated as a

23   fact witness and the Court assisting the government to

24   present its case, and so, the overall appearance of

25   adjudication by a neutral and detached arbiter was at issue

56

1    before we entered this hearing and it remains at issue.  So

2    we do renew our request.

3            THE MAGISTRATE: Denied and I do take issue with

4    your statement of that the Court is assisting the government

5    presents its case.  Had I wanted to do that, I would have

6    allowed this witness to adopt its entire motion as part of

7    his testimony and I did not allow that, among other things

8    of objections that you have raised.

9        But aside from that, aside from that, your request to

10   continue this hearing is denied for the reasons that I have

11   already articulated.  You may proceed with the examination

12   of the witness.

13   BY MS. HERNANDEZ:

14   Q    Now during this interaction on December 5, 2023, did

15   you provide instructions to the supervisee, to the

16   defendant, Alexis Negron?

17   A    It was talked about employment and the way that he

18   needs to --

19           MS. LERMAN: Objection, not responsive to the

20   question.  It was talked about, it's unclear.

21           THE MAGISTRATE: Can you repeat your question.

22   BY MS. HERNANDEZ:

23   Q    During this interaction on December 5th, 2023, did you

24   provide instructions to the supervisee, to the defendant,

25   Alexis Negron?

1    A    Yes.

2    Q    What type of instructions did you provide?

3    A    To seek employment.

4    Q    What was the response, if any?

5    A    That all the options provided by the Probation Officer

6    doesn't work for him and he laughed.

7    Q    Now, when was your next interaction with Alexis Negron?

8    A    On January, I believe, 2024.

9         MR. LERMAN: I'm sorry. I didn't hear the answer.

10        THE MAGISTRATE: Could you repeat please your

11   answer.

12        THE WITNESS: January, 2024.

13   BY MS. HERNANDEZ:

14   Q    I'm going to call your attention specifically to

15   January 3rd, 2024.  What, if anything, happened on that day?

16   A    On that day I again conducted a face to face contact

17   with Mr. Negron at his residence, at his address of

18   residence in Guarabi Carib, along with United States

19   Probation Officer Rosangela Lugo, in order to conduct a

20   supervision followup.

21   Q    What happened?

22   A    Upon arrival to Mr. Negron Cruz' room, when he opened

23   the door, he stated to me, "what do you want?"  After that I

24   tried to converse with Mr. Negron about his attitude and

25   about the way that he needs to comply with the conditions of

1  supervision and the way to communicate with the Probation

2  Officer.

3  Q    What was the response, if any?

4  A    He stated again that all the communications was going

5  to be through motions to the Court.

6  Q    What was the demeanor at that time of Alexis Negron?

7  A    His demeanor was -- he had a poor attitude and he

8  was --

9        MR. LERMAN: The same objection as previously, Your

10  Honor, about speculation and personal knowledge.

11        THE MAGISTRATE: Well, witness, again, the same

12  objection.  You have to ask the same follow up question and

13  I'm holding in abeyance the ruling.  Establish the basis.

14  BY MS. HERNANDEZ:

15  Q    You were describing at this point in time the

16  interaction.  Can you indicate what statements, if any, the

17  defendant made to you directly?

18  A    He stated that he didn't want to talk to me and that

19  all the communications was going to be through the courts by

20  motions.

21  Q    You were describing the demeanor at that time.

22  A    Yes, his demeanor.  The first contact was made, "what

23  do you want?"  It's not a common thing a supervisee states

24  to his Probation Officer.

25        MR. LERMAN: Objection, foundation, opinion and

1    probably hostile attitude from the officer in answering.

2            MS. HERNANDEZ: No, first of all, fairly noted for

3    the record, there's no hostile response.  He's responding

4    directly to the question.  As part of the conditions of

5    supervision, it also includes the communications,

6    particularly with the Probation Officer and the attitude and

7    that is why we are entering into these questions,

8    specifically relating to the interactions relating to

9    following instructions relating to the inquiries that are

10   being made and all this is part of the revocation

11   proceedings and what has been informed to the Court.

12           THE MAGISTRATE: The objection is overruled.  You

13   may proceed.

14           THE WITNESS: Yeah, so a poor attitude.  After

15   that, I observed that there was another person under

16   supervision inside the room with Mr. Negron Cruz laying down

17   on top of his bed, like a secondary bed, a bunk bed.

18   BY MS. HERNANDEZ:

19   Q    This other person was where?  Can you further describe?

20   A    So, it's two bunk beds.  So he was on the upper one.

21   Q    Okay and where was the defendant?

22   A    The defendant was standing.  He just opened the door.

23   Q    What happened at that time?

24   A    When I step inside the room, I observed that the other

25   person under supervision had three cell phones in plain view

60

1  in his bed and I asked him if the three cell phones belonged

2  to him in which he initially stated that, yes.

3  Q    Okay, and what happened after that?

4  A    After that I tried to communicate with Mr. Negron Cruz

5  in which he was not receptive to the communication that I

6  was making with him and again stated that all the

7  communication was going to be through the Court and he was

8  not going to talk to me.

9  Q    That happened during your home visit?

10  A    Correct.

11  Q    You indicated upon description that you saw three cell

12  phones which were in a bed with another individual.  Is that

13  correct?

14  A    Yes.

15  Q    What happened in relation to that?

16  A    So, when I was conducting a home inspection, I asked

17  the defendant to step away, step outside of his room.  So, I

18  could explain to the other person under supervision that Mr.

19  Negron Cruz cannot have access to cell phone devices with

20  internet capability and Mr. Negron initially refused to step

21  outside and was very agitated raising his arms and commenced

22  to close distance with the Probation Officer in which at

23  that time I gave him verbal commands just to stay back and

24  to not close the distance between him and me.

25       After he stepped away with the other officer, I talked

61

1    to this other person under supervision about those cell

2    phones and he indicated that --

3         MR. LERMAN: Objection, Your Honor, hearsay as to

4    whatever the subject person under supervision indicated.

5    Under U.S. versus Rondo, the Court would also have to

6    balance the statements and the reliability of these

7    statements as they're obviously as we know, some of them was

8    under supervision, had conditions imposed upon him, was

9    being supervised by the Probation Department, had every

10   incentive to lie to the Probation Department when they were

11   questioning him at Guarabi.

12        These statements are inherently unreliable and ask that

13   they be excluded under hearsay.

14        THE MAGISTRATE: You want to respond to that?

15        MS. HERNANDEZ: Yes, Your Honor, first of all, as

16   we indicated, this is a preliminary hearing relating to

17   revocation proceedings, so the evidentiary rules do not

18   apply in the same manner.

19        At this point and stage, we are inquiring about

20   statements made directly to the officer while he is doing

21   the home inspection, particularly related to devices being

22   found in defendant's phone and it is how also the inspection

23   takes place and part of the proceedings relating as to the

24   surroundings, the persons that are beside the defendant and

25   are relevant to the revocation proceedings, Your Honor.

1         THE MAGISTRATE: Well, taking into account once

2    again that this is a preliminary revocation hearing and that

3    the statements were made directly to this witness, I will

4    overrule the objection and then I'll give the testimony the

5    weight that I believe it deserves.  You may proceed.

6         THE WITNESS: So, when Mr. Negron Cruz step outside

7    the room, I talked to the other person under supervision

8    about the ownership of the three cell phones in which he

9    stated that one of the cell phones provides internet

10   services to the other two cell phones.

11      He voluntarily showed the cell phones in which he --

12   the two cell phones that does not have internet access in

13   which I observed that one of those two had internet access

14   because he had a carrier, a T-Mobile carrier in which I

15   asked him about this specific telephone and then he took

16   ownership of two cell phones and the other one he stated

17   that belongs to Mr. Negron Cruz.

18      After that he provide me that telephone that belonged

19   to Mr. Negron Cruz and I confirmed that Mr. Negron Cruz

20   about the ownership of the cell phone and that the other

21   person under supervision stated that this belonged to Mr.

22   Negron Cruz in which Mr. Negron responded that that

23   telephone belonged to former U.S. President Barack Obama, in

24   which I asked him again about the ownership and he nodded

25   his head affirming that the telephone was his and provided

1   the access code of the same and which was correct.

2           MR. NISKAR: We object there.  This appears to be

3   a translation and an uncertified translation that's being

4   proffered to the Court.

5           THE MAGISTRATE: Fair grounds for cross

6   examination.  Overruled.  You may proceed.

7   BY MS. HERNANDEZ:

8   Q    Now, you indicated that defendant said what relating to

9   that phone?  We want the record to be clear.

10  A    That the telephone belonged to former U.S. President

11  Barack Obama and after again asking him again about the

12  ownership of the telephone, he nodded his head affirming

13  that the telephone belonged to him and I asked him about the

14  access code of the same, in which he provided the same and

15  it was correct.

16  Q    You're indicating that it was correct.  Why do you say

17  this?

18  A    Because it granted me access to the cell phone, the

19  access code that he provided.

20  Q    So, what did you do in relation to the access code that

21  was provided by Alexis Negron to you?

22  A    I verified the cell phone and the same was with

23  internet access.

24  Q    Can you describe what type of cell phone that was.

25  A    It was a smartphone, an Android smartphone.

64

1    Q    Did that particular phone have internet access?

2    A    Yes.

3    Q    How were you aware of this?

4    A    I verified and it had a carrier, a cell phone carrier

5    and it had internet access when I verified it.

6    Q    Did that particular phone have any matched monitoring

7    equipment as required?

8    A    No.

9    Q    Now, subsequent to that interaction, did you report the

10   violations in any manner?

11   A    Yes, it was reported, the violations.

12   Q    What did you proceed to do?

13   A    After seizing the telephone?

14   Q    Yes.

15   A    So, I said to Mr. Negron Cruz that the same was going

16   to be seized and he immediately responded, "are you going to

17   leave me without a cell phone again" and he repeated that

18   three times and then he became very agitated, started

19   raising his voice and he started approaching me, in which at

20   that time I gave him verbal commands to stay back, just to

21   stay back and he complied.

22   Q    When you indicate he started approaching you, what do

23   you mean by that?

24   A    He started closing distance between him and me, and

25   myself.

1   Q    What did you interpret that to be?

2   A    A very hostile manner.  Raising his voice, swinging his

3   arms and stating that "are you going to leave me again

4   without cell phone?"

5           MR. NISKAR: I'm sorry, "leaving"?  What did you

6   say?

7           THE WITNESS: "Leaving me without a cell phone."

8   BY MS. HERNANDEZ:

9   Q    Had instructions been provided to the defendant

10  relating to his possession of any smartphone or device with

11  internet?

12  A    Yes.  Conditions were read to him and explained to him

13  and especially that if he had any devices, he needs to first

14  be approved by the Probation Officer before getting that

15  device.

16  Q    According to what you observed and found and seized,

17  were these instructions followed?

18  A    I'm sorry?

19  Q    According to what you have indicated here that you

20  observed during your home visits and what you found and

21  seized, were these particular instructions followed by the

22  defendant?

23  A    No.

24          MR. LERMAN: Objection.  That called for

25  speculation and it's really unclear what the answer to that

1    means.

2         THE MAGISTRATE: You may cross examine him on that.

3    BY MS. HERNANDEZ:

4    Q    Now, do you have information relating to the

5    association of this defendant with other individuals that he

6    is not supposed to associate himself with?

7    A    So, as indicated by Guarabi personnel, he was an

8    information provider to me --

9         MR. LERMAN: Objection again under the Rule 32.1

10   confrontation right, we have another attempt to transmit a

11   statement by someone out of court that's alleged in an

12   adverse manner and Mr. Negron has a right, again, a right to

13   confront and cross examine that person and the government

14   has a burden to present evidence in the balancing test that

15   the reliability of those statements would be overcome by

16   the burden of producing someone.

17        So, we don't have any evidence that anybody was asked

18   to come to this hearing from Guarabi and it doesn't matter

19   that this is a preliminary revocation.  It's well settled,

20   so it can't be an answer and it would encourage the Court to

21   commit reversible error to say that this is just a prelim

22   and this is just in the course of his duties, the rights

23   still apply.

24        MS. HERNANDEZ: We may respond, Your Honor?

25        THE MAGISTRATE: You may.

1          MS. HERNANDEZ: Yes, we do indicate that this is a

2     preliminary hearing and the Court has the discretion to

3     determine and evaluate the reliability and credibility of

4     the information being provided.  Nonetheless, it is also

5     settled that affidavit, other documents can be taken into

6     consideration.

7          In this case we have the Probation Officer who is

8     indicating information provided directly to the Probation

9     Officer as part of his duties and obligations to supervise

10    the defendant in this case who at that point in time is

11    residing within the Guarabi Residential Program.

12         In addition to that, as defense counsel is well aware,

13    as part of the discovery process even before the preliminary

14    hearing, he was provided as was I, the report of Guarabi

15    relating to all this information as well as the monthly

16    treatment reports relating to -- so this is information that

17    the defense has received and it's not something new or any

18    new factual allegation that is being included at this stage

19    of the proceedings.

20         That being said, being that these are statements and

21    input being received directly by the Probation Officer as

22    part of his duties and obligations, we would request that

23    the testimony be allowed.

24         THE MAGISTRATE: Well, although I'm going to

25    overrule the objection, ask the witness specifically who and

1   when was communicated.

2           MS. HERNANDEZ: Yes, Your Honor.

3           THE MAGISTRATE: All right, so rephrase your

4   question and then you may proceed.

5   BY MS. HERNANDEZ:

6   Q    Now, Officer, you stated that during these points in

7   time that we have been talking about, the defendant was

8   residing in Guarabi.  Have you received or did you

9   personally receive input from Guarabi relating to the

10  defendant's behavior at the center?

11  A    Yes.

12  Q    Who provided you this information?

13  A    The Guarabi case manager, Migdalia, I forgot her last

14  name but her first name is Migdalia.

15  Q    As part of putting someone that's on supervised

16  release within the Guarabi center, is it part of the process

17  to receive information from the case managers?

18  A    Yes.

19  Q    Why so?

20          MR. LERMAN: Objection, Your Honor.  It's

21  irrelevant to any of these charges and it's irrelevant to

22  whether the confrontation right could be put aside at this

23  point for the justification that the government alleged.

24          THE MAGISTRATE: Overruled.  You may proceed.

25  BY MS. HERNANDEZ:

1  Q    Why is it that you receive information from the center

2  where the defendant is residing and has a case manager?

3  A    Because we placed him inside Guarabi because it has a

4  contract with us, so any information related to violations

5  or needs, they need to be approved by us and if we need to

6  assist the defendant in any manner inside the Guarabi

7  center, we may.

8  Q    What information did you receive relating to the

9  defendant, Alexis Negron's behavior at the center in

10  Guarabi?

11        MR. NISKAR: Same objection.  Calls for hearsay and

12  in violation of the Rule 32.1, Fifth Amendment

13  Confrontational right.

14        THE MAGISTRATE: The same answer.  They and who?

15        MS. HERNANDEZ: I understood he had provided that

16  information but --

17        THE MAGISTRATE: Yes, well, but I don't know if

18  this -- well, as to the they, no.  As to the who, well, it's

19  not entirely clear to me if it's the same person or not.

20        MS. HERNANDEZ: Yes.

21  BY MS. HERNANDEZ:

22  Q    Who did you receive the update relating to the behavior

23  of defendant at Guarabi?

24  A    The defendant's case manager, Migdalia.

25  Q    Relating to that information that Migdalia provided,

70

1    when did you receive updates relating to this behavior?

2    A    Exact dates?

3    Q    In what time period?

4    A    In all his supervised release term that he was

5    supervised.  I believe it was a month and twenty nine days.

6    That's the whole period that they were constantly informing

7    about his behavior, about the defendant's behavior.

8    Q    How did the case manager inform about the behavior?

9    A    Verbal and in written.

10   Q    When you say written, in what format?

11   A    So, incident reports and MTRs, monthly treatment

12   reports.  Usually at the end of each month they provide that

13   document with the progress of the defendant, the goals and

14   if there has been any violations of the house rules or

15   procedures.

16   Q    What was the input that you were receiving in November

17   after you commenced the supervision from November 9 until

18   the time that you filed the motion which was in January 8,

19   2024?

20   A    The input was not a positive one as they were stating

21   that Mr. Negron Cruz did not follow the rules of the center

22   by leaving without authorization the center and not going to

23   the group meetings, not doing the chores around the center.

24   Q    Was any information provided about the association

25   with other individuals?

1    A    Yes, Ms. Migdalia also reported that Mr. Negron Cruz --

2         MR. LERMAN: The same objection, Your Honor, and

3    especially based on what the answers have been so far,

4    there's no basis based on how this has been communicated to

5    the Court so far in extremely vague manner that even not

6    this Migdalia person that's referenced, even that that

7    person had personal knowledge.  So, we don't know how many

8    layers of hearsay and all those layers violate the

9    confrontation right.

10         THE MAGISTRATE: Well, in the end when I make my

11    decision as to whether there is or there isn't probable

12    cause, I will have to take into account all these matters.

13    I will have to take into account how reliable or unreliable

14    is what it has been testified about and I will also have to

15    take into account how vague or not vague it is.

16         All those matters are fair to be assessed at the moment

17    that I make my decision as to whether there is or there

18    isn't probable cause.

19         So, although overruled, I am not -- that should not be

20    interpreted as meaning that issues such as vagueness are

21    matters that cannot be taken into account for purposes of

22    whether the government has met its threshold of probable

23    cause.  You may proceed.

24    BY MS. HERNANDEZ:

25    Q    Yes, you were about to discuss particularly the

72

1    information you received from Migdalia relating to the

2    association with other individuals.

3    A    Yes, Ms. Migdalia informed to me that on multiple

4    occasions the defendant has been associating with another

5    person that is under supervision, on multiple occasions

6    inside the center and also leaving the center together.

7         She informed that this person under supervision that

8    Mr. Negron Cruz was associating was a convict felon for

9    transportation of child pornography, I believe.

10   Q    Is the defendant a convicted sex offender?

11   A    Yes.

12   Q    As part of his conviction, does he also have

13   registration requirements?

14   A    Yes.

15   Q    Now, what are the rules of the center in relation to

16   coming in and out of that particular Guarabi center?

17        MR. LERMAN: Objection, Your Honor, foundation.

18   That would be a question that the center would have to

19   answer and that foundation hasn't been laid and relevant.

20     It's not relevant at this time to any of the conditions

21   that are alleged to have been violated and noticed at this

22   point as well for the lack of notice regarding what

23   allegations are in pursuit right now.

24        THE MAGISTRATE: Sustained.

25   BY MS. HERNANDEZ:

1   Q    As part of your supervision directly, are there

2   guidelines that are indicated when you're placing a

3   defendant in Guarabi?

4   A    Yes.

5   Q    What are those, particularly to Alexis Negron?

6           MR. LERMAN: Same objection, Your Honor.  Calls for

7   a solicitation of the same content that Your Honor just

8   sustained an objection to be explored at this time.

9           MS. HERNANDEZ: We may respond, Your Honor?

10          THE MAGISTRATE: Overruled.  You may proceed and

11  answer the question.

12          THE WITNESS: So, the rules of the center is that

13  if he's going to go outside the center, he needs to notify

14  the purpose of going outside and when he's going to go, he

15  also has, if he's going to use the Guarabi transportation,

16  he needs to notify in advance.

17      Additionally, there are chores in the center that needs

18  to be completed and also group therapies, daily group

19  therapies that he needs to go.

20          MR. LERMAN: Your Honor, the same objection.  We

21  move to strike that testimony that appears to have been

22  twisted and given after the Court sustained an objection.

23          THE MAGISTRATE: How do you know this?

24          THE WITNESS: Because Migdalia told me about the

25  rules.

1          THE MAGISTRATE: When?

2          THE WITNESS: Between -- while the defendant was in

3    supervision.  I don't recall the exact date and it's also in

4    the incident report provided by Guarabi.

5          THE MAGISTRATE: Well, AFPD Lerman, I think that

6    although -- I think that you had reasonable grounds to

7    reiterate your objection because I first, when I heard the

8    revised question, I thought that the witness was going to

9    answer about his personal knowledge whenever Probation sets,

10   in terms of any guidelines that they use, Probation Office

11   may have when they place somebody in a house like Guarabi.

12         MS. HERNANDEZ: Yes.

13         THE MAGISTRATE: It turns out that that's not what

14   the witness answered.  What the witness answer was what the

15   Court had originally sustained.  So, I understand the nature

16   of your objection.  At this moment --

17         MS. HERNANDEZ: If I may be allowed to ask an

18   additional question relating to that matter to see if the

19   matter is clarified?

20         THE MAGISTRATE: Well, I mean he already said that

21   this was information conveyed to him by Migdalia, the case

22   manager.  I believe he already answered that but he doesn't

23   recall when.  He simply said, "under supervision."

24         So, all I can say is at this moment these are, I mean,

25   frankly, the most I can say at this moment is that the lack

1   of specificity frankly raises significant questions as to

2   the reliability of this evidence.  So, I would let it stay

3   but frankly, I'll take it for what it's worth.

4           MS. HERNANDEZ: Yes, Your Honor, understood.

5   BY MS. HERNANDEZ:

6   Q    Now, sir, are you familiar with Guarabi Center and

7   how it operates?

8   A    Yes.

9   Q    Why are you familiar with the Guarabi Center?

10  A    Because I have multiple cases there.  I know the rules

11  that applies to the residents that live inside Guarabi.

12  Q    In this particular case, was defendant, Alexis Negron,

13  placed in Guarabi?

14  A    Yes.

15  Q    Are you familiar with the instructions that are

16  provided in Guarabi as to the defendant's being placed

17  there?

18  A    Yes.

19          MR. LERMAN: Objection, Your Honor, this has

20  already been asked and answered.

21          MS. HERNANDEZ: Your Honor, but we want to clarify

22  just for the record and for the Court how the Probation

23  Officer has this information and not that it's routine.

24          THE MAGISTRATE: The objection is sustained.

25  BY MS. HERNANDEZ:

1    Q    Now, sir, as having someone or being the supervisor

2    officer, do you receive reports relating to the defendant?

3    A    Yes.

4    Q    In this case did you receive such reports?

5             MR. LERMAN: Objection, Your Honor, that's asked

6    and answered already.

7             THE MAGISTRATE: I believe your objection is fair

8    but for the sake of context for the next line of questions

9    I'll allow it.

10            THE WITNESS: I'm sorry, can you repeat the

11   question?

12   BY MS. HERNANDEZ:

13   Q    In this particular case of Alexis Negron, did you

14   receive these reports?

15   A    Yes.

16   Q    Are they, if I say real time during the stay of the

17   defendant at the Guarabi Center?

18   A    I'm sorry, can you rephrase that question.

19   Q    The reports of the behavior that you are recently

20   relating and we're now talking specifically about defendant,

21   Alexis Negron, do you receive the reports during the stay of

22   the defendant in that particular center?

23   A    Yes.

24            MR. LERMAN: Objection, Your Honor, asked and

25   answered and he doesn't know when he got any communication

1    from them.

2          THE MAGISTRATE: I believe the matter has already

3    been addressed.  Next question.  Sustained.

4    BY MS. HERNANDEZ:

5    Q    In this particular case, after your interactions, what

6    happened on January 8, 2024?  What did you proceed to do?

7    A    I believe I filed a motion notifying violations of

8    supervision to the Court.

9    Q    Now, in terms of the Guarabi Center, what is the

10   current situation relating to Alexis Negron and the Guarabi

11   Center and his ability to reside in that particular center?

12         MR. LERMAN: Objection, Your Honor, calls for an

13   answer that's not based on first hand knowledge and it calls

14   for an answer that's based on confrontation right violating

15   hearsay.

16         THE MAGISTRATE: Overruled.  I'll allow the witness

17   to answer.

18         THE WITNESS: It was for information provided from

19   the Guarabi Center that he was not able to attend there

20   anymore based on his recurrency of violations in the center.

21   BY MS. HERNANDEZ:

22   Q    When you indicate that he was not able to attend there

23   anymore, what do you mean?

24   A    That he will not be allowed to reside there anymore

25   or furthermore.

1              MS. HERNANDEZ: No further questions at this time.

2              THE MAGISTRATE: All right.  Who's going to conduct

3     the cross examination of this witness?

4              MR. NISKAR: May we take five minutes?

5              THE MAGISTRATE: You can -- yes, the answer is,

6     yes.

7              THE WITNESS: Can I be excused to go to the

8     bathroom?

9              THE MAGISTRATE: Well, witness, you may have the

10    five minute break as well.  I'll remain here in the

11    courtroom.  However, during your recess, do not talk with

12    anybody about matters related to this case or your testimony

13    because you're not excused yet from your testimony because

14    now defense counsel will be asking questions on cross

15    examination.

16       So, you can enjoy the five minute break just like

17    anybody else but you don't have to be in the witness box but

18    do not talk with anybody about matters related to this case

19    or your testimony during this recess.

20             THE WITNESS: Okay.

21             THE MAGISTRATE: I'll remain here in the courtroom

22    but you may have your five minute break.

23             MR. LERMAN: Your Honor, may we ask permission for

24    Mr. Negron to use the restroom also?

25             THE MAGISTRATE: Oh, of course, of course.  If he

1    needs to use the restroom, absolutely.  Of course.

2                    (A recess was taken at this time)

3                    (Court back in session)

4            THE MAGISTRATE: Officer, if you could please

5    return to the witness box.  All right.  Very well, AFPD

6    Niskar, your witness for cross examination.

7            MR. NISKAR: Your Honor, prior to beginning our

8    cross examination, we would like to move for a short

9    continuance until this afternoon to come back and begin our

10   cross examination of USPO Lozada.

11       The cronos that we have received are nearly impossible

12   to read and contain information that we believe now that the

13   USPO has testified on direct, provides us with additional

14   fodder for cross examination that we were not aware of prior

15   to this morning.

16       These, as you can see, are single spaced and in font

17   size of approximately 1 or 2, maybe 3, and contain, as you

18   can see, a lot of information that relate to my cross

19   examination and the matters on cross examination.

20           THE MAGISTRATE: Are you saying that you can't read

21   them because of the font size?

22           MR. NISKAR: I'm saying I cannot read it because of

23   the font size and that I have not had the opportunity to be

24   able to digest all of this information in order to provide

25   my client with the zealous affect of the assistance of

1    counsel that he's afforded under the Sixth Amendment.  I

2    need time to review these crono notes.

3            THE MAGISTRATE: Well, see, denied because see, you

4    asked for a 15 minute break when those cronos were given to

5    you.  I granted that request and when you finished, you did

6    not tell me when you finished, looking in those 15 minutes,

7    "I can't read them because I have -- their font size or I'm

8    not going to be ready."

9      So, having said that though, in the spirit of trying to

10   facilitate matters, we'll begin with the cross examination

11   right now and Ms. Cruz, do we have a copy machine here that

12   can actually increase the size, enlarge the size when we

13   make a copy?  Is there a possibility to do that from the

14   copy machine here?

15           THE CLERK: I will have to verify, Your Honor.

16           THE MAGISTRATE: Okay.  Well, let's not delay the

17   cross at this moment but in the meantime, can we make a

18   quick test?  Just grab any piece of paper.  Make a quick

19   test right now to see if there's a possibility to somehow

20   make it a little bit bigger.

21           THE CLERK: I believe we can, Your Honor.

22           THE MAGISTRATE: That you can, okay, good.  Mr.

23   Niskar, if you don't mind having those brought here so that

24   at least we can try to enlarge those.

25           MR. NISKAR You don't have any other copies with

1    you, right?

2              THE WITNESS: Well, the same size.

3              THE CLERK: Can you verify if you can read those.

4              THE MAGISTRATE: Well, I mean, certainly, AUSA

5    Hernandez, please, for future occasions, ask the Probation

6    Officer to have something with bigger font size.  Frankly,

7    this is very inconvenient but having said that though, it is

8    readable, the original but frankly, it's not reasonable for

9    the defense to ask that they be provided in a bigger font

10   size.

11       Frankly I don't even know what the number for this font

12   size would be but frankly, this leaves much to be desired in

13   terms of font size.  Okay.  So, having said that though,

14   it's readable.  Okay, it's not that it's illegible. It's not

15   illegible, it's readable but frankly, you know, there is no

16   need to give the defense something with this kind of font

17   size.

18       So, we're trying right now to increase the font size as

19   much as possible.  Now I understand that these are not

20   documents necessarily generated by you, AUSA

21   Hernandez, but rather from the record keepings of the

22   Probation Office, but perhaps a little note for future cases

23   to give the Probation Officers a heads up that frankly it

24   should be a normal size font.  Okay, not something that

25   minuscule.

1      All right, but for the time being, we're trying to

2   provide at least Ms. Cruz has generously attempted to make

3   copies with bigger, a little bit of a bigger font size.

4   No, don't tear the originals.  Don't tear the originals,

5   please.

6          THE CLERK: These are not the originals.

7          MR. NISKAR: We have the originals.

8          THE MAGISTRATE: Okay, okay.  So, what I want is

9   for Mr. Niskar to have both, the originals and also the

10  copies with a little bit of a bigger font size.

11         THE CLERK:  He does, Your Honor.

12         THE MAGISTRATE: All right, okay.

13         MS. HERNANDEZ: Noted and may we briefly respond

14  just so the record is clear, that we received the same exact

15  document that they received.  We were aware that cronos

16  existed but purposely did not have a copy for ourselves over

17  the defense because they have even made an issue of that.

18      So, we received it at the same time.  We had informed

19  that they should file a motion with the Court and they were

20  fully aware that the position relating to the request for

21  cronos but they opted not to do that.

22      Nevertheless, we, before sitting down the witness,

23  indicated it to the Court because we also did not want any

24  other allegation than what it is that they should have

25  requested, they didn't but we requested the Probation

1    Officer that if they existed, they'd be here and we brought

2    it up to the Court to make sure and did not oppose that they

3    received the same.

4              THE MAGISTRATE: Okay, well, duly noted but in the

5    spirit of my directive is more for future cases.  Okay,

6    that's the spirit of my directive, just keep it in mind, you

7    know, that when these documents are produced, to try to have

8    them in a font size that is a little bit more normal or

9    ordinary.

10              MR. LERMAN: Judge Lopez, if we could make a follow

11    up request because we hadn't -- this is the first time the

12    government mentioned that it hadn't gone through the

13    statements to make sure that we received Jencks regarding

14    the witness and so, if the witness has brought other -- has

15    brought all of the crono entries from this period that could

16    be relevant, we'd ask that we be allowed to make an inquiry.

17              THE MAGISTRATE: At this moment I don't want to

18    delay any further the cross examination.  So, Mr. Niskar,

19    you may proceed.  Your witness for cross examination.

20              MR. NISKAR: Thank you, Your Honor.

21                        CROSS EXAMINATION

22    BY MR. NISKAR:

23    Q    Good afternoon, Mr. Lozada.

24    A    Good afternoon.

25    Q    You indicated on direct that you've been working for

1   the Probation Department here in Puerto Rico for ten years.

2   A     Correct.

3   Q     Correct and in those ten years, for how many of those

4   ten years have you been supervising defendants who have

5   been -- who are under supervision post conviction?

6   A     Eight to nine years.

7   Q     In regards to defendants who are under supervision for

8   offenses involving receipt of child pornography, sexually

9   related convictions, how many years?

10  A     Approximately one and a half to two years.

11  Q     Have you received any training in supervising these

12  types of offenders?

13  A     Yes.

14  Q     What types of training?

15  A     How to supervise sex offenders. FLETC. South

16  Carolina, Charleston.

17          THE MAGISTRATE: Pardon the interruption.  Could

18  you have the microphone a little bit closer towards you.

19  I'm sorry about the interruption, Mr. Niskar.  I just want

20  to make sure that his answers can be heard clearly.  You may

21  proceed with your examination.

22  BY MR. NISKAR:

23  Q     For the record, you said FLETC. That's F-L-E-T-C, the

24  acronym, correct?

25  A     Yes.

1    Q    Okay and how long was that training in South Carolina?

2    A    About a week.

3    Q    Okay.  Any other training related to these types of

4    offenses?

5    A    Yes, in-house training here in our office, too.

6    Q    What type of training in-house?

7    A    Again, how to supervise sex offenders cases.

8    Q    In regards to what?

9    A    In regards to monitoring devices, the type of treatment

10   with sex offender treatment, mostly that.

11   Q    Okay, monitoring devices, treatment.

12   A    Yes.

13   Q    What else makes these types of cases different than

14   others?

15   A    Yeah, basically the type of treatment that they're

16   going to receive, including polygraph, how a referral to the

17   polygraph specialist for the same to be conducted.  Yeah,

18   basically that.

19   Q    Okay.  In addition to your training in supervising

20   these types of offenders, you're aware that Guarabi is a

21   facility in Caguas that has a contract with the United

22   States Probation Department, correct?

23   A    Correct.

24   Q    The facility that Mr. Negron Cruz was housed at was

25   which Guarabi facility?

1    A    Carib.

2    Q    Carib?

3    A    Carib, yeah.

4    Q    Where is that?

5    A    In Caguas.

6    Q    What type of facility is that?

7    A    It's a transitional housing center.

8    Q    Okay.  In addition to the supervisees from this

9    Probation Department, are there other people that live in

10   that facility?

11   A    Besides supervisees, yes.

12   Q    Okay.  You're aware that in that facility are other

13   individuals being supervised by your office for sexually

14   related offenses, correct?

15   A    Yes.

16   Q    You were aware that, for example, Mr. Angel Martinez

17   was also housed at Guarabi at the same time as Mr. Negron

18   Cruz.

19   A    Yes, I was aware.

20   Q    So, you were aware that they were in the same facility

21   together.

22   A    When I was notified, yes.

23   Q    When you were notified.

24   A    Yeah, by the association.

25   Q    What association?

1   A     Migdalia, the coordinator from Guarabi.  The case

2   manager indicated the association.  I didn't know that that

3   person was a convict for sex offenders.

4   Q     That person is being supervised by your office here,

5   correct?

6   A     Yes.

7   Q     Who was placed in Guarabi first, Mr. Negron Cruz or

8   Mr. Martinez?

9   A     I don't know.  I don't have that information.

10  Q     Okay, but regardless, they were each placed in the same

11  facility, correct?

12  A     Yes.

13  Q     Are you aware that they had any other prior

14  relationship before being in the same facility in Guarabi?

15  A     No.

16  Q     Are you aware that they're related in any way?

17  A     Based on information provided by Guarabi?

18  Q     Are you in any way aware that they're related by blood?

19  A     No.

20  Q     Are you in any way aware that they are related in

21  regards to the cases?

22          MS. HERNANDEZ: Objection, Your Honor.  A good

23  faith basis has not been established for these questions.

24          THE MAGISTRATE: Overruled.  Overruled.  I'll allow

25  that.  You may proceed with your questions.

1    BY MR. NISKAR:

2    Q    Are you aware that their cases were in any way related?

3    A    No.

4    Q    Were you aware that they were acquaintances before

5    living together at Guarabi?

6    A    No.

7    Q    Do you have any information that they're friends?

8    A    No, besides what Guarabi informed.

9    Q    Okay.  When you arrived at Guarabi in November of 2023,

10   that was your first instance of making a home visit for Mr.

11   Negron Cruz.

12   A    Correct.

13   Q    Okay.  Before that he was living where?

14   A    He was incarcerated.

15   Q    Okay, because of a previous violation and then he was

16   released directly to Guarabi, correct?

17   A    Correct.

18   Q    So you visited him on what date?

19   A    On November 15, 2023.

20   Q    Okay and you met him where?  Withdraw the question.

21   Did he know you were coming that day?

22   A    No.

23   Q    Had you met him previously to have him sign any

24   paperwork?

25   A    Me, personally, no.

1    Q    Had your office had him sign any acknowledgements as to

2    what his conditions of supervision were?

3    A    I don't recall that.  I know he reported to our office.

4    I think it was the same day he was sentenced or the day

5    after.

6    Q    Okay.  I'm going to show you -- do you know -- you're

7    aware, are you not that on the supervision forms there is a

8    place for a defendant to sign acknowledging that he's aware

9    of what those conditions are, correct?

10   A    Are you referring to the judgement?

11   Q    Yes.

12   A    Yes.

13   Q    Okay.  Do you have a copy in your files with Mr. Negron

14   Cruz' signature showing his awareness and adoption of those

15   rules.

16   A    I believe so, yeah, he signed them.

17   Q    Can you show those to us here?  Can you show that to me

18   right now?

19   A    Yes, sure.

20   Q    Okay, please.

21        THE MAGISTRATE: Do you have it right there in the

22   witness box with you?

23        THE WITNESS: Yeah -- no, in the chair.

24        THE MAGISTRATE: Oh, in the chair?

25        THE WITNESS: Yeah.

1            THE MAGISTRATE: You mean like where, in the

2    general, in the jury box.

3            THE WITNESS: Yes.

4            THE MAGISTRATE: Well, Officer, excuse me, pardon

5    me.  Counsel Niskar, I don't have any problem if you don't

6    have any objection and the prosecutor doesn't have an

7    objection.  I don't have any issue with allowing the witness

8    to go and retrieve the document.  Do you have any issue with

9    that?

10           MR. NISKAR: No, I'd ask that he please retrieve

11   the document.

12           THE MAGISTRATE: Okay, well, Officer, you may go

13   ahead and do that.  Just for clarity of the record, the

14   witness has stepped out momentarily of the witness box or

15   the witness stand and he is going to where he had left his

16   belongings to retrieve the document requested by Counsel

17   Niskar.

18           THE WITNESS: I'm sorry, Your Honor.  I do not have

19   that copy right now with me.  I could probably go -- I don't

20   know if I have it in my backpack right in my office but I do

21   have his conditions but not the signed one that he signed,

22   that the defendant signed.

23   BY MR. NISKAR:

24   Q    Okay, so do you have some memory of him having signed

25   those conditions in your presence?

1    A    Yes, along with another officer that was with me that

2    day.

3    Q    So, when was it that you say Mr. Negron Cruz signed the

4    judgement?

5    A    The first day that we met, November 15.

6    Q    Okay, so on November 15, you traveled to Guarabi and

7    you were with whom, what other Probation Officer?

8    A    Officer Coralis Guzman.

9    Q    Okay and who else?

10   A    Just the two of us.

11   Q    Okay, you had previously indicated in a prior

12   informative motion that you filed with the Court that you

13   were with two other officers during your interventions with

14   Mr. Negron Cruz.  So, in addition to Ms. Guzman, who was the

15   other officer that you were with?

16   A    Well, on a separate day.  It wasn't the same day.

17   Q    Well, stick with the 15th, November 15th, you indicated

18   in your informative motion filed at document 469 on page 2,

19   that there were two other officers present during the

20   interventions.  So, in plural, correct?

21        MS. HERNANDEZ: Your Honor, in the statement of the

22   motion he is reading one portion but then alleging to

23   another.

24        THE MAGISTRATE: Well, it's cross examination.

25   I'll allow the question to proceed and the witness may

1    answer.

2    BY MR. NISKAR:

3    Q    So, November 15th was the first time you met Mr. Negron

4    Cruz after he was released from custody, correct?

5    A    Correct.

6    Q    You appeared in Guarabi on November 15th, yourself

7    along with USPO Guzman.

8    A    Yes.

9    Q    No other USPO with you.

10   A    No.

11   Q    Okay.  When you arrived, Mr. Negron Cruz, you said you

12   had not advised him that you were going to be arriving,

13   right?

14   A    No.

15   Q    That's correct?

16   A    It's correct.

17   Q    Okay and when you arrived, where did you go first?

18   A    I went to talk to Migdalia, that's Mr. Negron Cruz'

19   case manager, to know what was his adjustment.  Those were a

20   few days before going to his room and to know which room he

21   was in.

22   Q    So you went to Guarabi before --

23   A    No, it's the same day.

24   Q    The same day?

25   A    Yes, it's the same place.  It's just the administrative

1    office before going to the rooms.

2    Q    So, when you arrived, what room did you go to to meet

3    Mr. Negron Cruz?

4    A    I believe it was number 36.

5    Q    Room number 36.

6    A    Yeah.

7    Q    Okay.  Are there multiple levels to that building?

8    A    Yes.

9    Q    What floor is that on?

10   A    It was like the lower level.

11   Q    Okay.  You're aware, are you not, that there are video

12   recording and surveillance equipment in the hallways of that

13   facility, correct?

14   A    I didn't have any knowledge of that.

15   Q    Okay.  You didn't see the cameras in the hallway

16   facing the door?

17   A    No.

18   Q    No, okay.  When you arrived, was the door closed or

19   open?

20   A    Closed.

21   Q    The door to room 36, I'm talking about.

22   A    I believe it was closed, yes.

23   Q    It was just the two of you, you and USPO Guzman

24   standing outside of the door?

25   A    I believe Migdalia was also present.

1    Q    Okay, what happened next?  Did you knock on the door?

2    A    Uhum and Mr. Cruz answered the door.

3    Q    Okay and had you spoken with him at any time before

4    that to introduce yourself?

5    A    No, that was the first time.

6    Q    Would you describe for us when the door opened to room

7    36.  I'd like for you to draw for us a diagram with the

8    layout of the door and the room.  May I approach the

9    witness?

10         MS. HERNANDEZ: Objection, Your Honor, as to this

11    procedure relating to a sketch to be drawn at this stage.

12         MR. NISKAR: Your Honor --

13         THE MAGISTRATE: Overruled for this time being.  I

14    mean, he was asked questions on direct.  For example, as to

15    where exactly the laundry basket was located and I recall

16    very distinctly that he mentioned when he entered where he

17    said that it was.

18         Well, if he testified on direct as to the layout, well

19    I think it's fair for the defense on cross examination to

20    ask questions about the layout and if they want to do it

21    through a diagram, I don't have any problem with that.  You

22    may do so.  Objection overruled.

23         MR. NISKAR: May I approach?

24         THE MAGISTRATE: Yes, yes you may.

25    BY MR. NISKAR:

1    Q    Could you draw for us --

2              THE MAGISTRATE: I'm sorry.  I need you to use the

3    microphone because the proceeding is recorded.  I'm sorry,

4    Officer Niskar, but we really do need you to speak through

5    the microphone.

6              MR. NISKAR: Okay.

7    BY MR. NISKAR:

8    Q    Could you draw for us however you want to draw the

9    room, a square, however you want to depict the room and the

10   door, kind of like from a bird's eye view of what the

11   contents of the room were on that day when you knocked on

12   the door.

13             THE MAGISTRATE: Counsel Niskar, I'll repeat what I

14   said at the beginning during direct examination, both for

15   the government and for the defense.  The document projector

16   is at your disposal.  So, for example, I'm pretty sure

17   you're already aware of this but witnesses can, for example,

18   with their fingers draw on the screen, et cetera, or

19   whatever but if you want to do it this way, the traditional

20   way, that's fine.  I don't have any issue with that.  It's

21   your choice.

22        I just simply wanted to make sure that you're aware

23   that you have available also the document projector as an

24   alternative if you so wish.

25             MR. NISKAR: Thank you, Your Honor.

1            THE WITNESS: I'm done.

2            MR. NISKAR:  You're done?  May I approach?

3            THE MAGISTRATE: Yes, you may.

4    BY MR. NISKAR:

5    Q    So, I'm going to show you what's been marked zoomed as

6    Defense proposed exhibit --

7            THE MAGISTRATE: Id-A?

8            MR. NISKAR: A.

9            THE MAGISTRATE: Id-A.  All right, well let us go

10   ahead and mark it as Id-A and let the record reflect that I

11   believe that Mr. Niskar has placed on the document projector

12   the document that was handed to him by the witness.

13           MS. HERNANDEZ: Your Honor, so is it being marked

14   as an Id or as an exhibit because he's already publishing

15   the same without having it being admitted.

16           THE MAGISTRATE: Right now it's an Id-A.  If at

17   some point the defense moves to have it admitted into

18   evidence, well we'll see but at this moment, as of right now

19   it's Id-A.

20   BY MR. NISKAR:

21   Q    Can you see the document, Mr. Lozada, I have on the

22   screen here as Id-A, Defendant's Id-A?

23   A    Yes.

24   Q    Okay and who created this document?

25   A    I did.

1  Q    You created everything that's on this document,

2  correct?

3  A    Yes.

4  Q    All of the writing, all the sketches, all the

5  (Inaudible) except for the sticker at the bottom right

6  corner, correct?

7  A    Yes.

8  Q    Okay, so when you're standing at the door, you're

9  facing a window, is that correct?

10  A    Yes.

11  Q    Okay and the door opens which way, into the room or

12  into the hallway?

13  A    I do not recall but I believe it's inside.

14  Q    You believe the door opens to the inside?

15  A    Yes, but I do not recall which way it opens.

16  Q    Okay, and would it be fair to say that when you're

17  standing at the door you cannot see the closet, correct?

18  A    Not if you're not inside the room.

19  Q    Not if you're not inside the room.  So, the closet

20  would not have been in plain view when you were standing at

21  the door?

22  A    The what?

23  Q    The contents of the closet and the hamper were not

24  in plain view when you were standing at the door.

25  A    No.

1   Q    Okay.  The T.V., were you able to see any portion of

2   the T.V. from the door?

3   A    Yes.

4   Q    Yes?

5   A    Uhum.

6   Q    Is that a yes?

7   A    Yes.

8   Q    Okay and the pictures that have been offered,

9   Government's Exhibit 1 and 2 and 3, the ones that depict the

10  hot spot and the Xbox controller.  Do you need to see these?

11  A    No.

12  Q    Okay, these are the hot spot and the Xbox controllers

13  are on what appear to be the far right side of a dresser in

14  that the television is upon, correct?

15  A    Correct.

16  Q    So, is it true is it not -- I'm going to re-approach

17  the witness and ask you to mark where it was that you saw,

18  if you can put an X --

19           THE CLERK: Counsel, microphone.

20           MR. NISKAR: I'm sorry.

21  BY MR. NISKAR:

22  Q    I've re-approached and given you Id-A.  If you could

23  put the initials or write hot spot where it is that you

24  discovered the items depicted in Government Exhibits 1, 2

25  and 3.

1    A    Can I mark it with an X?

2    Q    I'd prefer if you wrote, "hot spot", put an X and then

3    write, "hot spot" next to the X.

4    A    Okay.

5         MS. HERNANDEZ: Your Honor, we're still not clear

6    why at this stage we're also marking, it's still an

7    identification.  It has not been entered as an exhibit.

8         THE MAGISTRATE: But we're going to get there

9    though.

10        MS. HERNANDEZ: But normally they enter as an

11   exhibit --

12        THE MAGISTRATE: I understand, AUSA Hernandez but

13   again, I'm going to say to you exactly the same thing that I

14   said to AFPD Lerman some while ago.  See, we can reach the

15   shore on a two hour swim or a fifteen minute sprint.

16        Okay, so here's the thing, here's the thing.  If you

17   want this to be marked into evidence and admit it as an

18   exhibit and frankly it would be admissible, if the defendant

19   were to choose to move to admit it into evidence, then every

20   single time that he asks the defendant to -- excuse me, not

21   the defendant, the witness to add any additional marking,

22   okay, well then now it's not Exhibit A.  Now we're going to

23   have to make a photocopy and mark the copy as Exhibit A-1

24   and then additional marking, well that's going to be Exhibit

25   A-2.  Another marking that's going to be Exhibit A-3.

1    Now we could be doing that and spend half an hour on

2    that or we can just simply wait until he's done with all his

3    markings and have it admitted into evidence if anybody wants

4    to move to have it admitted into evidence.

5    So, which way do you want it, the two hour swim or the

6    15-minute one?

7    MS. HERNANDEZ: Your Honor, it was our

8    understanding that in order to request the witness to

9    continue to do what he did, it should be admitted first as

10    an exhibit and not that they are publishing it, bringing it

11    in, putting it in the record as evidence and it's not even

12    an exhibit, nor do we know when we make that request at the

13    end.

14    So, we did want the fast way to it and that's why we

15    were inquiring, not because we thought it was determined to

16    include all the markings before.

17    THE MAGISTRATE: Okay, all right, again if you

18    want -- if we all want to get hyper technical, fine.  I'll

19    ask right now Mr. Niskar whether he wants to admit it into

20    evidence but be on notice that then every single time that

21    there is any additional marking, then, you know, we're going

22    to have to make perhaps because I have no idea how many

23    other additional markings Mr. Niskar is going to ask the

24    witness.

25    So, if he's going to ask for example, ten more

1    markings, well, I'm going to have to ask my Courtroom Deputy

2    to make ten photocopies and each different photo copy, each

3    different photo copy is going to have a different sticker.

4    Why, because he has chosen to do it the traditional way.

5     This would not be an issue if this were to be done with

6    markings on the screen.  With markings on the screen it's

7    much faster.  However, I'm not here to micro manage the

8    style of cross examination.

9     He has chosen to do it the traditional way, okay, so

10   the traditional way it is.  So, if you want to mark it, we

11   can mark it but then since I don't know how many additional

12   markings Mr. Niskar is going to ask the witness to make, in

13   an abundance of caution I'm going to have to ask my

14   Courtroom Deputy to make, I don't know, 10 or 15 more copies

15   of that so that we can mark them.  We can do that if you'd

16   like.

17    So, question, do you want this to be marked because

18   then I would need to ask Mr. Niskar whether he wants it

19   admissible into evidence.  Do you want it marked?

20        MS. HERNANDEZ: We are not the proponent, Your

21   Honor.

22        THE MAGISTRATE: Okay, well all right.  Okay, well

23   then you may proceed.  You may proceed.

24        MR. NISKAR: Thank you.

25        MS. HERNANDEZ: Our objection was as to the way it

1    was being –

2            THE MAGISTRATE: I understand, I understand.  I

3    mean, I understand the point of what you are saying.  It is

4    being published without first being formally admitted into

5    evidence but it's not exactly like we have a jury here.

6        So, in the end, in the end, if, I don't know if Mr.

7    Niskar is going to move to have this admitted into evidence

8    or not but if, yes, any markings that the witness has done,

9    all that would be admitted into evidence.  All right, okay.

10           MR. NISKAR: I have just retrieved what has been

11   marked as Id-A from the witness.  I did not mark anything on

12   the way back to the podium and I see now there's one change

13   that you've made, Officer Lozada.  Next to the T.V. you put

14   an X and you've marked, hot spot.  Correct?

15           THE WITNESS: Yes.

16   BY MR. NISKAR:

17   Q    The hot spot was next to and to the side of on another

18   electronic device, correct?

19   A    I don't recall.

20   Q    The Xbox was on the floor next to a dresser, correct?

21   A    If I could see the pictures but I don't recall.

22           THE MAGISTRATE: When you say the pictures, you

23   mean any particular exhibits?

24           THE WITNESS: Yes, the pictures, yeah.

25           MR. NISKAR: I'm going to show him what's been

1  admitted as Government's Exhibits 1, 2 and 3.

2  BY MR. NISKAR:

3  Q    Let me know if that refreshes your memory.

4         THE MAGISTRATE: All right.  Let the record

5  reflect that the witness has been handed Exhibits 1, 2 and

6  3.

7         MR. NISKAR: Is there a portable microphone in this

8  courtroom?

9         THE MAGISTRATE: I would gladly provide one if

10 there's one but I don't know because I move from courtroom

11 to courtroom, so I don't know but in the event --

12        MR. NISKAR: I'll just (Inaudible)

13        THE MAGISTRATE: Go ahead.

14 BY MR. NISKAR:

15 Q    When you're done looking at Exhibits 1, 2 and 3, let

16 me know, please.  Are you done?

17 A    Yes.

18 Q    Does that refresh your memory as to where the Xbox

19 console was located?

20 A    I don't know where the Xbox is located.  As to the

21 pictures you provided, that's I believe a back-up battery.

22 Q    What is a back-up battery?

23 A    The black box.

24 Q    Where is the hot spot?

25 A    The hot spot is just inside the dresser, on top of the

1    dressers, the sites.

2    Q    Is the hot spot detected in any of these exhibits?

3    A    I'm sorry?

4    Q    Is the hot spot depicted in any of the government's

5    exhibits?

6    A    Yes.

7    Q    Which ones?

8    A    Well, I don't know which one the number is it but the

9    one that you provided didn't have the hot spot.

10   Q    1, 2 and 3 did not have the hot spot?

11   A    The one that you provided, I didn't see the hot spot.

12   Q    Okay, I'm going to show you all of the government's

13   exhibits that have been introduced and let me know where the

14   hot spot is.

15   A    Sure.

16        THE MAGISTRATE: Let the record reflect that the

17   witness has been handed Exhibits 1 through 9.

18   BY MR. NISKAR:

19   Q    Okay, have you seen it?

20   A    Yes.

21   Q    Which numbers is the hot spot detected in?

22   A    1 and 2.

23   Q    1 and 2.  Where is the hot spot in 1 and 2?

24   A    Here and here.

25   Q    So there's an item on top of the dresser with a green

1   light on, that's the hot spot?

2   A    Yes.

3   Q    Okay and it's your testimony that you could see the

4   hot spot depicted in Government Exhibits 1 and 2 from the

5   door of the room where you were standing?

6   A    From the door, no.

7   Q    Okay, so from the door there was nothing in plain view

8   that was contraband that you could see, correct?

9   A    Not that I recall.  Only the T.V.  I could see the T.V.

10  Q    You could see the T.V.

11  A    Uhum.

12  Q    But the T.V. by itself is not contraband, correct?

13  A    I believe not.

14  Q    Okay.  I am going to return Defendant's Id-A to you and

15  ask that you put your name and date on it, all right.

16  A    Okay.

17  Q    Then I'm going to move for it -- let me ask you one

18  more time.  This photo now that you have created, does this

19  accurately depict room 36 or the room that you visited Mr.

20  Negron Cruz on November 15, 2023 at Guarabi Carib.

21          THE MAGISTRATE: Counsel, I'm sorry to interject

22  but you used the word photo.

23  BY MR. NISKAR:

24  Q    Does this diagram or sketch that you prepared

25  accurately depict the layout of the room that Mr. Negron

1   Cruz was living in at Guarabi on November 15?

2   A    Up to my best knowledge, yes.

3           MR. NISKAR: Okay and I would move for the

4   admission of Defense Exhibit A after Mr. Lozada initials and

5   dates the form or the sketch.

6           THE MAGISTRATE: All right.  I think the witness

7   needs a pen.  Here, I'll try to see if we can -- do you need

8   a pen?

9           THE WITNESS: Yes.

10          THE MAGISTRATE: Okay, let's provide him with one.

11  I'm sorry, do you want him what, to sign and date?

12          MR. NISKAR: Sign and date, please.  You'll let me

13  know when you finish.

14          THE WITNESS: It's the 12th, right?

15          MR. NISKAR: 2-12-2024.

16          THE MAGISTRATE: Okay, if you please show it to

17  opposing counsel.  Ms. Hernandez, I believe that Counsel

18  Niskar is moving forward the admissibility of Id-A.  Any

19  objection?

20          MS. HERNANDEZ: No, Your Honor.

21          THE MAGISTRATE: Admitted Exhibit A.

22                                  (Identification A was

23                                   admitted into evidence)

24          MR. NISKAR: Will we need another sticker for this?

25          THE MAGISTRATE: Yes.

1    BY MS. NISKAR:

2    Q    So you're standing at the door looking in with USPO

3    Guzman, correct?

4    A    Yes.

5    Q    What was your basis for going in the room?

6    A    To conduct a home inspection of the room.

7    Q    Okay, what was it that you needed to inspect?

8    A    We conduct home inspections to see where he's living

9    and all the items that are present in the room.  Usually

10    it's in a house and in the defendant's room and every room,

11    bathrooms, but in this particular case, it's the room that's

12    basically his house.

13    Q    So, at what point did you see the hot spot that you say

14    you saw in Government's Exhibit 1 and 2?

15    A    When I was conducting the home inspection.

16    Q    Okay.  Who has possession of this hot spot now?

17    A    Me.

18    Q    You do here in the United States Probation Department?

19    A    Well, we don't have an office right now, so --

20    Q    It's in the custody of the United States Probation --

21    A    It's in my custody, yes.

22    Q    At what point did this turn from a home inspection to

23    a search?  When did this turn to a search?

24    A    As soon as I saw the plain view contraband.

25    Q    What plain view contraband?

1    A    The hot spot.

2    Q    Okay and how did you know what this was?

3    A    I asked Mr. Negron Cruz when I observed it at plain

4    view.

5    Q    Okay anyone else that was in the room with him on that

6    day?

7    A    Do you mean other residents?

8    Q    Yes.

9    A    No.

10    Q    Anyone else that was assigned to that room residing

11    with him?

12    A    Not to my best of knowledge.

13            THE MAGISTRATE: All right, AFPD Niskar, since I

14    don't want to rush you through your cross examination.  I

15    want to give you a fair opportunity to cross examine the

16    witness.  I believe that since it's around almost 12:30

17    p.m., this might be a good moment to recess and we're going

18    to reconvene.

19            So we're going to meet again at 1:45 p.m.  Okay, it's

20    almost 12:30 p.m. right now.  We're going to recess and

21    we're going to continue with the cross examination of the

22    witness.

23            Witness, I'm going to repeat the same thing that I said

24    when we had the previous break.  During this recess do not

25    talk with anybody about matters related to this case or to

1  your testimony because you're still not done with your

2  testimony.

3      I believe that Mr. Niskar still wants to ask you some

4  additional questions on cross examination.  So, you may

5  enjoy the recess just like anybody else but do not talk with

6  anybody about matters related to this case or your

7  testimony.

8      Any exhibits that have already been admitted into

9  evidence must remain with the Courtroom Deputy Clerk.

10  Okay, so before you exit, please leave any exhibits that

11  have already been admitted with Ms. Cruz.  So, we'll

12  continue then at 1:45 p.m.  The Court is in recess.

13          MR. NISKAR: Thank you, Your Honor.

14              (The hearing adjourned at 12:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION    1:47 p.m.

2              THE MAGISTRATE: Very well.  AFPD Niskar, you

3    may continue with the cross examination of the witness.

4              MR. NISKAR: Thank you, Your Honor.

5                    CROSS EXAMINATION (Continued)

6    BY MR. NISKAR:

7    Q    Officer Lozada, when we broke we were talking about you

8    entering the room to conduct your home inspection.  Do you

9    remember that?

10   A    On what date?

11   Q    On November 15th, 2023.

12   A    Yes.

13   Q    So, is it the practice of the Probation Office to

14   conduct a home inspection the first time that you arrive at

15   a person's residence?

16   A    Yes.

17   Q    Then after that are there further home inspections or

18   would those be limited by the search conditions?

19              THE CLERK: Excuse me, Your Honor, the

20   defendant cannot hear the interpreter.

21              THE MAGISTRATE: Let's change, perhaps check the

22   unit if it needs replacement.

23              MR. NISKAR: May I?

24              THE MAGISTRATE: Yes, you may proceed.

25   BY MR. NISKAR:

1    Q    Do you remember the question?

2    A    Can you repeat it, please.

3    Q    Is it the practice of the Probation Department to

4    conduct the home inspection the first time you visit a

5    supervisee?

6    A    Yes.

7    Q    Then after that, are there further home inspections or

8    are those limited by the search condition?

9    A    There are further home inspections.  It's a routine

10    part of the supervision process.

11    Q    Okay.

12    A    Search is another different.

13    Q    Okay, is there a condition that requires someone to

14    allow a home inspection?

15    A    Yes, actually, well a conditional supervision like

16    imposed?

17    Q    Yes.

18    A    Not that I remember.

19    Q    Okay, so your ability to enter the room to conduct the

20    home inspection is governed by what authority?

21    A    Probation.

22    Q    But who gives you the authority -- if someone doesn't

23    want to consent to allow you to enter their home for a home

24    inspection, what is the recourse that Probation has?

25    A    I mean, according to our policy, a home inspection is

1    mandatory for us to know where the defendant is living and

2    the conditions of the defendant is living.  So --

3    Q    Okay, but you're aware of Guarabi, correct?

4    A    I'm sorry?

5    Q    You were the one that placed Mr. Negron Cruz in

6    Guarabi.

7    A    Yes, because of its --

8    Q    So you were satisfied, were you not, that Guarabi was

9    a residence that was suitable for Mr. Negron Cruz, correct?

10   Yes or no?

11   A    Yes, correct.

12   Q    You are aware, you had done previous inspections at

13   Guarabi, correct, home inspections?

14   A    In Guarabi?

15   Q    In Guarabi.

16   A    In different rooms but not that specific room.

17   Q    Okay, so, how long had Mr. Negron Cruz been in room 36

18   before November 15?

19   A    Before November 15, since his release from custody.

20   Q    He was released on November 9, correct.

21   A    Yes.

22   Q    So, again, there was no authority you had pursuant to

23   a court order to inspect the home of Mr. Negron Cruz,

24   correct?

25   A    The U.S. Probation Office or officers do not need a

1  court order to inspect or take supervision activities.

2  Q    You don't?

3  A    Court order, like a search warrant or something like

4  that?

5  Q    Yes.

6  A    No.

7  Q    Well, let's talk about home inspection only.

8  A    Uhum.

9  Q    What authority and again, if you don't have authority

10 or you don't know of a law or a search condition that's part

11 of this case, let me know, but what authority in this case

12 did you have to enter Mr. Negron Cruz' room without his

13 consent?

14 A    As part of his condition of supervision --

15 Q    There is and I'm going to show you the multiple orders

16 in this case.  I'm going to show you document 143 and

17 document 429 and I'd ask you to point out to me if you

18 could, where you had the authority to make a home

19 inspection.  Okay?

20 A    Sure.  May I respond?

21 Q    When you're done.

22 A    Yeah.

23 Q    (Inaudible) lectern.  I'm going to read to you

24 (Inaudible)

25 A    Uhum, yeah.

1           MS. HERNANDEZ: Your Honor, the document I believe

2    was not to refresh the recollection but requested

3    specifically relating to that --

4           THE MAGISTRATE: What is your objection?

5           MS. HERNANDEZ: That if it's to be read from the

6    document itself then the witness should be allowed to have

7    the document.

8           MR. NISKAR: The question is -

9           THE MAGISTRATE: Well, I mean it's -- as far as I

10   know, it's not being offered as an exhibit and as far as I

11   know, it also has not been offered to refresh recollection.

12   Now, he already approached.  He already approved the

13   document, so let him answer the question.

14       Now had you asked the question before or raised the

15   objection before, then the question would have been okay or

16   are we dealing here with something that the defense wishes

17   to introduce into evidence or something that the defense

18   wanted to use for refreshing recollection?  But it's a

19   little bit too late for that.

20       The witness has already seen the document and has

21   already, the document has already been retrieved.  You may

22   ask your question.

23   BY MR. NISKAR:

24   Q    So, what authority do you have to make an inspection of

25   Mr. Negron Cruz's home?

1    A     Standard condition number 6.

2    Q     Okay, standard condition 6 is what?

3    A     I cannot verbatim the whole sentence but it stated that

4    he shall reside in an approved place by the Probation

5    Officer and if the Probation Officer observes something or

6    contraband at plain view, he can seize it.

7    Q     Okay, so we're not talking about plain view.  We're

8    talking about home inspection.  You would agree, would you

9    not, standard condition 6 is that Mr. Negron Cruz must allow

10   the Probation Officer to visit you at your home.  Correct?

11   A     Yes.

12   Q     It doesn't say anything about an inspection outside of

13   reasonable suspicion or plain view, correct?

14           MS. HERNANDEZ: Objection, Your Honor.  He is not

15   reading standard condition number 6 in its entirety.

16           THE MAGISTRATE: I don't know.  You can deal with

17   that.  If you need to request leave for direct on that

18   particular point, I'll let you to.  Go ahead, you may

19   proceed.

20   BY MR. NISKAR:

21   Q     The document that the government asked the Court to

22   take judicial notice of earlier today states on page 5 of 6,

23   under standard condition 6, I believe that the Court has

24   taken judicial notice of this.

25           "You must allow the Probation Officer to visit you at

1    any time at your home or elsewhere and you must permit the

2    Probation Officer to take any items prohibited by the

3    conditions of your supervision that he or she observes in

4    plain view."  Okay?

5        So, from the doorway of room 36, on November 15, you

6    already told us earlier today you saw nothing in plain view

7    that was contraband, correct?

8    A    From the door?

9    Q    Yes.

10   A    Yeah.

11   Q    Okay, so now standard condition 6, you would agree does

12   not say you can make an inspection of the home, correct?

13   A    Well, I can further --

14   Q    Standard condition 6, yes or no?

15       MS. HERNANDEZ: Let the witness answer before you

16   interrupt him.

17       THE WITNESS: I cannot answer that question with a

18   yes or no without explaining the condition entirely.

19   BY MR. NISKAR:

20   Q    Well, no, I need you to answer yes or no whether

21   standard condition 6 allows you to make an inspection of the

22   home without viewing anything in plain view.

23       MS. HERNANDEZ: Objection, Your Honor.  If the

24   witness may be allowed to answer –

25       MR. NISKAR: Well, I need to finish my question

1    first.

2            THE MAGISTRATE: Okay, well then finish your

3    question.

4    BY MR. NISKAR:

5    Q    Does standard condition 6 allow you, 6 only, allow you

6    to make an inspection and search of a defendant's home?

7    A    Search is a completely different --

8    Q    Okay, so let's start with search.  Does it allow you to

9    make a search without consent?

10   A    Can you rephrase that question?

11   Q    Does it allow you to make a search without the consent

12   of the defendant?

13   A    If reasonable suspicion is arise, that search can be

14   conducted without his consent.

15   Q    At the doorway you already told us on November 15th,

16   you had no reasonable suspicion to enter -- to search that

17   apartment, correct?

18   A    I had -- I was conducting supervision activities which

19   includes go visit him in his residence and in this case his

20   room.

21   Q    You can visit him.  I agree with you, standard

22   condition 6 –

23           MS. HERNANDEZ: Your Honor, at this time we would

24   object as to be beyond the scope of the purpose of this

25   hearing because it seems that he is now trying to dispute

1    search related questions and consent and this is all

2    relating to a probable cause determination of conditions of

3    supervised release.

4        His questions appear geared not towards whether there

5    were items found during that inspection of the room but

6    whether it was proper or not the steps that he followed in

7    relation to that, which we submit from our point of view,

8    they are and they're clear but this is beyond the scope of

9    this hearing.

10        MR. NISKAR: We disagree.  The government and

11    Probation are making an argument that the defendant did not

12    follow the instructions of the Probation Officer; that he

13    had refused to allow this Probation Officer to enter his

14    residence; that this officer used some type of coercion to

15    tell him he had to allow him to answer to conduct an

16    inspection for a search when he had no authority to do

17    either.  So, I should be allowed to --

18        THE MAGISTRATE: You're allowed to ask questions as

19    long as you don't become argumentative with the witness.

20    But, yes, I will allow you to ask the questions.

21        MR. NISKAR: Thank you.

22    BY MR. NISKAR:

23    Q    So, standard condition 6, Officer Lozada, you would

24    agree, only allows you to visit Mr. Negron Cruz at his home

25    or elsewhere.  Correct?

1    A    Can you rephrase the question?

2    Q    I can't.  There's only one way I can phrase that

3    question.

4    A    Okay, but can you repeat it.

5         THE MAGISTRATE: Well, just a moment.  If you do

6    not understand a question, you can tell the attorney that

7    you don't understand a question.  However, if you do

8    understand the question, answer it.

9    BY MR. NISKAR:

10   Q    Okay, do you understand the question?

11   A    I don't understand the question.

12   Q    Okay, my question is this.  Does standard condition 6

13   allow you to enter a defendant's residence to make a home

14   inspection, not a search pursuant to the search condition,

15   pursuant to plain view, pursuant to reasonable suspicion.

16   We're not talking about that.

17        We're talking about does standard condition 6 allow you

18   to make a home inspection of a person's home, papers,

19   affects and property?

20   A    Well, inspect papers, no, but inspect the property,

21   yes.

22   Q    Where does it give you that authority?

23   A    Well, the conditions say that he has to allow the

24   Probation Officer to enter his property.

25   Q    It doesn't say that.  Does it say that?

1  A    I believe it says.

2  Q    Okay, I'm going to show you.  I'm going to approach.

3  May I approach?

4        MS. HERNANDEZ: Your Honor, it would all be more

5  simple if we can take judicial notice of the condition

6  number 6 exactly how it's stated.

7        THE MAGISTRATE: Counsel, there is no point in you

8  starting an argument with the witness as to what the

9  standard condition says or does not say.  I can read it for

10 myself and I can draw my own conclusions based on what the

11 witness has answered and what does the standard condition

12 number 6 say.

13 BY MR. NISKAR:

14 Q    So, you were operating under the assumption that

15 standard condition 6 gave you the authority to enter Mr.

16 Negron Cruz' apartment and make a home inspection.

17 A    As part of the supervision activities, yes.

18 Q    Any other condition and any other order of the Court

19 that you believed allowed you to enter the apartment and

20 make a home inspection that day?

21 A    Not to my knowledge right now.

22 Q    Okay.  So, when Mr. Negron Cruz, he initially told you

23 you weren't going to come in, correct?

24 A    I don't recall that.

25 Q    He told you that he was not doing anything wrong.

1    A    On November 15?

2    Q    Yes.

3    A    Okay.

4    Q    Correct?

5    A    I don't recall that but I do recall what you say about,

6    "I'm not doing anything wrong."

7    Q    Okay.  You eventually entered the apartment, correct?

8    A    Yes.

9    Q    That was not because he consented but because you told

10   him you had the authority to enter, correct?

11   A    Yes, as part of our supervision process, yes.

12   Q    You earlier stated that after you entered and

13   discovered the hot spot and the Xbox, that you also found

14   a phone that you described as hidden inside of a laundry

15   basket, correct?

16   A    Correct.

17   Q    Mr. Negron told you where that cell phone was, correct,

18   where you would find it.

19   A    After asking several times, yes.

20   Q    Okay and that phone was located in a laundry hamper

21   with other belongings of his, correct?

22   A    Yes.

23   Q    There was a wallet that was in that basket?

24   A    I don't recall the wallet.

25   Q    You created crono notes in this case related to your

1    response and arrival to Guarabi on November 15, correct?

2    A    Yes.

3    Q    Nowhere in your crono notes do you ever say that this

4    phone was hidden or that Mr. Negron hid the phone, right?

5    A    I do not recall stating that, the same words.

6    Q    The photos that were taken on November 15th were taken

7    by your cell phone, you stated earlier?

8    A    Yes.

9    Q    That phone is a personal phone or is that a phone

10   issued by the United States Probation Department?

11   A    It's a government phone issued by the United States

12   Probation Office.

13   Q    Okay and are those pictures still located locally on

14   your telephone?

15   A    That's correct.

16   Q    You have not deleted them from your phone.

17   A    No.

18   Q    Okay, I will ask that you do not delete them from your

19   phone.

20        MS. HERNANDEZ: Objection, Your Honor, as to the

21   attorney now giving instructions to the witness --

22        MR. NISKAR: I didn't instruct.  I merely made a

23   request.  I would ask that you not delete the pictures from

24   your phone.  Is that okay with you?

25        MS. HERNANDEZ: That is not a question that is

1   being posed, Your Honor.  That is providing instructions to

2   the Probation Officer at this point.

3           THE MAGISTRATE: Look let's try to make this easy.

4   Do you want a court order requiring this witness not to

5   delete those phones.

6           MR. NISKAR: I would like a preservation.

7           THE MAGISTRATE: Okay, well granted.

8           MS. NISKAR: Thank you, Your Honor.

9           THE MAGISTRATE:  Officer, do not delete the

10  photographs that you took, I believe it's November 15th?

11          THE WITNESS: November 15th.

12          THE MAGISTRATE: November 15th, 2023.  Do not

13  delete those photographs from the cell phone until these

14  proceedings have concluded or unless you receive a different

15  directive from the Court.

16          MR. NISKAR: Thank you, Your Honor.

17          THE WITNESS: Noted.

18  BY MR. NISKAR:

19  Q    Did you take any other photos other than these nine?

20  A    I do not recall.

21  Q    Okay.  I believe that, Your Honor, if there were any

22  other photos that were taken on that day, they would be

23  covered by the order that you just ruled on.

24          THE MAGISTRATE: To make it very clear so that

25  there is no ambiguity, if in addition to these nine

1    photographs, you have other photographs regarding this visit

2    on November 15th, 2023 at Guarabi, if you have any

3    additional photographs aside from the ones that have been

4    marked into evidence as Exhibit 1 through 9, preserve them

5    in your phone.

6        Do not, do not delete them until the conclusion of the

7    revocation proceedings or unless the Court gives you an

8    order to the contrary.

9            THE WITNESS: Noted.

10   BY MR. NISKAR:

11   Q    Did you see the other Probation Officer that you were

12   with also taking pictures?

13   A    No.

14   Q    Okay.  Did you take any audio recordings of your

15   interactions that day with Mr. Negron?

16   A    No.

17   Q    Did you take any video recordings of any of the

18   conversations with Mr. Negron?

19   A    No.

20   Q    Did you take any recording surreptitiously, meaning

21   without Mr. Negron knowing, either an audio or video?

22   A    No.

23   Q    The phone that you found in the laundry basket, you

24   testified earlier that you compared it to the box that was

25   found inside of the -- underneath the laundry basket?

1    A    I compared?

2    Q    You compared the style.  Ms. Hernandez asked you if

3    both phones were both the same type of cell phone.  Do you

4    remember that?

5    A    Not -- barely.

6         MR. NISKAR:  May I see the Government's Exhibit --

7    BY MR. NISKAR:

8    Q    Government Exhibit 9 depicts the white box that was

9    underneath the (Inaudible) hamper.  Do you see this?

10   A    Yes.

11   Q    Ms. Hernandez asked you if you compared the box of the,

12   to the (Inaudible) phone or the blue box in the top left

13   corner here.

14   A    Uhum.

15   Q    With the phone that you found in the laundry basket.

16   You remember that on direct exam?

17   A    Yes.

18   Q    Do you remember what your testimony was?

19   A    That both are the same kind of telephones.

20   Q    Okay, the same kind of phone.  Did you compare the

21   IMEI numbers?

22   A    No.

23   Q    Did you compare the sim card numbers?

24   A    No.

25   Q    Do you know the date of the manufacture, the date that

1   the phone was manufactured?  Do you know the date the phone

2   was manufactured that was originally contained in either of

3   those boxes?

4   A     No.

5   Q     Do you know from where either of those phones that have

6   boxes in them were purchased?

7   A     No.

8   Q     Do you know where the phone that was in the hamper was

9   purchased?

10  A     No.

11  Q     Do you know where the hot spot was purchased?

12  A     No.

13  Q     Have you done any forensic analysis of the hot spot?

14  A     No.

15  Q     Have you done any forensic analysis or extraction of

16  the telephone in the hamper?

17  A     Only a manual extraction.

18  Q     That manual extraction consisted of doing what?

19  A     Just to see if the cell phone has internet, if the cell

20  phone has any social media, any user names or any e-mail

21  accounts or any conversations, any different applications of

22  messaging.

23  Q     Okay.  When you say if the phone has internet, what do

24  you mean?

25  A     That is capable to connect to the internet and has --

1    Q     How does the phone -- do you know how the phone

2    connects to the internet?

3    A     I do not know.

4    Q     So how would you --

5    A     I mean, I do know that it has a carrier, a cell phone

6    carrier and that the same connects to different platforms

7    that will need internet in order for them to work but I am

8    not an expert in internet nor any cell phone devices.

9    Q     So then how can you testify here today that this phone

10    was capable of connecting to the internet?

11    A     I mean, it's a pretty common knowledge.  Everybody here

12    has a telephone and you can test the cell phone if it has

13    internet or not.  First you start by looking at the carrier,

14    like in this case T-Mobile or Claro or --

15    Q     Which phone are we talking about?

16    A     For the one seized.

17    Q     The one in the hamper.

18    A     Correct.

19    Q     Okay, so one in the hamper, you retrieved it from the

20    hamper --

21    A     Uhum.

22    Q     You took it back to your office.

23    A     Correct.  Well, we don't have an office.

24    Q     You took it back to your work space?

25            MS. HERNANDEZ: Your Honor, the witness was

1   answering the particular question and he interrupted for

2   additional questions.

3           THE MAGISTRATE: Let's proceed, proceed.  Go ahead.

4   BY MR. NISKAR:

5   Q    I think you ended and if I cut you off, please let me

6   know but I thought what you said was everybody knows how to

7   connect to the internet, correct?

8   A    I mean it's common knowledge when your telephone is

9   connected or not connected to the internet.  Applications

10  don't work -- the majority that requires internet.  Browsers

11  don't work, so yeah.

12  Q    So, did this phone have an IMEI card in it?

13  A    Yeah, I believe so.

14  Q    You believe or you know?

15  A    I think -- I mean what you're referring to IM, the sim

16  card?

17  Q    Yes.

18  A    Yes, it has a sim card.

19  Q    Okay and the service was through who?  That sim card

20  service was through what carrier?

21  A    I believe it says Claro.

22  Q    Claro.  You believe?

23  A    Yeah, I'm not sure right now but if I can see my

24  chronological notes that you have, there is the carrier.

25  Q    Okay and you made an inspection back in your work space

129

1  by doing what?

2  A    By looking through the phone, look at the message,

3  photos, social media, any user names or any blogs that he

4  might have.

5  Q    Did you connect to the internet on this phone?

6  A    With the internet of the phone, yes.

7  Q    Using the phone, you connected to the internet using

8  Mr. Negron's phone?

9  A    Yes.

10  Q    Without putting the phone in any type of safe mode or

11  anything like that.

12  A    The telephone was in airplane mode.  In order to verify

13  it, we have to place it back to the carrier.

14  Q    Okay --

15  A    In order to verify if the telephone actually has

16  internet we have to actually start the telephone without the

17  airplane mode.

18  Q    You did this without having any training or experience

19  in cell phone maintenance and operation?

20  A    Yes.

21  Q    Your office has someone that's employed by the United

22  States --

23          MS. HERNANDEZ: Your Honor, again objection, beyond

24  the scope.

25          THE MAGISTRATE: Overruled.  You may proceed.

1   BY MR. NISKAR:

2   Q    Did you call your -- the United States Probation

3   Department has an employee that's assigned and designated to

4   assist in extractions and searches of electronic devices,

5   correct?

6   A    Yes, correct.

7   Q    Did you and did you make an effort to contact that

8   person before you, yourself, made the examination of this

9   phone?

10  A    So, since we don't have an office, our lab, forensic

11  lab is located in the second floor in our office, so our

12  instructions were, if you find a telephone that is a

13  contraband, you might have to do a manual inspection because

14  we don't have longer that equipment available to do that.

15  Q    Who was with you when you made this manual inspection

16  of the phone?

17  A    I was alone.

18  Q    Where did you do the manual inspection of the phone?

19  A    In my house.

20  Q    Using your home's WiFi?

21  A    No.  It was in airplane mode and then to activate it,

22  it was under the internet of the cell phone itself.

23  Q    On November 28th you scheduled an appointment with Mr.

24  Negron Cruz to install the electronic monitoring system on

25  his cell phone, correct?

1    A    Correct.

2    Q    So, thirteen days or two weeks later the Probation

3    Department is all right, is satisfied with Mr. Negron Cruz

4    having a cellular phone and having this surveillance or --

5    A    Monitoring.

6    Q    Monitoring system installed on it, correct?

7    A    So --

8    Q    Is that correct, yes or no?

9    A    I didn't understand the question.  I thought it was me

10   explaining the process.

11   Q    The question is, two weeks after you found a phone

12   inside of Mr. Negron Cruz' apartment, you are assisting him

13   with allowing him to have a cellular phone.

14   A    Yes.

15   Q    Making sure he does so according to the rules.

16   A    Correct.

17   Q    Okay, but on that day he -- the software could not be

18   installed on the phone.

19   A    On December 7.

20   Q    On December 7, it couldn't be installed, correct?

21   A    Correct.

22   Q    Because the phone wasn't compatible.

23   A    Correct.

24   Q    You then about a week later make another home visit to

25   Mr. Negron Cruz, right?

1    A    Correct.

2    Q    On this day, your purpose of going to Guarabi was for

3    what?

4    A    Supervision process.

5    Q    Okay, to do what?

6    A    Visit him, how's he doing, ask if he has a stable

7    employment, basically just going around the supervision

8    activities.

9    Q    Did you search the home on December 5th?

10   A    On December 5th, if I searched the home, no.

11   Q    Yeah, the room.

12   A    Searched, no.

13   Q    Okay.  On January 3rd, you again made contact with Mr.

14   Negron at Guarabi, correct?

15   A    Correct.

16   Q    Again, you called this a home inspection again,

17   correct?

18   A    Correct.

19   Q    Your authority for doing a home inspection was based

20   again on standard condition 6?

21   A    Correct.

22   Q    For entering the room in the apartment, your basis was

23   based upon standard condition 6?

24   A    Yes and supervision process activities.

25   Q    Standard condition 6 for making a home inspection?

1          MS. HERNANDEZ: Objection, Your Honor.  The witness

2     has answered on various occasions to this question.

3          MR. NISKAR: But then he elaborated at the end and

4     I think what the witness said was, yes, standard supervision

5     process.

6          THE MAGISTRATE: I'm sorry, I'm sorry, yes and the

7     supervision process?

8          MS. HERNANDEZ: The standard supervision --

9          MR. NISKAR: The standard supervision process.

10    Okay.

11         THE MAGISTRATE: Okay.

12         MS. HERNANDEZ: That was his response.

13    BY MR. NISKAR:

14    Q    So, it's not the standard supervision process that

15    gives you authority to search someone's residence, correct?

16         MS. HERNANDEZ: Objection, Your Honor.

17    Argumentative.

18         THE MAGISTRATE: Sustained.

19    BY MR. NISKAR:

20    Q    What authority gave you -- what authority did you have

21    for making the search of the home on this date, on January

22    3rd?

23    A    Part of the supervision process is to make home

24    inspections and visit Mr. Negron Cruz at his residence.

25    Q    What is -- you keep saying home inspection.  What's

134

1   your definition of a home inspection?

2   A    It's simply enter the room or enter the house and just

3   look around.  We are not -- in a home inspection you cannot

4   touch or move anything unless you have reasonable suspicion

5   that contraband was found.

6   Q    Is it your belief that Mr. Negron was required to let

7   you in on January 3rd, to the home -- to the room?

8   A    It's part of the condition that he has to allow the

9   Probation Officer to enter his room -- his residence.

10  Q    To enter the residence.

11  A    Uhum.

12  Q    Is that a yes?

13  A    Yes, enter the residence.

14  Q    You testified earlier that you had received both

15  incident reports and monthly treatment reports from Guarabi.

16  Correct?

17  A    Correct.

18  Q    You're aware that you have not sent the defense any

19  incident reports, correct?

20  A    I believe that I sent it, yes.

21  Q    You sent us, I believe, three monthly treatment

22  reports.

23  A    Before that.

24  Q    Before that you sent us a three-page document from

25  Guarabi.

1    A    Uhum.  That's the incident report.

2    Q    So you just received one incident report and three

3    monthly treatment reports.

4    A    Correct.

5    Q    Nothing more?

6    A    Nothing more.

7    Q    Is the United States Probation Office also supervising

8    a person by the name of Jose Rivera Torres that's mentioned

9    in your informative motion?

10   A    Is that the one who reside with him in his room, with

11   Negron Cruz' room?

12   Q    I don't know.  It's contained in your motion at

13   document 439, that you alleged that Mr. Cruz has associated

14   with Mr. Jose Rivera Torres.

15   A    In which he's a person convicted for --

16   Q    Transportation of --

17   A    Yeah, he's under supervision of the United States

18   Probation Office.

19   Q    By you personally?

20   A    No.

21   Q    By which officer?

22   A    I believe it's Officer Emanuel Maldonado.

23   Q    Who placed Mr. Rivera Torres at Guarabi?

24       MS. HERNANDEZ: Objection, Your Honor, beyond the

25   scope.

1          MS. NISKAR: I'll withdraw the question.

2          THE MAGISTRATE: Okay, well, withdrawn.

3    BY MR. NISKAR:

4    Q    You have no information that Mr. Negron Cruz and Jose

5    Rivera Torres were associating at Guarabi because of

6    anything unrelated to their placement there.  You

7    understand?

8    A    The only information that I have is Ms. -- the case

9    manager from the Guarabi stated that on multiple occasions

10   they go outside of the center together.

11   Q    Okay and --

12   A    Besides, you know --

13   Q    Do you have any information that their cases were

14   previously related?

15   A    No.

16   Q    That they in any way transferred obscene material or

17   sexually explicit material between each other.

18   A    No.

19   Q    That they are in any way related by blood.

20   A    No.

21   Q    Or marriage.

22   A    No.

23   Q    That they're friends or acquaintances apart from

24   Guarabi.

25   A    No.

1   Q    It's true, is it not, that you were the one that asked

2   Guarabi to author the incident report, correct?

3   A    I asked for an incident report.

4   Q    Prior to that you had not received any incident reports

5   from Guarabi about Mr. Negron.

6   A    Verbally, not written.

7   Q    Okay and are those verbal incident reports contained in

8   cronos notes in other parts of your file?

9   A    I do not recall.

10          MR. NISKAR: May I have one second, Your Honor?

11          THE MAGISTRATE: Yes.

12          MR. NISKAR: I have no further questions.  Thank

13   you, Your Honor, for your indulgence.

14          THE MAGISTRATE: AUSA Hernandez, during cross

15   examination there was a particular point that I remember you

16   raised an objection and I said that if you wanted to address

17   that on redirect that I would grant you leave to redirect.

18   So, if you wish to redirect, you may.  If you don't wish,

19   then I'll excuse the witness.

20          MS. HERNANDEZ: Yes, Your Honor.  We just have a

21   couple of questions.

22          THE MAGISTRATE: Okay, so you want to redirect.

23   Go ahead.

24                    REDIRECT EXAMINATION

25   BY MS. HERNANDEZ:

1   Q     Looking at what has been identified as Defendant's
2   Exhibit number A, is that a square room?
3   A     Yes.
4   Q     Once you enter the room, are you able to visualize
5   everything that's in the room?
6   A     Once I enter, yes.
7   Q     Does the closet have any doors?
8   A     No.
9   Q     Now, the T.V. that you indicate is to the left side,
10  is that a Smart T.V.?
11  A     Yes.
12  Q     Was it connected to the hot spot?
13  A     As stated by Mr. Negron Cruz, yes.
14  Q     Was there also a play station there?
15  A     Xbox gaming console.
16  Q     An Xbox gaming console.  Was that Xbox gaming console
17  connected to the hot spot and to the Smart T.V.?
18  A     According to Mr. Negron Cruz, yes.
19          MS. HERNANDEZ: As to the clarification, Your
20  Honor, at this time we would request that the Court take
21  notice again of 429 in page 5, it includes the standard
22  conditions of supervision and since questions have been
23  posed relating to that, we would request that the Court take
24  notice of standard condition number 4, 5, 6 and 7, which all
25  relate to the standard conditions of supervision.

1            THE MAGISTRATE: I do take judicial notice of the

2      entire contents of the judgement in Docket 429, including

3      those particular provisions that you have just mentioned.

4            MS. HERNANDEZ: No further questions, Your Honor.

5            THE MAGISTRATE: You're excused.

6            THE WITNESS: Thank you, Your Honor.

7                      (Witness excused)

8            THE MAGISTRATE: Does the government have any

9      additional witnesses?

10           MS. HERNANDEZ: Yes, Your Honor.  At this time the

11     United States will call Coralys Guzman.

12           THE MAGISTRATE: Very well.  Let's place the

13     witness under oath.

14                   (The witness was duly sworn)

15     Whereupon,

16                      CORALYS GUZMAN

17     was called as a witness and after having been first duly

18     sworn, was examined and testified as follows:

19           THE MAGISTRATE: AUSA Hernandez, your witness for

20     direct examination.

21                   DIRECT EXAMINATION

22     BY MS. HERNANDEZ:

23     Q    Will you please state your full name for purposes of

24     the record.

25     A    Coralys Guzman, U.S. Probation Officer, for the record.

1  Q    Where do you work as a U.S. Probation Officer?

2  A    I work at the District of Puerto Rico.

3  Q    For how long have you been working as a Probation

4  Officer?

5  A    A bit over two years.

6  Q    I'm going to call your attention particularly to

7  November 15, 2023.  On that date did you participate in any

8  manner with the supervision of Alexis Negron Cruz?

9  A    I did.

10  Q    Do you see that person in court here today?

11  A    I do.

12  Q    Can you please point to the person and identify him.

13  A    Yes.  He's over there.

14  Q    You can say his characteristics.

15  A    Yes, he's using a beige or cream overall and a headset.

16       MS. HERNANDEZ: Let the record reflect that the

17  witness has identified the defendant, Alexis Negron Cruz.

18       THE MAGISTRATE: The record shall so reflect.

19       MR. NISKAR: Your Honor, may we have sequestration

20  while this witness is testifying?  There's another raised

21  just like fact witness that's currently in the courtroom,

22  Mr. Lozada, that's going to be hearing the testimony of

23  another fact witness.  We would ask that Mr. Lozada be

24  sequestered at this time.

25       THE MAGISTRATE: Well, Officer Lozada is the one

1    that you're asking to be --

2              MR. NISKAR: Yes.

3              THE MAGISTRATE: Do you have an objection to this

4    request?

5              MS. HERNANDEZ: Well, Your Honor, procedurally we

6    do in the sense that that is the supervising officer and

7    even in criminal cases, the case agent is allowed to remain

8    in the courtroom.  Nevertheless, if it will accelerate the

9    proceedings, we have no objection for this moment.

10              THE MAGISTRATE: Okay, well in view that --

11              MS. HERNANDEZ: Without renouncing to any statement

12    that we have made whether it's proper or not that a

13    Probation Officer that's supervising remain in the

14    courtroom.

15              THE MAGISTRATE: Okay, understood, understood that

16    you are reserving your rights accordingly.  Officer Lozada,

17    please, if you could step out of the courtroom in view that

18    the government is amenable to proceed under these

19    circumstances.

20        You may proceed with your examination of the witness

21    and for clarity of the record, Officer Lozada, has just

22    stepped out of the courtroom.  He's not in the courtroom

23    right now.  So, you may proceed with the examination of the

24    witness, AUSA Hernandez.

25    BY MS. HERNANDEZ:

1   Q    Yes, November 15, 2023.

2   A    Yes.

3   Q    Can you tell us what, if any, was your participation

4   on that date relating to the supervision of Alexis Negron

5   Cruz?

6   A    Yes, we were conducting an initial visit to the client

7   at Guarabi Carib, which is a housing -- it's not treatment

8   but it's a housing arrangement that we do.  So, upon

9   arrival --

10  Q    Who were you with?

11  A    Officer Lozada.

12  Q    Was that the supervising officer?

13  A    Yes, sure.

14  Q    What was your role?

15  A    I was a secondary officer.

16  Q    What happened upon arrival at Guarabi?

17  A    We met with Migdalia Gonzalez, that's one of the case

18  managers.  She directed us towards the client's room.

19  Officer Lozada knocked on the door and the client answered

20  and opened the door for us.

21      After that, Officer Lozada started to use officer

22  clarification, a role clarification, as we usually do in

23  initial visits and the client rapidly stated that Officer

24  Lozada couldn't take a UA sample, urinalysis, because it

25  wasn't his condition, like the condition was waived for him

1  and he stated, "ya fallastes" or, "you already failed."

2  Officer Lozada --

3          THE MAGISTRATE: I'm sorry. I couldn't hear what

4  you just said.  What is it that he said?

5          THE WITNESS:  "Ya fallastes" or --

6          THE MAGISTRATE: I am sorry.  I need you to testify

7  in English.

8          THE WITNESS: Yes.  He said, "ya fallastes" or,

9  "You already failed."

10          THE MAGISTRATE: You may proceed.

11  BY MS. HERNANDEZ:

12  Q    Who said that?

13  A    The client, Mr. Negron.

14  Q    To whom?

15  A    To my partner, Officer Lozada.

16  Q    What happened after?

17  A    Officer Lozada clarified that he hadn't failed to this

18  point since he hadn't taken any sample and he wasn't going

19  to and he started to review the conditions of supervised

20  release as we usually do in initial visits.

21      The client kept making interactions to make specific

22  statements in regards to previous supervision experiences

23  and Officer Lozada kept redirecting the conversation towards

24  reviewing the conditions of release and talking about what

25  we usually talk in initial visits, including clarifying our

144

1   role as officers and his role as a client.

2   Q    What did you observe to be the attitude of the

3   defendant at that stage?

4   A    It was confrontational and up to a point he started to

5   be a little bit agitated as well, defensive I would say, and

6   again he kept talking and going on about previous

7   experiences and talking about what was fair and what wasn't

8   fair and Officer Lozada kept redirecting him and asking him

9   to please stay on topic and not to discuss previous

10  experiences or court matters at that time.

11  Q    During that entry to the room what, if anything, were

12  you able to observe?

13  A    I saw a Smart T.V., an Xbox, that's a gaming console,

14  and what appeared to be like a router or a hot spot of some

15  kind.

16  Q    Was that visible within the room?

17  A    Yes, it was just on top of the dresser.

18  Q    Subsequent to that, was anything else found in the

19  room?

20  A    Yes, yes.

21  Q    What was that?

22  A    After that we found when we started the search, we

23  found another, like a cell phone.  It was like a tablet of

24  some sort, another hot spot or router.  That's what I recall

25  and a lot of like cables and stuff like electronic cables.

1    Q    Do you recall whether the cell phone found was a

2    smartphone?

3    A    It was, yes.

4    Q    When the term smartphone is used, what do you

5    understand that to mean?

6    A    A cell phone with access to the internet.

7    Q    During this intervention, did you feel or understand

8    that you had to take any measures?

9    A    I did.  At some point the client or Mr. Negron kept

10   coming close to Officer Lozada and at some point I even

11   opened my OC pouch because I understood that things were

12   escalating, you know.

13   Q    They were escalating from the part of whom?

14   A    Of the client.  He kept raising his voice --

15        MR. LERMAN: Objection, Your Honor.  That question

16   calls for speculation there and it calls for an opinion.

17        MS. HERNANDEZ: It calls for her observations

18   relating to what she is observing and viewing.

19        THE MAGISTRATE: Well, let's focus on what you

20   observed and what you were doing and what the -- but could

21   you -- I heard you say something that you opened a pouch.

22   What pouch you opened?

23        THE WITNESS: Oh, the OC pouch, that's where we

24   keep our pepper spray.

25   BY MS. HERNANDEZ:

1    Q    Why did you feel the need to do this?

2    A    He kept closing in on Officer Lozada, raising his voice

3    and he, like his attitude was, I was observing, it was very

4    confrontational and at that point I believed like something

5    could escalate even more, like he could maybe attack my

6    partner or something like that.  So I opened by OC pouch.

7            MR. LERMAN: Objection, Your Honor, speculation and

8    relevance to the charges here as written.

9            MS. HERNANDEZ: Your Honor, --

10           THE MAGISTRATE: Overruled, overruled.  You may

11   proceed.

12   BY MS. HERNANDEZ:

13   Q    When you say he, who are you referring to?

14   A    Mr. Negron.

15           MS. HERNANDEZ: No further questions.

16           THE MAGISTRATE: Who would like to conduct cross

17   examination of this witness?  All right, AFPD Lerman, your

18   witness for cross examination.

19           MR. LERMAN: May I request, just before we begin,

20   if there's any Jencks for this witness.

21           MS. HERNANDEZ: No.

22           MR. LERMAN: May I have just a moment, Judge?

23           THE MAGISTRATE: Sure.

24                          CROSS EXAMINATION

25   BY MR. LERMAN:

1    Q    Good afternoon, Officer.

2    A    Good afternoon.

3    Q    The home visit that you were just describing, that was

4    November 15th, right?

5    A    Correct.

6    Q    That was the only home visit you did at Guarabi that

7    day or did you visit some other people?

8    A    We visited other people after that.

9    Q    Okay.

10         THE MAGISTRATE: I'm sorry, because of the noise,

11    the background noise in the system, I couldn't hear the

12    answer.  Could you repeat your answer.

13         THE WITNESS: Yes, I said, we visited other people

14    after that.

15         THE MAGISTRATE: Okay, you may proceed.  I'm sorry

16    for the interruption.  Go ahead.

17    BY MR. LERMAN:

18    Q    So you know anytime that you visit someone that's part

19    of supervision, so you need to make a record of the work

20    that you've done?

21    A    Not necessarily.  We make a record of it if we are the

22    primary officer, not if we are the secondary officer.

23    Q    I understand.  So, when you finish the site visit at

24    Guarabi and you return to your regular work station, you

25    didn't write anything down based on your observations?

1   A     No because as I said, I was a secondary officer in that

2   instance.

3   Q     Were you involved before November 15th on any

4   supervision of Mr. Negron?

5   A     No.

6   Q     When Mr. Lozada was speaking with Mr. Negron after he

7   opened the door, did you go inside of the room that Mr.

8   Negron was living in?

9   A     Not exactly as the room is very, very small.  So if

10  we're in just at the door, we're practically in, so I just

11  stayed right at the door but it's quite a small space.

12  Q     So when you were describing what was found and what was

13  recovered by Officer Lozada, that was -- you were describing

14  what Officer Lozada found inside the room.

15  A     What I saw also.  I was just there beside Mr. Lozada.

16  Q     When, what you saw Officer Lozada find inside the room

17  A     Yes and why also, I also saw the if you're referring,

18  I'm not sure if you're referring to the T.V., to the Xbox,

19  to the hot spot and then what was later found in the hamper

20  basically.

21  Q     Would any of the items that you described as found, did

22  you ever so inside the room and recover those items

23  yourself?

24  A     I didn't touch the items myself but I saw them directly

25  since if I'm standing right in the door, I can literally see

149

1    absolutely everything.  It's a very, very limited space.

2    Q    Okay.  Just to clarify.  So I've heard you describe

3    what you were seeing from outside the room, so you never

4    walked through the doorway inside, to go inside the room,

5    right?

6    A    Not into the room.  I just wanted to clarify because

7    you could be misleading saying not going into the room but

8    stepping right the door is basically being in the room.  I

9    just want to clarify that.

10   Q    Okay, so if I'm -- let's say at the end of the podium

11   here is the entrance to the room and I would have to step

12   forward through the doorway.  Did you ever step with your

13   feet through the doorway into the room?

14   A    I would say, yes, at the beginning, like a step closer

15   in the room, yeah.

16   Q    So how many steps into the room did you go?

17   A    Probably just --

18        MS. HERNANDEZ: Objection, Your Honor.  This has

19   been asked and answered.

20        THE MAGISTRATE: Overruled.  I'll allow the

21   question to proceed.  Go ahead.

22        THE WITNESS: I could say approximately like a

23   step, no more than two steps into the room.  Something like

24   that.

25   BY MR. LERMAN:

1    Q    Did you have to, after you left the home visit on

2    November 15th, did you process any of the items?  Were you

3    involved with any supervision after November 15th?

4    A    I didn't.

5    Q    So, after November 15th until today, have you discussed

6    this case with anybody?

7    A    Discuss the case, no.

8    Q    Have you had an opportunity to read --

9    A    Well, let me clarify.  I did tell my supervisor that I

10   was going to be here today but not discuss the case.

11   Q    Okay, so you haven't had the opportunity to read any

12   of the documents that have been filed in this case?

13   A    Yes, I have, yeah.

14   Q    So you read those this morning before you came to

15   testify?

16   A    I read some of the documents last week when was

17   supposed to be the first hearing.

18   Q    So you read some of the documents and you're referring

19   to what documents did you look at before you came here?

20   A    I looked at the docket.

21   Q    You opened anything from the docket?

22   A    I did.  I cannot remember a specific motion but I did

23   review motions.  I was just trying to see like the hearing

24   date and what not.

25   Q    Did anyone ask you to read a draft of the motion to

1    revoke supervision before it was filed?

2    A    No.

3           MR. LERMAN: Your Honor, may I have thirty seconds

4    before I continue?

5           THE MAGISTRATE: Well, of course, of course.

6    BY MR. LERMAN:

7    Q    Officer Guzman, you mentioned that you opened a strap

8    on your OC pouch.

9    A    The pouch, yeah.

10   Q    So that's the step you take before using force, right?

11   A    Yes.

12   Q    Does your office policy require making a report to

13   anyone since you made that step?

14   A    No, not by opening the pouch, no.

15   Q    Did you make a report regarding that?

16   A    No.

17   Q    Okay, so at no point did you ever write anything down

18   related to this or speak to anyone about what your

19   observations were before today?

20   A    To my supervisor, I did say to my supervisor that I was

21   going to be coming in here today.

22   Q    Okay.  Is your supervisor in court today?

23   A    No.

24           MR. LERMAN: No further questions, Your Honor.

25           THE MAGISTRATE: You're excused.

1          THE WITNESS: Thank you.

2          THE MAGISTRATE: Does the government have any

3  additional witnesses?

4          MS. HERNANDEZ: No, Your Honor.  The case is

5  submitted on behalf of the United States.

6          THE MAGISTRATE: Very well.  Will the defense want

7  to call any witnesses?

8                    (Witness excused)

9          MR. LERMAN: Your Honor, may we have thirty

10  seconds?

11          THE MAGISTRATE: Of course.

12          MR. LERMAN: Your Honor, may we take a brief recess

13  so that Mr. Negron can use the restroom?

14          THE MAGISTRATE: Excuse me, a recess for what you

15  said?

16          MR. NISKAR: So that Mr. Negron can use the

17  restroom.

18          THE MAGISTRATE: Well, if he needs to use the

19  restroom, well he can use the restroom but before he goes

20  out, do you intend to call any witnesses?

21          MR. NISKAR: Your Honor, we may have one.  We're

22  still processing.  This has been a long hearing and there

23  was a lot --

24          THE MAGISTRATE: Okay, well if, let's to this.  If

25  you plan to call that witness, while Mr. Negron is going to

1    the restroom, ask that witness to be walking on his or her

2    way over here.  Okay, so that we don't have any delays.  All

3    right.

4            MR. NISKAR: I understand, Your Honor.

5            THE MAGISTRATE: Marshals, you may -- I believe

6    that I've been told that the defendant needs a restroom

7    break.  I will wait right here.  So, in the meantime, if you

8    decide to use a witness, you can ask him or her to start

9    coming to the courthouse, excuse me to the courtroom.

10       All right, so now that the defendant has returned, is

11   the defense going to call any witness to the stand?

12           MR. NISKAR: Yes, Your Honor.  Mr. Negron Cruz

13   would like to testify and we're going to call Alexis Negron

14   Cruz to the witness stand.

15           THE MAGISTRATE: Very well.  Before he takes the

16   stand have you duly advised him of the fact that he's not

17   required to testify, that he has a right to remain silent.

18                       (Inaudible)

19           THE MAGISTRATE: Yes, sure.  Have you duly advised

20   Mr. Negron that he has a right to remain silent; that he's

21   not forced or required to take the stand at today's hearing

22   and that anything that he testifies here today, the

23   government can use against him for purposes of these

24   revocation proceedings?

25           MR. NISKAR: I've explained to him that and I'll

1  also explain to him now that not only will he would have to

2  answer my questions but he would be subject to having to

3  answer the questions of the government and possibly the

4  Court as well, if the Court or the government has questions

5  after we conclude and after doing so, I will ask my client

6  again whether or not "it's your choice and your choice alone

7  to testify in this proceeding today."

8          THE MAGISTRATE: Okay.  Well, so you have also

9  advised him about the fact that he's going to be subject to

10  cross examination.  Okay, is it your understanding that your

11  client's decision to testify is a decision that he's making

12  voluntarily?

13          MR. NISKAR: Yes, Your Honor.

14          THE MAGISTRATE: Okay.  Very well.  Well, then

15  under these circumstances, Mr. Negron.  Please.

16          MR. NISKAR:  Can we ask, Your Honor, that he be

17  unshackled first.

18          THE MAGISTRATE: Well, let's at least one of the

19  two hands because we're going to have to take his oath, so

20  at least one of the two hands.  So his right hand, so that

21  he can take his oath.

22      AFPD Niskar, if you want for clarity of the record to

23  ask any preliminary questions to your client as to his

24  decision to voluntarily testify, you're free to do so, if

25  you so wish, if you so wish.  I mean it's just, I just want

1  to make sure that and I think I'm satisfied with your

2  answers that you have conferred to him and you have

3  explained to him his rights and that he voluntarily wishes

4  to testify, but nonetheless, if you wish to ask any of those

5  questions as part of the preliminary questions, you're free

6  to do so if you so wish.  Let's place the witness under

7  oath.

8                    (The defendant was duly sworn)

9  Whereupon,

10                    ALEXIS D. NEGRON-CRUZ

11  was called as a witness and after having been first duly

12  sworn through the interpreter, was examined and through the

13  interpreter testified as follows:

14          THE MAGISTRATE: Have a seat.  If the witness, we

15  have the microphone close towards him, that will be great.

16  AFPD Niskar, your witness for direct examination.

17          MR. NISKAR: Is there a way that I could ask the

18  witness to switch chairs, so that I could see my client

19  while he's testifying.

20          THE MAGISTRATE: That's fine.  I personally don't

21  have any problem with that.  I mean, is this an issue for

22  the interpreter?  Does it create an issue?

23          THE INTERPRETER: The interpreter is (Inaudible)

24  The interpreter will make the effort.

25          MR. NISKAR: I'm sorry.  Thank you.

156

1          THE MAGISTRATE: Again I don't have any particular

2    preference one way or the other.  It's fine.  If that helps

3    you to see your client better, that's fine.  Okay.  Very

4    well and thank you to the interpreter for accommodating that

5    request.  Okay, you may proceed.

6                         DIRECT EXAMINATION

7    BY MR. NISKAR:

8    Q    Buenas tardes.  Good afternoon.

9    A    Good afternoon.

10   Q    Would you please state your name for the record.

11   A    Alexis Negron Cruz.

12   Q    Are you currently under supervision and being

13   supervised by the Probation Department here in this court?

14   A    I'm under supervised release.

15   Q    Okay and when did that start?

16   A    The first time or now?

17   Q    The most recent.

18   A    On November 9th.

19   Q    In November 9th where were you living?

20   A    I left MDC Guaynabo and I was transported to Guarabi.

21   Q    Why were you transported to Guarabi?

22   A    It was the Probation Office that decided for me to be

23   at Guarabi.

24   Q    To do what there?

25   A    I don't have housing and since I do not have housing,

157

1    to house me there temporarily.

2    Q    Were you unemployed?  I mean, were you homeless?

3    A    Yes, I'm homeless.

4    Q    Were you unemployed when you were released from MDC

5    Guaynabo?

6    A    In the prior revocation I lost my job, my house and

7    part of my properties and my vehicle, my car loan.

8    Q    Okay.  Did there come a time where you met your

9    Probation Officer that was going to be supervising you in

10    this case?

11    A    Before or after the 15th?

12    Q    On the 15th did you meet your Probation Officer?

13    A    On the 15th was the first time that I saw the Probation

14    Officer.

15    Q    Okay.  Tell us and tell the Court what happened that

16    day.

17    A    That day they knocked on the door and I was inside the

18    room.

19    Q    What happened next?

20    A    Two Probation Officers appeared together with Ms.

21    Migdalia.

22    Q    Okay and what happened next?

23    A    He asked one question as if to take a urine test and I

24    told him that I did not have that supervision as such.  He

25    came with some objects to make a urine test and I said that

1    I did not have that supervision as such.

2    Q    Okay, at this point where was Mr. Lozada standing while

3    you were talking to him?

4    A    He was outside the door.

5    Q    Was he with anyone else?

6    A    He was with the Probation Officer who sat here before.

7    Q    Okay and then what happened next?

8    A    He started questioning me as if I had something in my

9    room like I had some sort of artifact in the room.

10    Q    Okay and what happened next?

11    A    I told him that I would not answer that question.

12    Q    Okay, what happened next, if anything?

13    A    He asked me if he could come into the room.

14    Q    What did you say?

15    A    I know that if I refused him entry I would be in

16    violation of the orders and I said, yes, that there was no

17    problem.

18    Q    Okay and did he come in?

19    A    Yes, he came in.

20          THE MAGISTRATE: I believe there was a portion of

21    the answer in Spanish that was not translated to the English

22    language.

23          MS. HERNANDEZ: That is correct, Your Honor.

24          THE MAGISTRATE: I say this very respectfully

25    because I hold in very hard regard the esteemed work of all

1 the interpreters but I believe that -- I believe -- just a

2 second please.  I believe that at some point the witness

3 answered that he understood that he could not say no to the

4 request to enter the room because otherwise he would be and

5 I don't remember the exact words but he would not be like or

6 in compliance or it would be in violation of some

7 conditions.  I believe he said something like that.

8         THE INTERPRETER: Remember that he said, "I knew

9 that I could not refuse him entrance because I knew, I would

10 be in violation of the order."

11         THE MAGISTRATE: Okay, well then my mistake, my

12 mistake.

13         MS. HERNANDEZ: Your Honor, we're seeking

14 clarification because in Spanish the words were "en

15 violacion de mis condiciones".

16         THE INTERPRETER: El dijo, "en violacion de la

17 orden".

18         MR. NISKAR: He said, "violacion de mi supervision

19 no condiciones".

20         THE MAGISTRATE: Okay, so we have three different--

21 All right, fair enough, fair enough.  I have just heard

22 three different versions in Spanish.  So let's do this.

23 AFPD Niskar, would you mind just simply repeating the same

24 question because that way and again, the interpreter could

25 very well right.  Maybe it was my mistake and I missed the

1    translation.  So, if that's the case, I'm sorry for the

2    interruption but since now I've heard three different

3    versions in Spanish, could you repeat that, the question

4    that led to that answer.  Go ahead.

5    BY MR. NISKAR:

6    Q    I think the question was, did you allow Mr. Lozada to

7    enter the room?

8    A    Yes, I allowed Mr. Lozada to enter my room because in

9    my conditions it stated that if I do not allow him to come

10   into my room, I would be violating my conditions.

11   Q    Okay, so who entered, either, did both of the Probation

12   Officers enter?

13   A    Only Mr. Lozada.

14   Q    Before Mr. Lozada entered, did he tell you that he had

15   seen any contraband from the doorway of your room?

16   A    No, at no point did he see any contraband from the

17   outside door.

18   Q    Okay, so what happened after he entered your room?

19   A    He started inspecting to see what I had like, he

20   started looking at everything.  He started looking behind

21   the T.V. to see if he could find something.

22   Q    Okay, you in fact told Mr. Lozada where he could find

23   the cellular phone, correct?

24          MS. HERNANDEZ: Objection, leading, Your Honor.

25          THE MAGISTRATE: Could you rephrase your question.

1    BY MR. NISKAR:

2    Q    Did you tell Mr. Lozada that you had a cellular phone?

3    A    Mr. Lozada does not have technical knowledge.  He

4    started asking me about each object that I had there.

5            MR. HERNANDEZ: Objection, not responsive.

6            THE MAGISTRATE: Well, I'll take the answer for

7    what it's worth.  You may proceed with your next question.

8    BY MR. NISKAR:

9    Q    Did you tell him anything about a cellular phone?

10   A    Mr. Lozada, I told him about the cell phone after I

11   told him that I had a hot spot.  I'm sorry, he could not

12   identify the hot spot as such.  I told him that it was a hot

13   spot.

14   Q    Did you ever threaten Mr. Lozada?

15   A    Never.

16   Q    Were you ever aggressive with him?

17   A    I'm not an aggressive person.

18   Q    Did you ever intentionally approach Mr. Lozada at a

19   close distance to try and put fear in him?

20   A    No, he was the one who approached me.

21   Q    At some point after the 15th you were advised about an

22   appointment to install the surveillance equipment on your

23   phone, correct?

24   A    On the very 15th, on the very day of the 15th, after the

25   revision, Mr. Lozada, the lady who was here, the Probation

1    Officer who was here before and Ms. Migdalia, we met at the

2    Chapel to talk about the conditions.

3    Q    Okay, and was there a plan to install the electronic

4    monitoring system on your phone?

5    A    I told Mr. Lozada that the monitoring system has always

6    caused me problems.  It has always caused me problems in my

7    supervision and I told him to please solve that and he told

8    me to give him two days.

9    Q    What happened next, if anything?

10   A    They left.  A week went by and he didn't call me or

11   communicate with me.  I asked the person who was then my

12   attorney, Mr. Andrew McCutcheon, and I explained to him the

13   situation.  I explained to him that I needed a phone and I

14   explained to him about the monitoring and that I needed

15   internet and he communicated with Mr. Lozada and then Mr.

16   Lozada communicated with me.

17   Q    Okay.  Why is it that you needed a telephone?

18   A    Everybody needs a telephone.

19   Q    Why did you need a telephone?

20   A    When I came out of prison for the first time, I could

21   not see myself without a phone.  The second time when I came

22   in, you couldn't talk to the phone.  Then when I came out

23   everybody was talking to the phone and chatting on the phone

24   and to me it was something weird, why is everybody always

25   hooked on the phone.

1  Q    So, why is it that you needed a phone?  Was there some

2  purpose that you needed a phone?

3  A    I need the telephone to communicate with my family, to

4  communicate with the people that I know.  With the phone now

5  you know where to go, you know how to call people, people

6  write to you by a text message.

7  Q    Would it have assisted you with employment

8  opportunities?

9  A    In 2022 when Taisa Mojica and Jeffrey Semidey allowed

10  me to have a phone with internet and no monitoring, I found

11  a job in less than a month.

12  Q    Was the software ever installed on your telephone?

13  A    On 2022 the software was going to be installed in my

14  phone but it was decided to revoke me before the software

15  was installed.  On the very 27th of March when I went to the

16  Probation Office with the attorney for the software to be

17  installed, on that same day they decided to revoke me

18  instead, instead of installing the software.

19  Q    So, again, this last December of 2023 you were not

20  employed, correct?

21  A    On November 9th when I came out, I was without a job and

22  I spent November and December of 2023 without a job.

23  Q    Were you able to pay the cost of the electronic

24  monitoring program?

25  A    The condition states that it's subject to what the

1    person can pay.  I cannot pay the software right now.  Up

2    until now I cannot pay for the software because I was

3    without a job.

4    Q    Is it your feeling that you interfered in any way with

5    having this software system installed on your phone?

6    A    At no point.  I have always communicated to the Court

7    all the problems that I've had through motions to install

8    the software.

9    Q    You were here during the testimony of Probation Officer

10   Lozada, right?  You heard that testimony?

11   A    Yes, I heard the translation that was provided to me of

12   the testimony.

13   Q    He has testified that at two points there was an

14   individual by the name of Jose Rivera Torres -- well, he has

15   testified that an individual by the name of Jose Rivera

16   Torres was in your room at Guarabi.  Did you hear that

17   testimony?

18   A    In my room?

19   Q    Yes.

20   A    No, Jose has never come into my --

21   Q    That you had left Guarabi, I'm sorry, my fault.  That

22   you had left Guarabi with Mr. Rivera Torres and you were

23   associating with him at Guarabi.  Did you hear that

24   testimony?  Yes or no?

25   A    Can I clarify something for the Court?

165

1    Q    Not yet, just yes or no.  Did you hear that testimony?

2    A    Yes, I heard that testimony.

3    Q    Was Mr. Rivera Torres someone that was associated with

4    your original case that you had a conviction for?

5    A    If he has any kind of relation to me in that case?

6    Q    Yes.

7    A    No, no, never.

8    Q    Apart from Guarabi, were you acquaintances or friends

9    with Mr. Rivera Torres?

10   A    In 2022 when I found a job, my then boss hired me to

11   work at Liberty.  He found an additional vehicle that he

12   left me in charge of so that I could hire an additional four

13   people.

14        I hired four people exclusively from Guarabi to collect

15   data for Liberty.  One of these people was Jose Rivera.  He

16   worked eight hours a day with me together with the work team

17   five days a week.  His Probation Officer knew it.

18        We never had any problem like the one that's happening

19   now with any kind of relationship.  On the contrary, they

20   were happy because he had a job.

21   Q    When you left Guarabi with Mr. Rivera Torres, that was

22   with or without the permission of Guarabi?

23   A    With the permission of Guarabi because you have to sign

24   a list for your exits and they bring you together with other

25   people in a bus and that was only once to go buy food at

1    Econo.

2              MR. NISKAR: I have no further questions but Ms.

3    Hernandez may have some questions for you.

4              THE MAGISTRATE: Your witness, Ms. Hernandez.

5              MS. HERNANDEZ: Yes, Your Honor, if I can have a

6    just a couple of minutes to review the documents.

7              THE MAGISTRATE: Yes, yes, you may.

8              MS. HERNANDEZ: Ready to proceed, Your Honor.

9              THE MAGISTRATE: Very well.  Your witness for cross

10   examination.

11                        CROSS EXAMINATION

12   BY MS. HERNANDEZ:

13   Q    Mr. Negron, it is correct to stated that you are

14   familiar with your conditions of supervised release, is that

15   correct?

16   A    Yes.

17   Q    Your conviction for which you are on supervised release

18   is possession of child pornography material, correct?

19   A    Yes.

20   Q    As part of the offense of conviction, it involved the

21   use of a telephone and electronic devices.

22   A    It involved a computer, not phone.

23   Q    It involved an electronic device with access to the

24   internet.

25   A    It involved a computer with access to the internet but

1  never a phone.

2  Q    In your judgement of conviction since December 4,

3  2013, it included a condition that you would not have access

4  to the internet at your place of residence unless approved

5  by the Probation Officer.

6  A    In my conditions, the ones that were modified before --

7  Q    I'm asking exactly related to --

8         THE MAGISTRATE: Hold on, hold on, please allow him

9  to finish his answer.  Please allow him to finish.  You may

10  finish your answer.

11         THE WITNESS: Before I could not have a telephone

12  with access to the internet without asking the Probation

13  Officer.  Those conditions were modified.

14  BY MS. HERNANDEZ:

15  Q    I'm asking you precisely about your first judgement of

16  conviction.  I will ask later about the modified conditions

17  after your revocations of supervised release.

18         MR. LERMAN: Objection, Your Honor.  This is beyond

19  the scope of not only the direct but it's beyond the scope

20  of the charges.  What's relevant here is the condition that

21  he had when he was released on November 9th and then the

22  throwing out gratuitously about, "your other revocations."

23  There's a revocation that's under appeal in the Circuit.

24         MS. HERNANDEZ: It goes to -- if I may respond,

25  Your Honor?

1          THE MAGISTRATE: I'll hear you.

2          MS. HERNANDEZ: Yes, it goes to his knowledge of

3    his conditions as to what his conditions he has had since

4    the onset until current relating to the modifications and

5    what transpired then on November of 2023 and it is important

6    to establish what the conditions are and what the conditions

7    have been and the requirements to comply because it all goes

8    to his knowledge and understanding whether he's complying or

9    not with the conditions.

10         MR. LERMAN: Your Honor, also I know that this may

11   be a practical issue but I don't think –

12         THE MAGISTRATE: Mr. Lerman.

13         MR. LERMAN: I'm sorry, my apologies.

14         THE MAGISTRATE: Okay, well then, all right, you

15   may proceed.

16   BY MS. HERNANDEZ:

17   Q    We are again speaking about your original judgement.

18   Since the onset it also indicated that you should not

19   possess or use a computer, cellular telephone or any other

20   device with internet access and capability at any time or

21   place without prior approval from the United States

22   Probation Office.

23         MR. LERMAN: Objection, Your Honor.  It's a

24   compound and very long question and it has to be interpreted

25   and I don't know if we're able to interpret --

1           MS. HERNANDEZ: I think my questions have been a

2      lot shorter than the ones that were made --

3           THE MAGISTRATE: Hold on, please, please.  Let's

4      not start arguments of this nature.  Let's just simply, if

5      the interpreter has an issue or a difficulty, sir, feel free

6      to let us know and then we'll try to see how we can address

7      that.  All right.

8           THE INTERPRETER: Sure, Your Honor.  If you could

9      just hand me the text that you just read and repeat the

10     question that will be great.  I believe the original

11     question was, if he knew your original conditions on the

12     first judgement was --

13          MS. HERNANDEZ: Since the onset.

14          THE INTERPRETER: Since the onset were --

15          THE MAGISTRATE: Please repeat your question for

16     the sake of the record.

17          MS. HERNANDEZ: Yes.

18     BY MR. HERNANDEZ:

19     Q    Since the onset in your original judgement of

20     conviction, it included the condition which was read from

21     condition number 6.

22          THE MAGISTRATE: Okay, okay.  Once again, I'm going

23     to repeat what I have said several times already at this

24     hearing.  Condition 6 of what docket number, of what page?

25          MS. HERNANDEZ: Your Honor, yes, and to be clear,

1  we were answering a question.  We had the document with us.

2  We provided it to the translator, so we are receiving the

3  document back so we can once again pose the question as we

4  had for the record.

5        THE MAGISTRATE: Well pose the question then

6        MR. NISKAR: Your Honor, my only concern at this

7  point is the colloquy and the discussions between counsel

8  and the Court and the objections that are being made are not

9  being translated for Mr. Negron Cruz by the court

10  interpreter.  None of this has been translated.

11        THE MAGISTRATE: Well, I think that's fair.  Thank

12  you for bringing that to my attention.  Mr. Ravelo, he's

13  going to have to keep wearing the headset so that that way

14  because the defendant chose to remove the headset, so --

15        MR. NISKAR: Only on one ear.  He can (Inaudible)

16  on one ear.

17        THE MAGISTRATE: So, that way when these situations

18  arise, that way Mr. Ravelo can provide translation.  Thank

19  you for bringing that to my attention but now I see that the

20  defendant has chosen to at least put on one ear the headset.

21     So that way when these kind of objections arise, that

22  way he can also listen to the translation.  Thank you, AFPD

23  Niskar for bringing that matter to my attention.  So, once

24  again, AUSA Hernandez, just for clarity of the record, can

25  you simply ask the full question so that that way the

1    interpreter can translate that to the witness.

2            MS. HERNANDEZ: Yes, Your Honor.

3    BY MR. HERNANDEZ:

4    Q    Since the onset in the original judgement of

5    conviction, it included a supervised release condition and I

6    am referring now for clarity of the record, the judgement is

7    at docket 143.  We are reading from page 5 of the seven page

8    judgement, condition number 19, the first sentence. "He

9    shall not possess or use a computer, cellular telephone, or

10   any other device with internet accessing capability at any

11   time or place without prior approval from the Probation

12   Officer."

13           THE WITNESS: You took it off.

14           MS. HERNANDEZ: It was just to read that I had it

15   on the screen.

16           THE WITNESS: I was reading it.  I'm reading it.

17   BY MS. HERNANDEZ:

18   Q    If you may answer the question.

19   A    It's just that I want to make sure because I had some

20   conditions that were changed afterwards and I want to make

21   sure that you have the correct paper, not the one that

22   changed afterwards.

23   Q    Sir, I'm asking precisely and how the question

24   commenced relating to your original judgement of conviction

25   on December 4, 2013.

1   A    Those conditions were changed.

2   Q    I have not asked whether they have been changed.  I

3   ask whether at that time that condition was imposed, at that

4   point in time in 2013?

5   A    Yes, but it's 2024.

6   Q    Correct, sir, and after that judgement of conviction,

7   you've had two following supervised release revocation

8   hearings, correct?

9   A    That's correct and we've also had two changes in the

10   supervisions.

11   Q    Your last judgement of conviction was on November 9,

12   2023.

13   A    Yes.

14   Q    Now, that judgement of conviction also had the

15   requirements relating on whether you could access or possess

16   cellular devices or other electronic devices, correct?

17   A    I didn't quite understand that question.

18   Q    Sir, did the supervise release conditions imposed on

19   your last judgement of conviction include also a condition

20   that indicated that you should not possess or use computer,

21   cellular telephone or any other device with internet access

22   and capability at any time or place other than with the

23   systems that will enable the Probation Officer or his or her

24   designee to monitor and filter any internet access?

25   A    I understood that question, so that it doesn't need

1  translation and that was changed because it was changed to

2  say that he could not use the devices without internet

3  without the consent or approval of the Probation Officer.

4  That was changed.

5      MS. HERNANDEZ: At this time we would request that

6  the Court take judicial notice of docket 429, a judgement

7  and particularly in page 2 of the six page document where it

8  indicates special condition number 32.

9      THE MAGISTRATE: I'm sorry.  I'm sorry, I don't

10  mean to interrupt you but there's a request that the

11  prosecutor is asking me to take judicial notice of, so

12  that's not really a question that's being made to you, Mr.

13  Negron.  It's a request that the prosecutor is making to me

14  and the Court is asking me to take judicial notice of

15  special condition number 32 in docket 429 at page 2. Is

16  there any objection to this request, AFPD Lerman?

17      MR. LERMAN: Your Honor, we -- I think I understand

18  why Mr. Negron was answering because we don't see how this

19  relates to the cross examination.  If the government at some

20  point wants to ask the Court to look at a particular

21  document, the government's been cross examining on some

22  different documents and, so, if we're through with cross

23  examination and the government has other evidence, so we

24  just object for relevance at the moment.

25      THE MAGISTRATE: Well, the objection is overruled.

1  I do take judicial notice that in docket 429, on page 2, at

2  special condition number 32, it states, "he does not possess

3  or use a computer, cellular telephone or any other device

4  with internet accessing and capability at any time or place

5  other than those with systems that will enable the Probation

6  Officer or his or her designee to monitor and filter any

7  internet accessing.  You may proceed with your examination.

8        MR. LERMAN: Your Honor, I'm sorry, my apologies

9  and just that the Court is taking notice of that document,

10  we would just -- we wouldn't object to the taking notice

11  that that was one of the violations that Judge Besosa found

12  on the November 9th, date, so that's not --

13        THE MAGISTRATE: I have not taken judicial notice

14  of that.  I have simply taken judicial notice of the fact

15  that special condition number 3, to which I read verbatim,

16  word by word, is contained in the judgement of revocation on

17  docket 429 on page 2, that's it.  That's all I've taken

18  judicial notice of.  I've never said that whether that was a

19  violation that the Court found or did not find.

20      I'm not taking judicial notice of that.  I'm just

21  simply taking judicial notice of the fact that there is a

22  special condition number 32 in docket 429 in that judgement

23  of revocation.  That's all.

24        MR. NISKAR: But that's not what 429 stands for.

25  429 just states that Judge Besosa found that special

1    condition 32 had been violated previously, not that he's

2    still under the obligation to complete that special

3    condition.

4         THE MAGISTRATE: Okay, once again, you see, you're

5    jumping one step ahead.  You see, I have not taken judicial

6    notice of that which you have just stated.  All I have taken

7    judicial notice of is the mere fact that special condition

8    number 32, as I read it word by word, appear and it's

9    contained and it's part of the judgement of revocation on

10   page 2 in docket 429.  That's it.

11        MR. NISKAR: But what is the purpose of the

12   government asking the Court to take judicial notice?

13        THE MAGISTRATE: Well, --

14        MR. NISKAR: That's not relevant.

15        MS. HERNANDEZ: If we may respond because I think

16   it was defense counsel themselves who indicated that the

17   supervised release in document 429 also includes that all

18   the special conditions of supervision to continue under the

19   same conditions previously imposed on him which would

20   include special condition number 32.

21        THE MAGISTRATE: Okay, in any event, again, I can

22   take judicial notice of the contents of a judgement of

23   revocation in terms of what the document says and in this

24   particular case I have literally read verbatim word by word

25   from page 2 of docket 429 special condition number 32 and

1   what are the implications of that, well, the parties may

2   disagree and well, I'll hear arguments from both sides, but

3   the fact that it's contained in the judgement of revocation

4   as special condition number 32 in docket 429, I do take

5   judicial notice of that.  You may proceed with your next

6   question.

7   BY MS. HERNANDEZ:

8   Q    Yes and the question was that that was one of the

9   conditions that was imposed.

10  A    I tell this Court that the condition that I have as

11  far as I know is the changes, is that Mr. Negron can have

12  any system or telephone as long as it has a monitoring

13  system that he can pay for.  To date, the Probation Office

14  has not been able to solve it.

15  Q    So, you need a monitoring system for any device that is

16  going to be under your possession?

17  A    As long as the Probation Officer can solve that

18  problem, it is my understanding that I can.  So far the

19  Probation Office has not been able to solve that problem

20  and because of that I have been left without a phone.

21       If they cannot provide or they cannot solve this

22  problem, I will be left without a phone for the rest of my

23  life.

24  Q    On November 15, 2023 you had a smartphone.

25  A    I had a smartphone for emergencies.  I did not have a

1   smartphone for my personal use.  It was a smartphone

2   for emergencies.

3   Q    So you had a smartphone?

4   A    That day I had a smartphone for emergencies.

5   Q    We are in agreement that at that moment in time you

6   were residing in Guarabi.

7   A    Yes.

8   Q    In a square room.

9   A    Yes.

10  Q    And it was a small room?

11  A    Yes.

12  Q    The closet did not have any doors.

13  A    Forgive me for -- I mean, the closet did not have doors

14  but I don't understand why the closet had to have any doors.

15  Q    In that room you had a Smart T.V.

16  A    I've always had a Smart T.V.

17  Q    You also had an Xbox.

18  A    Since 2022 the Probation Office has known that I have

19  an Xbox, that I have a Smart T.V.  That I have all of those

20  things.

21  Q    On November 15, 2023, sir, I'm specifically asking you

22  for that date, you a Smart T.V. and you had an Xbox.  Is

23  that correct?

24  A    Yes.

25  Q    You also had an internet hot spot.

1    A    On 2022 I also had a hot spot.

2    Q    See, sir, I'm asking you for November 2023.

3    A    I've always had a hot spot and there's never been a

4    problem with the hot spot.

5    Q    So the response is, yes.

6    A    Yes.

7    Q    Prior to that date, November 15, 2023, you had not had

8    other interactions with Negron.

9    A    I am Mr. Negron.

10    Q    Yes, Negron, sorry.  I'm saying with Probation Officer

11    Jose Lozada.

12    A    Before December 15th he was not my Probation Officer.

13    Q    Are you meaning to say before November 15 of 2023.

14    A    Yes.

15    Q    On that date you also, as you just admitted, had a

16    smartphone?

17    A    Yes.

18    Q    That smartphone was capable of having access to the

19    internet.

20    A    That emergency telephone does have capability to

21    access the internet.

22    Q    That smartphone did not have a monitoring device.

23    A    That same smartphone in which it was attempted to

24    install the monitoring system is not compatible with the

25    monitoring system.

180

1   Q    So then the response is, yes, it did not have a
2   monitoring device.
3   A    Because it could not be installed.
4   Q    Sir, I'm going to ask you one more time, yes or no,
5   did that particular phone have a monitoring device at that
6   point in time of November 15, 2023, yes or no?
7   A    It did not have a monitoring system.  It could not be
8   installed.
9   Q    On that date you also provided the password to the
10  Probation Officer Lozada for that particular phone.
11  A    I always provide the password because if I refuse, that
12  would be a violation.
13  Q    Now, sir, I just want to make sure, looking at what
14  has been identified as Government's Exhibit number 2, that
15  is the hot spot that you had in your room in Guarabi,
16  correct?
17  A    That is a hot spot that Mr. Lozada was not able to
18  identify.
19  Q    But you were able to identify it.
20  A    Yes, I identified it and I told him that I had a hot
21  spot.
22  Q    What's a hot spot?
23  A    That hot spot is a system, that hot spot is provided
24  by the company, Claro, with the Obama phones.  It's not that
25  phones are owned by the President, President Obama, it's

1    that they're called Obama phones.  They're free phones and

2    the company, Claro, provides a free phone and a free hot

3    spot.

4    Q    That is to have access to the internet.?

5    A    That's specifically to provide access to the game

6    console for video games and to the T.V. set to watch movies.

7    Q    What we see in Government's Exhibit number 3 is your

8    Xbox, correct?

9    A    Wrong.

10   Q    What is it that we see there, sir?

11   A    A UPS, that's a battery.

12   Q    This question here relates to the controls of the

13   Xbox, correct?

14   A    Yes, that's to charge the Xbox controls?

15   Q    That's the Xbox that you also had in your room.

16   A    Which one?

17   Q    Well, the one that you have indicated that you also

18   had an Xbox in your room.

19   A    No, that was a battery.  You didn't show me an Xbox.

20   Q    Sir, I ask you, but you also had an Xbox in your room.

21   A    With all due respect, Madam Prosecutor, you showed me

22   an image and I told you as an image and there was no Xbox in

23   the image.

24   Q    At this time I'm not showing you an image and I

25   inquired right before, you also had an Xbox in your room,

1    correct?

2    A    If I could clarify some details to the Court.

3    Q    If you could please answer my question, yes or no?

4    A    Can you please repeat the question.

5    Q    You had an Xbox in your room.

6    A    I have a video game console, an Xbox because the

7    Probation Office does not have a system that could monitor

8    it or monitor it just the same the T.V. and since they don't

9    have a monitoring system that can monitor it, they cannot

10   take it away from me.

11        That's why I've always had a T.V. set and a video game

12   console because if the software it does not provide support,

13   if it cannot support the monitoring, they cannot take away

14   or leave me without a T.V. set or a video game console.

15   Q    Sir, I'm going to follow my next question because at

16   this stage I'm asking relating to the items that you had.

17   In Government's Exhibit number 6, is that the smartphone

18   that you have identified as the smartphone that you have?

19   A    That's the phone in which the monitoring system cannot

20   be installed.

21   Q    That's the telephone that you had on November 15, 2023

22   in the room.

23   A    That is the phone that I had in the room on November

24   15, 2023 and that is the phone that Mr. Lozada brought to me

25   on December 5th in order to install the monitoring system on

1  December 7.

2  Q    During the month of December, there was no monitoring

3  system that was provided, any smartphone provided to you,

4  correct?

5           THE INTERPRETER: I'm sorry, there was no

6  monitoring system --

7  BY MS. HERNANDEZ:

8  Q    In December 2023 you were not provided with any

9  smartphone or phone that had a monitoring device.

10          MR. LERMAN: Objection.  That question is compound.

11          THE MAGISTRATE: I believe, wasn't the question

12  that -- I believe your question is, AUSA Hernandez that

13  whether on the 5th of December --

14          MS. HERNANDEZ: In December 2023 --

15          THE MAGISTRATE: Whether he had been provided with

16  a smartphone.

17          MR. HERNANDEZ: Yes, that had a monitoring device.

18          THE MAGISTRATE: Okay, I don't think that's a

19  compound question.  It's basically -- all right, you may,

20  does the interpreter need to have the question repeated?

21          THE WITNESS: December, what day of December?

22  BY MS. HERNANDEZ:

23  Q    Any day during December.

24  A    On December 7th there was an attempt to install the

25  monitoring system in that phone, in that same phone, and it

1    was not compatible.

2    Q    After that date you were not provided with a cell

3    phone that had any monitoring device.?

4    A    Whether the Probation Officer provided me with a phone

5    with monitoring, no.

6    Q    Now, sir, calling your attention now to January 3rd,

7    2024, on that date Probation Office also visited your room

8    at Guarabi, correct?

9    A    Yes.

10   Q    At that time you were also found to have a smartphone

11   in the room, correct?

12   A    Can you please pose the question again.

13   Q    On January 3, 2024, during the visit by the Probation

14   Office, you were also found to have a smartphone on that day

15   in the room.

16   A    That day I told the Probation Officer --

17          THE MAGISTRATE: Let me have at least the

18   translation.  Can you go ahead.  What's the translation?

19          THE WITNESS: That day I told the Probation

20   Officer.

21   BY MS. HERNANDEZ:

22   Q    At that time we're asking to first respond to the

23   question yes or no.

24   A    I'm going there.

25   Q    Yes or no?

1   A    I'm sorry.  That day --

2            MS. HERNANDEZ: Your Honor, if we may instruct the

3   witness to answer the question.

4            THE MAGISTRATE: He's trying to.  Let's allow him.

5   Let's allow him to answer.

6            THE WITNESS: On that day I told the Probation

7   Officer that one of the phones was mine.

8            THE MAGISTRATE: Go ahead.  Continue answering the

9   question.

10           THE WITNESS: Yes.

11  BY MS. HERNANDEZ:

12  Q    Sir, and during the period of November 15 through

13  January 8, just to be clear, November 15, 2023, through

14  January 3, 2024, you were not employed.

15  A    Correct.  I was not able to find a job.

16           MS. HERNANDEZ: One moment, Your Honor.

17  BY MS. HERNANDEZ:

18  Q    Sir, so any contacts that you had with Jose Rivera

19  Torres at that time was not related to any employment.

20  A    At that time my relationship with Jose Rivera Torres

21  had been like before when we didn't have an employment in

22  2022.

23  Q    So specifically from November 15, 2023 through January

24  of 2024, your contact with this individual was not related

25  to any employment, correct?

1  A     I gave him an employment on November 9th but it was an

2  employment that, I mean if I could explain this a little bit

3  to the Court briefly so that they could understand it.  In

4  Guarabi you sign up to perform some tasks.  If you do not

5  want to perform the tasks you have to delegate them, you

6  delegate them.

7      At the time you delegate a task, it's five dollars that

8  you have to pay for the task.  I told Jose that if he wanted

9  to perform my tasks, I would pay him.  He accepted the tasks

10  and I would pay him.  It's an employment.

11  Q   So your association with him was that you employed him

12  to do your tasks at Guarabi.

13  A    Yes, I can employ any person but I trust him because

14  he's a good worker.

15  Q   What type of tasks do you ask him to do for you?

16  A    No, no, no.  These are tasks that Guarabi assigns.

17  Guarabi assigns those tasks to everybody.  You have to

18  perform an obligatory task.  If you cannot or if you do not

19  want to perform the task, you delegate it and I talked to

20  him and I asked him if he wanted to perform the tasks and if

21  he wanted to perform the task, I would pay him five dollars

22  with the Food Stamp card and that's why we went to Econo to

23  buy food.

24  Q   So, as part of that relationship that you established

25  with him, you also went outside of Guarabi to a supermarket

187

1   to purchase food with him.

2   A    It was only once because I was able to pay him only

3   once because I pay him monthly.

4   Q    Sir, and during your stay at Guarabi, isn't it correct

5   that you together with the case manager have had to confer

6   because you are breaking the rules and have not been

7   attending group meetings.

8           MR. LERMAN: Objection, Your Honor, relevance to

9   any charge here and it assumes facts that haven't been

10  presented and it's beyond the scope of direct and really

11  anything that's come out in the case so far.

12          MR. NISKAR: Improper impeachment as well.

13          THE MAGISTRATE: Just give me a second, please.

14  Can you repeat your question once again, AUSA Hernandez.

15          MS. HERNANDEZ: Yes, the question was if during his

16  stay in Guarabi, he had been told by the case manager and he

17  had had conflicts relating to breaking the rules and not

18  participating in group meetings.

19          THE MAGISTRATE: Well, I don't believe that subject

20  matter was covered on direct examination.  So, beyond the

21  scope of direct.  Next question.

22          MS. HERNANDEZ: Your Honor, if we may respond

23  briefly, they did cover his compliance at Guarabi and him

24  leaving or not without authorization or with his conditions

25  and it also goes to his attitude towards supervision which

1   is part of also the supervising process and not following

2   instructions, not complying and he was also asked relating

3   to his general compliance in relation to that.

4           MR. LERMAN: Your Honor, we would object to those

5   as grounds and one, because it's -- we don't think it's

6   factually accurate and two, we object and contest the claim,

7   the generic claim about attitude related to at least as it's

8   described by the government.

9       There's six different allegations here and none of them

10  cover what the government just described and none of them

11  cover the rules of the housing placement and the Court has

12  already seen some major issues with some verbal testimony

13  about somebody hearing, from somebody hearing, from somebody

14  about what the rules might have been over there.

15          MS. HERNANDEZ: Your Honor, in response to that,

16  the Court has not heard testimony about somebody hearing

17  about somebody hearing, about somebody hearing, but

18  what it has heard is the testimony of the Probation Officer

19  who directly supervised and had conversations with the case

20  manager in the center, who was also present during some of

21  the interactions and who has provided monthly treatment

22  reports and all of that has come in as part of the record in

23  this case and defense counsel has had access to that even

24  before this hearing.

25          THE MAGISTRATE: I still maintain my original

1   ruling that I believe that -- you're ready to listen to what

2   I have to say?

3           MS. HERNANDEZ: Yes, Your Honor.  We're listening.

4           THE MAGISTRATE: Okay, well, I have already ruled

5   that it's beyond the scope of the direct.  There was a

6   question on direct examination specifically as to whether

7   there was a meeting on November 15th, on November 15th,

8   between Mr. Negron, the Probation Officer and somebody else

9   from Guarabi.

10      If you want to ask about that meeting, go ahead.  If

11  not, the objection is sustained as beyond the scope.

12          MS. HERNANDEZ: We will move to another inquiry,

13  Your Honor.

14          THE MAGISTRATE: All right.  You can move to

15  another inquiry then.

16          MS. HERNANDEZ: Yes.

17  BY MR. HERNANDEZ:

18  Q   Particularly where you also reprimanding for leaving

19  the center without notifying the staff in charge.

20          MR. LERMAN: Same objection to that that we just

21  made for the other line of questions, Your Honor.

22          MS. HERNANDEZ: Your Honor, this particularly

23  relates to the part about his association, about his

24  compliance and that which has been reported and which he

25  also asked about.

1            THE MAGISTRATE: Well, but leaving without

2     permission is one thing.  Associating with somebody is

3     another thing.  So, I mean, I don't see how a question about

4     leaving without permission has something to do with

5     association.

6            MS. HERNANDEZ: It has to do, Your Honor, in the

7     manner in which he is leaving the center with or without

8     permission and also associating himself with another person

9     outside of the center.

10            THE MAGISTRATE: Well, those are two different

11     questions.  You may ask the latter.

12     BY MS. HERNANDEZ:

13     Q    Sir, were you also leaving the center without

14     permission and in one occasion with Jose Rivera Torres?

15     A    At no point did I leave Guarabi without permission and

16     even less with Jose Rivera Torres because Jose Rivera

17     Torres, he always takes the bus because he doesn't like to

18     walk and I leave walking, on foot.

19     Q    Sir, in your testimony here today you did indicate that

20     you did leave the center with this person, correct?

21     A    The exit was signed.  We got on the bus with the rest.

22     We went to Econo and after that we came back.

23     Q    For how long have you known this person?

24     A    I've known him since 2022 when I hired him to work at

25     Liberty and his Probation Officers knew everything about it.

1    I believe her name was Elsie or Daisy.  I don't remember

2    exactly what her name was.

3    Q    Sir, and as part of your conditions you need to

4    register as a sex offender, correct?

5    A    Yes.

6    Q    This individual does also, correct?

7    A    I don't know what his case is.  I never asked him.

8              MS. HERNANDEZ: No further questions.

9              MR. NISKAR: No redirect.

10             THE MAGISTRATE: You're excused.  Although, of

11   course, you're entitled to remain in the courtroom because

12   you are the defendant.  So, you're excused from the witness

13   box but you are certainly entitled and welcome to remain in

14   the courtroom.

15                      (Witness excused)

16             MS. HERNANDEZ: Your Honor, we would ask that the

17   Probation Officer, he should be coming into the courtroom at

18   this stage also.

19             THE MAGISTRATE: Well, let's first give a chance

20   for the defendant to walk to defense counsel table.  One

21   step at a time.  Okay, are there any additional witnesses

22   that the defense wants to call?

23             MR. LERMAN: No, Your Honor, we don't have any

24   additional witnesses.

25             THE MAGISTRATE: Okay, so then now that the

1    government and the defense have concluded with their

2    presentation of the evidence and for the limited purpose of

3    the preliminary revocation hearing, they have rested.  Let's

4    make sure that all the exhibits are with the Courtroom

5    Deputy Clerk.

6        So, let's take a fifteen minute recess and in fifteen

7    minutes I will be back.  If the attorneys would like to make

8    any arguments, I'll hear you.  Then I'll make a decision on

9    this matter.

10           MR. NISKAR: We were thinking of asking the Court

11   to allow a brief opportunity to brief the violations.

12           THE MAGISTRATE: I think that I would prefer to

13   hear you orally here when we're done.  So, when we reconvene

14   in fifteen minutes.  So, I will give both sides an

15   opportunity to be heard.  If you want to argue as to the

16   particular violations as to why the Court should or should

17   not make a finding of probable cause, both sides will be

18   given an opportunity to be heard. Okay.  So, the Court is in

19   recess for fifteen minutes.

20           (A recess was taken at 4:24 p.m.)

21           (Court back in session at 4:53 p.m.)

22           THE MAGISTRATE: I said that I was going to give

23   you an opportunity to be heard as to any arguments.  AUSA

24   Hernandez, any arguments that the government wishes to bring

25   to my attention before I make a decision?

1          MS. HERNANDEZ: Your Honor, all that we would like

2     to clarify is that at this stage of the proceedings what we

3     are requesting is that the Court find that there is probable

4     cause relating to the violations that have been reported via

5     the motion notifying violations of supervised release and

6     for which we have presented evidence during this hearing.

7          That probable cause determination would encompass the

8     violations from the conditions of supervised release that

9     were imposed in the last judgement of conviction which was

10    November 9, 2023 which is document 429.

11         Pursuant to that judgement, it contains mandatory

12    conditions.  It contains standard conditions and also

13    contains special conditions.  The special conditions, it

14    indicates that it needs to continue to follow the special

15    conditions previously imposed on the defendant.

16         The last judgement of conviction prior to the one

17    thousand docket 429, is the one that was imposed on February

18    7, 2022, which is docket 323.

19         In addition to that, Your Honor, then the violations

20    that are being reported include the following standard

21    conditions which we understand there has been evidence to

22    sustain.

23         Standard condition number 4 that the defendant must

24    answer truthfully the conditions asked by the Probation

25    Officer and there was testimony in relation to the response

1    of not being truthful as the time of the first intervention

2    on December 15, 2023 that then escalates and leads then to

3    the inspection which then lead to finding eventually the hot

4    spots, the smart T.V. and then the smartphone that was found

5    in the residence at that time.

6         THE MAGISTRATE: Which exactly was the statement

7    that was false?

8         MS. HERNANDEZ: The statement relating to him at

9    that moment in time for when first entered the room not

10   indicating that he had no devices.

11        THE MAGISTRATE: No, you mean no electronic

12   devices?

13        MS. HERNANDEZ: No electronic devices, yes, Your

14   Honor, and upon further inspection --

15        THE MAGISTRATE: Who testified as to that?

16        MS. HERNANDEZ: Officer Lozada.  There was

17   testimony and it is also included in the motion that was

18   submitted with the allegations.  As to the standard

19   condition also during the motion it's mentioned and number

20   3, it would be number 7, which relates that the defendant

21   must work full time at least 30 hours per week in a lawful

22   type of employment unless the Probation Officer excuses you

23   from doing so.  If you do not have full time employment, you

24   must try to find a full time employment unless the Probation

25   Officer excuses you from doing so and there was testimony

1  that during that span of time of November 15 to January 3,

2  the probationer was not employed and according to the

3  testimony, was not looking for options to be employed

4  because he understood that the only way to find a job was

5  having a smartphone or having access to the internet.

6      So, during that period, he was not complying with this

7  condition or either having full time employment or looking

8  and making the due diligence to get full time employment.

9  In fact, according to his testimony, he was not even

10  performing the tasks that he was supposed to be doing at

11  Guarabi because he was paying a third party to comply with

12  those tasks and paying him through the money that he was

13  receiving from Food Stamps.

14      As to standard condition number 13, "you must follow

15  the instructions of the Probation Officer related to the

16  conditions of supervision" and that covers all the

17  conditions that he is actually violating and his response

18  and his attitude as to the instructions that are being

19  provided, as to the conditions of supervised release that he

20  has to follow and as to not having the devices that he could

21  not have according to his own conditions.

22      In addition to that, there was reported in relation to

23  special condition number 24, that he shall not associate

24  with individuals who have previously traded elicit material,

25  a family member, a friend under the criminal justice system,

196

1    on vesting a third party setting and with prior approval of

2    the Probation Officer and to that respect the testimony that

3    was provided was his contact with Jose Rivera Torres, who is

4    also a sex offender and according to the testimony that we

5    heard from the Probation Officer, that is information that

6    had been obtained directly from the case manager, who also

7    supervises in the context of the Guarabi facility, who he is

8    associating himself with and also by the admissions of the

9    defendant himself to indicate that he did continue to

10    associate himself with that person and even entered into

11    what he considers to be an employer relationship with him.

12        Then there's special condition 31 and 32, which they

13    relate to each other because 32 is specifically that he

14    shall not possess or use a computer, cellular telephone, or

15    any other device with internet accessing capability at any

16    time or place other than those with systems that will enable

17    the Probation Officer or his or her designee to monitor and

18    filter any internet accessing and that goes together with

19    special condition number 31, that he shall consent to the

20    installation of such system.

21        In this case the testimony is clear that on two

22    occasions he was found with devices, electronic devices that

23    were smartphone, had access to the internet.

24        He had in the first occasion November 15, by his own

25    admission, a hot spot with access to the internet.  He

1    was in possession of the smartphone that was password
2    protected and he was the one that had the password and it
3    was not monitored in any way, shape or form.

4        In addition to that, then on Januar3 3, 2024, again he
5    is found with another smartphone and that smartphone was not
6    the one that had the monitoring systems that were required.

7        As the condition stands, it's not the defendant who
8    decides when and how he can have a smartphone that has
9    internet access capability and then set up a hotspot where
10   he has internet in his room but he did that not only one,
11   but twice.

12       After having been granted the opportunity by the
13   Probation Officer, he took it upon himself to understand
14   that he was not going to comply by the conditions and that
15   he had a right to have that phone and that it was first what
16   he characterized as an Obama phone and then subsequently
17   which was clear, was not compatible with the system for
18   monitoring and then on the second occasion he had another
19   phone that was found in his possession.

20       In addition to that, we take it -- we asked the Court
21   to take into consideration the testimony of both Probation
22   Officers relating to the attitude and character of this
23   defendant while he is being given instructions, asked
24   questions relating to this supervision and the fact that he
25   has demonstrated a conduct where he is unsuperviseable and

1  does not want to follow the instructions that are being

2  provided.

3          THE MAGISTRATE: Which condition does having an

4  attitude violate?

5          MS. HERNANDEZ: Your Honor, not just that he's not

6  having -- the attitude is relating to the interactions that

7  he's having to not complying with the conditions of not

8  having electronic devices and --

9          THE MAGISTRATE: Okay, not following instructions

10  is clearly a condition.

11          MS. HERNANDEZ: Yes, Your Honor.

12          THE MAGISTRATE: But having an attitude, how is

13  that a violation of conditions of supervised release?

14          MS. HERNANDEZ: It's having an attitude towards the

15  supervision specifically.  It's not just that you're having

16  an attitude but of being inquired about the devices that you

17  have and whether you're allowed to have certain devices or

18  not, that you have a negative attitude toward the

19  supervision process.

20          THE MAGISTRATE: Okay, so please tell me, in docket

21  429, which condition does having an attitude towards

22  supervision violate?

23          MS. HERNANDEZ: It relates to standard condition

24  number 13, which says, "you must follow the instructions of

25  the Probation Officer related to the conditions of

1    supervision" and that is one of the most basic conditions

2    that is imposed in terms that in order to be supervised,

3    there are conditions that need to be imposed and here's

4    the supervising officer who indicates and discusses also

5    what are these conditions and how they are not being

6    complied with.

7    We heard testimony from both Probation Officers as to

8    confrontation, defiance, being the defendant the one that

9    says, "ahora fallestes tu".  You're the one that like, you

10   have one that you are wrong already."  So it is relating to

11   that in terms of his supervision, Your Honor, and in terms

12   of that particular special condition but as indicated, the

13   interactions also all relate to the standard conditions

14   relating to him having access to the electronic

15   devices that have no monitoring system because that is

16   precisely what the defendant understands that he does not

17   want to follow instructions on and that he is entitled on

18   his own to decide when and how he can have a smartphone and

19   if confronted on that, then that is the way that he acts in

20   terms of defiance.

21   There was also testimony, although limited in some

22   manner by the Court about his interactions at the

23   Guarabi Center because that also relates to him following

24   instructions.  He was placed there by Probation after having

25   completed his imprisonment term in relation to the prior

1   revocation in November of 2023 and he did have to follow the

2   conditions also related to that center and that was also

3   presented through the testimony, Your Honor.  Duly

4   submitted.

5           THE MAGISTRATE: Thank you.

6           MR. LERMAN: May it please the Court, Judge Lopez.

7   We asked the Court not to find probable cause on any of the

8   six allegations that are before the Court and the first

9   point that we'd like to make before going through the six

10  conditions is that as this court construes these

11  allegations, like any allegation of wrong doing, the Court

12  has to start with the elements and insure that the Court is

13  not enforcing a vague law because a law that's

14  irreconcilably vague is subject to arbitrary enforcement and

15  this Court should construe a number of these conditions with

16  an eye toward a construction that's constitutionally viable

17  and promotes the goals of supervision.

18      I'd like to start with what's hopefully the easiest of

19  these allegations and that's the allegation of some improper

20  association.  On the face of that, there's been no proof

21  presented that this person, Rivera Torres, is a sex

22  offender.  There's been no proof of a friendship.  There's

23  been no proof of the requisite mens rea possessed by Mr.

24  Negron.

25      Mr. Negron testified and we think that the Court should

1    find that credible that Mr. Negron didn't ask Rivera Torres

2    what his crime was and in any case, there's an issue of just

3    a basic notice.  Any of these revocations need factual

4    notice under Rule 32.1b1b.  That's a Constitutional

5    requirement.

6        There's not an allegation as to a specific deed that

7    we're defending against. There's an allegation that these

8    two gentlemen left a structured housing environment

9    together.  I don't think there's no dispute that they were

10   on a Guarabi provided transportation on this occasion.  If

11   this occasion is during the time that Mr. Negron was under

12   supervision.

13       Anything before the Court has to be, in order to be a

14   violation, has to be a violation of conditions that were

15   provided when Mr. Negron was released on November 9th and

16   so, there should be no probable cause for the association

17   condition.

18       Employment, there's an allegation in testimony at one

19   point that the officer stated and I don't have the exact

20   wording, but the officer stated that he offered a number of

21   alternatives to Mr. Negron.

22       Mr. Negron was in a housing shelter temporarily, a

23   temporary shelter, and the Court has already heard and has

24   in the record un-rebutted information that Mr. Negron had

25   applied to longer term housing and had been accepted.

1    So, if this wasn't completely excused by Probation

2    which on the face of the condition, a lack of employment can

3    be excused.  The United States has a bad history with

4    vagrancy laws that punish somebody for not working and the

5    only thing that protects this condition from that history is

6    construing it strictly and so the Court would really have to

7    hear something a lot more precise that other than Mr. Negron

8    was told that he could, you know, go to town or take a bus

9    somewhere and apply for more jobs, other than go through

10   this process and he was also engaging, there's testimony and

11   I'll discuss that more when we get to the first allegation

12   of truthful answering and the allegations related to

13   consenting to installation of the systems.

14   Mr. Negron engaged with this process.  There's

15   testimony that that engagement wasn't perfect.  Some of us

16   in these hearings sometimes we get animated when we think

17   that we're right about something and Mr. Negron has been

18   through some difficult situations.

19   He doesn't excuse that and yet it provides context to

20   how the Court evaluates whether there's probable cause to

21   any of these conditions.

22   So, our position is that there's no probable cause for

23   this working condition either because it was excused or it

24   was simply, there's an issue of necessity whether it's

25   essentially a de minimis charge.

1    All of these charges have to be viewed with an eye

2    toward pragmatic interpretation and they have to allege and

3    prove a fact of consequence related to them.

4    I'd like to address charge one, what's written on the

5    accusatory document as standard condition number 4, together

6    with special condition what's written in the accusatory

7    document 439 is number 31, about the consent to install

8    systems and number 32, about the prohibition of devices

9    unless they can be monitored appropriately by Probation.

10   I'd like to address those together.  We've heard testimony

11   about a number of dates with some pretty large gaps in

12   between and we heard testimony from the Probation Officers

13   about what sounds like an emotionally taxing interaction on

14   November 15th.

15   What was added without dispute from the government by

16   Mr. Negron is that after the November 15th meeting in his

17   bedroom, that he went downstairs, he talked to the Probation

18   Officer, he talked to the social worker in the home.

19   The Probation Officer said, "give me two days and I'll

20   work on this and I'll get your phone activated" because

21   Probation recognized, even though these tools aren't perfect

22   and we don't have -- what the Court doesn't have is any

23   documentation before it about what this third party company

24   demands.

25   What is a compatible phone?  How does this process go

1    forth?  What arrangements were made by Probation to get

2    these phones activated but nevertheless, we have this

3    meeting going on on November 15th and we have this follow-up

4    from the attorney who represented Mr. Negron in his last

5    revocation which is under appeal and we have this follow-up

6    and he says, "oh, okay."

7        So this phone that Officer Lozada confiscated is not

8    completely contraband.  It's described as contraband but

9    it's provided back with part of this process because again

10   and we have to recognize the defense of necessity is pretty

11   well placed in revocations and the concept of a de minimis

12   violation is pretty well placed because somebody has to get

13   a device.

14       Does Probation go shopping with somebody who needs to

15   purchase a device?  Do they get a window of time?  Is it

16   like when CESCO gives you a temporary permission to take

17   your car to get it to pass it through the emissions check?

18   We don't know, we don't know what that process is and I

19   don't think, based on the testimony.

20       I think the testimony supports a pretty reasonable

21   inference that the people doing the day to day probation

22   work don't quite understand this and we see a lot of

23   confusion and we see Probation Officer Lozada, he's

24   undergone courses.

25       I don't completely understand what these courses were

1   but he's undergone courses to supervise people who suffered

2   convictions of sex offenses.  This is a sex offense that is

3   from 14 years ago and yet these conditions apply and

4   technology changes over time.

5       So, if somebody has a phone that's an inexpensive phone

6   that's by a Chinese manufacturer and that doesn't fall under

7   what the private company will certify and monitor, well,

8   apparently that doesn't cover it.

9       What's indicated here in terms of monitoring which I

10  think is subject To vagueness and pre-arbitrary enforcement

11  is, we have an allegation that says and I'm just looking at

12  the accusatory document but in the sixth of these conditions

13  it says, it prohibits possession or use of any of these

14  computers or phones except with systems that will enable

15  Probation to monitor and filter internet accessing.

16      Okay, we've had Probation take phones.  The Probation

17  Officer took the phones, took them to his home, did the

18  inspection.  We don't have any information that it's not

19  consistent with the protocols.

20      They sound like some pretty unusual protocols that he

21  has to take into his home and there's not somebody that's an

22  expert on computers, dealing with them and once that's

23  completed, we have a return of the phone to Mr. Negron.

24   Whether that falls under the letter of these conditions on

25  which dates the government, it's unclear whether they allege

1    an on-going violation through all these dates.  It

2    definitely wasn't a violation, it definitely wasn't in

3    violation status when Officer Lozada gave Mr. Negron back

4    the phone.

5        If he gives Mr. Negron the phone, then he's not

6    committing a violation because that's provided to him.  Was

7    it violation status once the company said, "you know what,

8    it doesn't work for us."  Is there a list of phones that

9    work for them, we don't know.

10       Truthfully answering questions, you have some various

11   allegations.  We ask that the Court not give any weight to

12   the unsworn narrative that the government referenced at

13   document 39 for the reasons we stated in our objection.

14       We ask that the Court not give any weight to the issues

15   that -- the testimony where we objected on confrontation

16   grounds because there's especially, after hearing the

17   questions, there's no basis for applying the 32.1 Valentin

18   test to admit that stuff and it didn't show any markers of

19   reliability.

20       So, we have some back and forth and we have Mr. Negron

21   who was pretty clear that certain conditions don't apply to

22   him and the very start of the interaction is, "I'm going to

23   have you urinate in this cup.  We're going to the bathroom

24   together.  I'm going to close the door and I'm going to

25   watch you urinate in this cup and I'm going to test it" and

1  he said, "you know what, that invasion of personal privacy

2  is not among my conditions."  So, let's talk about the other

3  ones.  Does he need to respond with more tact?  Yes, and he

4  wants to sit down and go through a mediation process, if

5  possible, with Probation so that they can work out a mutual

6  solution and figure out how this monitoring condition can be

7  applied.

8      Is that a violation?  Is any of that conduct in these

9  conversations that happened in and outside Mr. Negron's room

10  a violation in an important respect?  We respectfully ask

11  the Court to find that the conversations discussed and the

12  alleged conduct that's been talked about today, is not

13  probable cause of any of these violations and we thank this

14  Court for the opportunity to provide an impartial

15  preliminary hearing and independent of any finding of

16  probable cause, we'd just like to reiterate the most

17  important thing to Mr. Negron, is that there's a resolution

18  reached so that he can have basic access to the internet for

19  the needs that he and pretty much everyone else in 2024 have

20  for that access.  Thank you, Your Honor.

21      THE MAGISTRATE: Thank you.  This is my decision

22  regarding this particular matter.  I will start by saying

23  this very briefly.  Although some of the matters that I have

24  heard today and seen today during this hearing, I believe

25  are relevant regarding the dispute between the parties as to

1  matter of bail, I am going to refrain from making any

2  expressions or any opinions because I believe that I'm not

3  with jurisdiction at this moment.

4      There is a notice of appeal that is pending before

5  Judge Besosa.  So, I am not going to make any expressions

6  one way or the other as to that particular matter out of

7  respect of the pendency of that appeal.

8          MR. NISKAR: May I, Your Honor, if I can just add,

9  even if I think I would have to research that issue, so I'm

10 not saying that I disagree but I checked the way I generally

11 understand especially if a case is on appeal to the Circuit,

12 a lower court can issue an indicative ruling and we could

13 provide the Court with that indicative ruling if the Court

14 does have a position.

15         THE MAGISTRATE: Well, at this moment, again out of

16 respect for the process, all I'm going to say is that I

17 believe that some, I'm not saying everything but some of the

18 matters that I've heard here today I believe do shed some

19 light on the areas of, for example, risk of flight and

20 danger to the community but out of respect for the fact I

21 also notice on the docket that Honorable Judge Besosa has

22 already scheduled a hearing regarding that particular

23 matter.

24      So I think that the most prudent course of action is

25 for me to refrain from expressing an opinion one way or the

1    other as to that particular matter out of respect for the

2    fact that that matter is right now under the consideration

3    of Honorable Judge Besosa.

4        Now, having said that, having said that, let's now

5    address the matter at hand and I would like to start with

6    some procedural matters or at least threshold matters.

7        As I said at the beginning of the hearing, I have

8    proceeded with this preliminary revocation hearing because

9    at least as of today I'm not aware of any order from either

10   the Court of Appeals from the First Circuit or from Judge

11   Besosa staying the proceedings.

12       Now, as to the threshold matters, I would like to

13   address several matters.  First, either directly or

14   indirectly during the hearing there were some questions

15   raised as to whether a Probation Officer had or didn't have

16   the authority to conduct home inspections and I believe that

17   the officers testifying distinguished a home inspection from

18   a search because a home inspection, according to their

19   testimony, they can look but they cannot touch or move

20   things.

21       They cannot touch or move things, for if they want to

22   touch or move things, then they would need reasonable

23   suspicion of contraband or a violation et cetera in order

24   for them to go into a search mode.

25       So, clearly the Probation Office does not consider to

1  be the same thing, a home inspection or a search.  Now, the

2  question is, can a Probation Officer conduct a home

3  inspection and I conclude in the affirmative, yes, the

4  Probation Officer can and, for example, in docket 429 the

5  Judgement in docket 429 on page 5, standard condition number

6  6, it indicates, "you must allow the Probation Officer to

7  visit you at any time at your home or elsewhere and you must

8  permit the Probation Officer to take any items prohibited by

9  the conditions of your supervision that he or she observes

10 in plain view."

11      Well, that is home inspection, the authority to conduct

12 a home inspection, not a search which is different.  For a

13 search there needs to be -- there's a different requirement.

14      So, I would like to start by saying that I do make a

15 finding that the Probation Officer did have the authority to

16 conduct home inspections and there's nothing in these

17 conditions that say that home inspections can only be

18 conducted once, that it can only be one day.

19      A home inspection can be conducted more than one day.

20 So, I wanted to at least address that issue from the outset.

21      Now, there's another threshold issue that I wanted to

22 address before I go into the specific alleged violations and

23 at some point during the examinations of the witnesses, it

24 came to there was a line of questions along the lines of

25 whether on the 15th of November of 2023, that was the first

1  day that Mr. Negron was able to meet Officer Lozada and
2  whether that was the first day that he actually, they sat
3  down and went over the conditions and whether Mr. Negron
4  signed them on that day.

5       Well, I don't think those questions are irrelevant
6  because in order for somebody who is under supervision, that
7  person needs to first be aware of what are the conditions.

8       Okay, and perhaps an argument can be made, well, there
9  is no evidence that, for example, he signed the conditions
10 before the 15th of November or that the conditions were
11 explained to him before the 15th of November or that he was
12 aware of the conditions before the 15th of November.
13 However, regardless of the exact date of when Mr. Negron
14 signed those conditions, his testimony here in court, Mr.
15 Negron's testimony strongly suggests that he was well aware
16 of his conditions.

17      For example, I'll mention just a few.  I'm not going to
18 give here an exhaustive list.  For example, Mr. Negron
19 testified that as to the matter of whether a urinalysis
20 could be done because at least he was under the impression
21 that Officer Lozada wanted to conduct a urinalysis, that
22 that was not one of his conditions.

23      Well, actually it turns out that he's right.  When you
24 look at page 6 of docket 429, where it says special
25 conditions of supervision and I read, "Mr. Negron Cruz shall

1   continue under the same conditions previously imposed on him

2   except that the condition of drug testing is eliminated."

3      Well, that suggests somebody who is well aware of his

4   conditions.  Let me mention another example.  During his

5   testimony Mr. Negron also testified that when Officer Lozada

6   asked to enter the room, that he allowed him to enter the

7   room because otherwise he felt that he would be in violation

8   of his conditions of supervised release.

9      Well, it turns out that once again Mr. Negron is right

10  under standard condition number 6, which I read a few

11  moments ago on page 5 of docket 429, he would have to give

12  permission for Officer Lozada to conduct a home inspection.

13     I'll give one example, one additional example of Mr.

14  Negron's testimony but again, I don't mean here to give an

15  exhaustive list.  That's not the intent.  I'm just trying to

16  provide some context as to my conclusion.

17     Mr. Negron testified that when asked by the Probation

18  Office, he always provides the password or passcode to the

19  electronic device because if he refuses, then that would be

20  a violation.

21     Well, if you look at special standard condition number

22  31 and I'm only going to read -- I'm not going to read the

23  entire special condition but I will mention a few.  It says,

24  I'm sorry, just one portion.  I'm not reading the entire

25  special condition.  It says, "Mr. Negron shall immediately

1  notify --" I'm reading from page 2, docket 429, special

2  condition number 31.

3      Again I'm not reading the entire special condition,

4  only the pertinent portion.  "Mr. Negron shall immediately

5  notify the Probation Office upon registration for access to

6  any website or service that allows for communication with

7  other users, uploading or downloading files, posting of any

8  material.  Notification shall include the site address, user

9  name, password, pseudonyms and log ons."

10     Well, Mr. Negron is right once again.  That shows that

11 he was actually quite knowledgeable of what his conditions

12 were.

13     So, I do make a finding that the defendant was aware of

14 his conditions of supervised release when the alleged

15 incidents in controversy transpired.  Now, the question is,

16 did he comply with them?  Were there any violations to his

17 terms and conditions of supervised release?

18     I'm going to start with the allegation of the special

19 condition that the defendant shall not associate with

20 individuals with whom he has previously traded illicit

21 material.  Well, I don't have any evidence here of Mr.

22 Negron associating with somebody with whom he has traded

23 illicit material.

24     Now, the condition continues by saying that he shall

25 not associate with a family member or friend under criminal

1    justice supervision for a sex offender crime.

2        Now, let's stop right there.  There has been testimony

3    that the defendant has been associated with a subject by the

4    name of Jose Rivera Torres and there has been some

5    testimony, at least from one of the Probation Officers

6    that this person is a sex offender.

7        Now, but there are several problems here with this

8    allegation that need to be addressed.  The first one is if,

9    for example, on the date that allegedly they left together

10   Guarabi in the bus, well, if there's a process at Guarabi,

11   where they have to check and request permission to leave?

12   Well, if Guarabi knows that these two persons are two sex

13   offenders, why did Guarabi allow them to leave together in

14   the same bus?  I have not received any explanation for that.

15       The second thing is this?  What evidence is there here,

16   what evidence has been introduced that Mr. Negron was aware

17   that Mr. Rivera was convicted of a sex offense?

18       What evidence have I heard here today about that?

19   Nothing.  There has been evidence that Mr. Rivera is

20   convicted of a sex offense, yes.  I believe that at least

21   one of the two Probation Officers testified to that effect

22   but the question is, what testimony has been introduced here

23   today to establish that Mr. Negron was even aware that Mr.

24   Rivera was convicted of a sex offense?  I haven't heard

25   anything here today to that effect.

1       But here comes the third reason and perhaps the most
2   baffling one, or the third factor.  The U.S. Probation
3   Office places both Mr. Negron and Mr. Rivera to live in the
4   same place.
5       So, the U.S. Probation Office puts two sex offenders,
6   two persons who have been convicted of sex offenses to live
7   in the same place and now they allege that Mr. Negron is
8   unlawfully associating with somebody who lives in the place
9   that Probation put right there.  Frankly, this sounds to me
10  like the left hand doesn't know what the right hand is
11  doing.
12      Yes, Mr. Negron admitted that they both went out, I
13  believe to an Econo grocery store.  I don't even know the
14  exact day because I don't recall any specific date given
15  but, yes, he admitted that but that does not cure any of the
16  three problems that I have just mentioned here and for that
17  reason, I do not find probable cause that Mr. Negron
18  unlawfully associated with a convicted sex offender.
19      Now, let us continue with the analysis.  The matter
20  about the defendant not being working full time.  Well, I
21  think that Mr. Negron was quite candid that he was
22  unemployed.  He testified to that effect.
23      Now, there are two components here to this analysis.
24  On the one hand I frankly don't know since when this issue
25  of lack of compatibility between a device and the phone and

216

1    the monitoring system of Probation is there, I don't know.

2    I don't know if this is a recurring problem, a long term

3    problem, a systemic problem or an isolated problem that has

4    only happened here in this case.  I don't know and I'm not

5    going to speculate.

6        If it's a systemic problem, well that there's a

7    constant problem of compatibility, well, then this is

8    something that needs to be evaluated deeper because then for

9    all practical purposes, a defendant would never be able to

10   have a phone.

11       Because if there's a constant problem of lack of

12   compatibility, well then Probation will never be able to

13   monitor.  However, I don't know, maybe it's not a systemic

14   problem.  Maybe it has been working fine with many other

15   people but with this particular defendant and his device, it

16   hasn't.

17       Well, this perhaps is more than anything else, food for

18   thought as to how to deal with this condition of monitoring,

19   putting in monitoring on a device.  However, I do make a

20   finding of probable cause that the defendant has not met

21   with this condition and this is the reason why.

22       The Probation Office offered Mr. Negron two

23   alternatives.  One of them was to do supervised internet

24   with the case manager.  Well, the other alternative was to

25   go out in person and look for a job.

1      Well, I understand that particularly nowadays, that

2   could present an inconvenience, a hurdle in trying to be

3   able to find a job, not being able to do it from the

4   internet.

5      It might be easier to look for a job if you have access

6   to the internet.  I understand that and I empathize with

7   that but the reality is that at least until the problem of

8   the monitoring of the phone and the internet have been

9   solved, well, at least in the meantime the defendant had

10   been offered alternatives, perhaps inconvenient but they're

11   nonetheless alternatives.

12      Go out in person to look for a job or otherwise do

13   supervised internet with the case manager, internet search

14   with a case manager and the defendant refused both

15   alternatives.

16      So, for those reasons, I do make a finding of probable

17   cause that the defendant failed to meet the condition which

18   appears, a standard condition which although the motion says

19   number 3, I believe that that is a typographical error.  I

20   believe that if you look at the conditions, it's number 7.

21   It's standard condition number 7 but in any event, the

22   substance, the wording of the allegation is nonetheless

23   there and I do make a finding of probable cause that Mr.

24   Negron has failed to comply with standard condition number

25   7.  That is the one about seeking full time employment.

1    Nonetheless, I do want to say as a side note that I

2    understand the difficulties of trying to find a job just

3    going out in person and without having a car. That's not

4    easy. That's not easy and I understand Mr. Negron, how

5    inconvenient that is for you. I'm not saying that it is

6    ideal.

7         I would have much preferred that the compatibility

8    issue of monitoring had been solved. But even then they

9    offered you an alternative and that was supervised internet

10   searches with a case manager. So, I do make a founding of

11   probable cause as to that particular violation.

12        Now, let us proceed. I will proceed now with special

13   condition number 32. I'm looking specifically in docket

14   429, page 2, special condition number 32 and I quote. It

15   reads as follows: "He does not possess or use a computer,

16   cellular telephone or any other device with internet access

17   and capability at any time or place other than those with

18   systems that will enable the Probation Officer or his or her

19   designee to monitor and filter any internet accessing."

20        Well, I would like to start by the following. Much has

21   been said here about smart T.V. and an Xbox but frankly the

22   motion filed by the Probation Office doesn't really make a

23   big deal about that at all. In fact, I'm not even sure that

24   it even mentions it.

25        The motion filed by the Probation Office, however, does

1  allude specifically to three items, a black Android BLU,

2  smartphone with access to the internet and charger.  Number

3  two, a black Franklin Wireless hotspot and charger and

4  number three, a score 17 touch pad device.  Says provided

5  while under BOP custody.

6      Well, I will start backwards.  I'm going to start with

7  the touch pad, the one that was for our BOP.  I believe that

8  the testimony here today was that it did not have access to

9  the internet and I don't recall any testimony specifically

10  regarding that particular tablet about any internet

11  accessing capability.

12      So, as to item number 3, yes, there was evidence that

13  he had it but the condition is about items with internet

14  accessing capability, okay, and that was not the testimony.

15  Yes, there was testimony here about him having the device,

16  there was but not about having internet accessing

17  capability.

18      So, as to the touch pad device, I do not find probable

19  cause.  However, I do make a finding of probable cause that

20  the defendant violated special condition number 32 for

21  possession of the Android smartphone and the black wireless

22  hot spot and their respective chargers.  As to that, I do

23  make a finding of probable cause.

24      Now, there's something else that needs to be said

25  because remember that we had two different interventions --

1  interventions is not the right word.  Please allow me to

2  correct myself.

3      Two visits.  There was one on the 15th of November but

4  then there was another visit down the road regarding I

5  believe it was on the third of January of 2024, and here

6  there were three devices but two -- one of the three phones

7  would actually provide internet to the other two.

8      Well, I'm not going to split her hairs here.  Whether

9  one phone was acting as a sort of a hot spot for the other

10  two phones, it doesn't matter.  Even if the defendant only

11  owned one of the three phones and the other two belonged to

12  somebody else, the fact is regardless of whether the one

13  that Mr. Negron had in January of 2024, regardless of

14  whether it was the one that belonged to -- whether the one

15  that belonged to him had access on its own to the internet

16  or was relying on the other, on another phone to give him

17  access to the internet, the bottom line is that the phone

18  that he had, had access to the internet, either directly on

19  its own or by means of another phone that was operating as a

20  hot spot.

21      So, to sum it up, regarding special condition number

22  32, I do make a finding of probable cause that special

23  condition number 32 was violated for on the 15th of

24  November, possession of an Android smartphone, also for

25  possession of a hot spot and their respective chargers and I

1    also make a finding that regarding the January 2024, at

2    least one of the three phones, at least one of the three,

3    had access to the internet, was in his possession and either

4    access to the internet on its own or by relying on the

5    connectivity of another phone.

6        These findings are also directly related to special

7    condition number 31, which also appears in the motion.

8    However, I have to be careful here with special condition

9    number 31 because special condition number 31 as written in

10   the motion, contains a lot of different information and I

11   think that we have to be careful here because, for example,

12   the last sentence I'm reading specifically on docket 439

13   special on page 2 of the paragraph that says, Special

14   Condition number 31.  The last sentence says Mr. Negron

15   shall contribute to the cost of the monitoring service based

16   on his ability to pay.  Well, if he's unemployed, he has no

17   ability to pay.

18       So, I don't think that it would be fair to find -- to

19   make a finding of probable cause of him violating special

20   condition number 31 for failure to contribute to the payment

21   of the monitoring device.

22       You see but that's only one segment of special

23   condition number 31.  Special condition number 31 and I'm

24   going to focus now on the more relevant portion which I

25   believe I read before.  It says, "Mr. Negron shall

1    immediately notify the Probation Officer upon registration

2    for access to any website or service that allows for

3    communication with other users uploading or downloading of

4    files, posting of any material, et cetera.  That a vacation

5    shall include the site address, user name, password,

6    pseudonym and logins, but it is not limited to social

7    networks, cloud sources, message boards, et cetera."

8         Well, Mr. Negron had to first request permission in

9    advance to have a device connected to the internet, not

10   after the fact but in advance and but even if he had gotten

11   the device connected to the internet or with access to the

12   internet, he must have immediately notified the Probation

13   Office of any passwords or log ons, et cetera and he did

14   not.

15        Now, I heard testimony along the lines of "well, this

16   was just an emergency smartphone."  Well, it's

17   understandable for somebody to want to have a smartphone for

18   emergencies, however, there is nonetheless still a

19   requirement.  There's still a requirement and there's

20   nothing in these special conditions that says, "well, you

21   can do that if it's an emergency device.  If it is not an

22   emergency device you don't have to do it."  Well, but that's

23   not the way the conditions are written.

24        So, I do make a finding of probable cause that the

25   defendant has violated special condition number 31 but only

1    in the portion that I have indicated.  Okay.

2         Standard condition number 13, I believe this condition

3    is on page -- well, actually it's repeated twice in docket

4    429.  If you look at docket 429, standard condition number

5    13 on page 5, it says, "you must file the instructions of

6    the Probation Officer related to the conditions of

7    supervision" and but if you look at page 2, well, standard

8    condition number 13 is repeated again on page 2.

9         MR. NISKAR: Just for clarification, page 2 is

10   listing the violations that were enumerated in the previous

11   judgement prior to November 9, 2023.  So, those violation

12   numbers on page 1 of 6 and 2 of 6 that Judge Besosa found

13   violations of 4, 6, 7, 13, 31 --

14        THE MAGISTRATE: You're correct, you're correct.

15   I stand corrected.  Thank you, AFPD Niskar.  But nonetheless

16   on the motion filed by the Probation Office, they do bring

17   to the attention of the Court standard condition number 13

18   and if you look at the standard conditions, you can find

19   them also on page 5.  But your clarification is duly noted

20   as to standard condition number 13.

21        MS. NISKAR: They would also relate to 31 and 32 as

22   well.

23        THE MAGISTRATE: Well, I understand what you're

24   saying but you also need to look at the last page of page 6.

25   It says special conditions of supervision.  It says, "Mr.

1    Negron shall continue under the same conditions previously

2    imposed on him except the condition regarding drug testing."

3        So, that incorporates the special conditions.  Okay,

4    so, but nonetheless, I do appreciate Mr. Niskar you bringing

5    this to my attention but by virtue of the language on page

6    6, those special conditions are part of his current

7    conditions of supervision.

8        Now, as to following the instructions of the Probation

9    Officer, I am going to -- I do make a finding of probable

10   cause that that condition was violated but let's try to

11   distinguish one thing from the other.

12       Simply having an "attitude" however you want to define

13   that, that in and of itself is not necessarily, does not

14   necessarily arise to the level of failure to follow the

15   instructions of a Probation Officer.

16       Of course, we always hope that there by good

17   communication and good attitude from both the Probation

18   Officer towards the person under supervision and the other

19   way around, from the person under supervision to the

20   Probation Officer.  But in the end what we want to know is,

21   did he follow the instructions, yes or no, and on more than

22   one occasion he did not do so.

23       You know, he was offered alternatives to seek for a

24   job, he did not do so.  He was told about not being able to

25   access, have devices with access to the internet and yet in

1  January of 2024 he was found again, yet with a device with

2  access to the internet.

3      So, I do make a finding of probable cause that standard

4  condition number 13 has been violated and I think that the

5  one that remains is really standard condition number 4 and

6  it says "you must answer truthfully the questions asked by

7  your Probation Officer."

8      Well, here's perhaps of all the ones that I've had to

9  analyze, the one that is a little bit of a closer call.  I

10  think that in some areas there has been a little bit of a

11  misunderstanding.  For example, the whole thing about the

12  Obama phone.  Well, I think that Mr. Negron gave a

13  reasonable explanation here today on the stand.

14      You know, in other words, it's not that he was trying

15  to be sarcastic or defiant to Officer Lozada, when he said,

16  "this is an Obama phone."  He said he didn't mean that the

17  phone belonged to former President Barack Obama.  What he

18  meant was that this was simply a phone that was provided

19  presumably under some kind of program that allows for either

20  free phones or phones with access to the internet or

21  something along those lines.

22      So, again I don't -- I mean that particular incident,

23  for example, doesn't strike me as something where the

24  defendant was trying to be purposely defiant or was trying

25  to be untruthful or even sarcastic to Officer Lozada.

1    On the other hand, there are other things that are more

2    problematic.  Perhaps the one that would be of concern among

3    other incidents that we're testifying here today is that at

4    the beginning on November 15, 2023, although eventually the

5    defendant did acknowledge that he had a smartphone, that was

6    not forthcoming.

7    I believe that at the beginning there was a denial but

8    then eventually there was an acknowledgment.  So, I do make

9    a finding of probable cause that defendant violated standard

10   condition number 4, although I think that -- I say this with

11   a word of caution.

12   Let's put it this way, compared to other violations

13   that I've seen here, the evidence appears to be stronger

14   regarding the other violations than this one in particular.

15   I am concerned that some of the incidents appear to be

16   more of misunderstandings than anything else.  However,

17   because of what I previously explained, particularly

18   regarding the November 15 incident, I do make a finding of

19   probable cause as to that matter.

20   Therefore, this matter is respectfully referred to the

21   attention of Honorable Judge Besosa for a final revocation

22   hearing for the reasons that I have indicated.

23   I do make a finding of probable cause as to violations

24   to standard condition number 4, standard condition number 7,

25   standard condition number 13, special condition 31 and

1  special condition 32 with the specifics that I articulated.

2      I do not make a finding of probable cause regarding

3  special condition number 24 regarding the unlawful

4  association.  As to that I do not make a finding of probable

5  cause.

6      This matter is referred to the attention of Judge

7  Besosa for a final revocation hearing and that is the

8  decision of the Court.

9      Counsel, I believe that you have handed already the

10  exhibits but if by any chance any of you has any of the

11  exhibits of this hearing, please make sure that they remain

12  here with the Courtroom Deputy Clerk before you exit.  This

13  concludes these proceedings. You may withdraw.

14          MR. NISKAR: Thank you, Your Honor.

15          MR. LERMAN: Thank you, Your Honor, have a nice

16  evening.

17          (The hearing ended at 6:03 p.m.)

18

19

20

21

22

23

24

25

228

1    U.S. DISTRICT COURT)

2    DISTRICT OF PUERTO RICO)

3

4         I certify that this transcript consisting of 228 pages

5    is a true and accurate transcription to the best of my

6    ability of the proceedings in this case before the Honorable

7    Magistrate Judge Marcos E. Lopez, on February 12,2024.

8

9

10

11

12   S/Boabdil Vazquetelles

13   Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25